**VALLE MAKOFF LLP**
JEFFREY B. VALLE (State Bar No. 110060)
   jvalle@vallemakoff.com
KATHERINE BALATBAT (State Bar No. 196758)
   kbalatbat@vallemakoff.com
11911 San Vicente Blvd., Suite 324
Los Angeles, California 90049
Telephone:    (310) 476-0300
Facsimile:    (310) 476-0333

Attorneys for
Harbor Performance Enhancement Center, LLC

# UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| HARBOR PERFORMANCE ENHANCEMENT CENTER, LLC, a Delaware limited liability company,<br><br>Plaintiff,<br><br>v.<br><br>CITY OF LOS ANGELES HARBOR DEPARTMENT; CITY OF LOS ANGELES; INTERNATIONAL LONGSHORE AND WAREHOUSE UNION; INTERNATIONAL LONGSHORE AND WAREHOUSE UNION LOCAL 13; and EUGENE D. SEROKA,<br><br>Defendants. | Case No.<br><br>**COMPLAINT FOR VIOLATION OF SHERMAN ACT, UNFAIR LABOR PRACTICE, BREACH OF CONTRACT, BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING, AND DECLARATORY RELIEF**<br><br>**JURY TRIAL DEMANDED** |

1

## **TABLE OF CONTENTS**

2

Page

NATURE OF THE ACTION ........................................................................ 3

JURISDICTION AND VENUE .................................................................... 7

THE PARTIES .............................................................................................. 7

NOTICE TO THE CITY ............................................................................... 9

FACTS COMMON TO ALL CLAIMS …..................................................... 9

A.    The Port Selected HPEC's Transformational Plan ........................... 9

B.    The Port Agreed To Negotiate In Good Faith And
      Exclusively With HPEC ................................................................. 10

C.    The ENA Was Amended To Extend The Exclusivity Period
      And Two MOUs Were Executed ..................................................... 12

D.    The MOUs Obligated The Port To Act In Good Faith And Did Not
      Restrict Drayage To The ILWU ..................................................... 13

E.    The Port's Public Statements Led HPEC To Believe It Supported
      The Project....................................................................................... 14

F.    HPEC Initiated Marketing Efforts That Were Intended To Result In
      Substantial Income To HPEC ......................................................... 15

G.    The Port Continued To Develop The Project With HPEC ............. 15

H.    Executive Director Seroka's State of The Port Address Included
      HPEC As A Highlight ..................................................................... 16

I.    The Port Delayed The Start Of The Pilot Study ............................ 16

J.    HPEC Raised The Financing Needed For The Project ................... 17

K.    The Port Repeatedly Met In Secret With The ILWU
      And Local 13 About HPEC.............................................................. 18

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

L.   In April 2018, The Port Claimed In Bad Faith That
     The Amendment Still Needed Board Approval ............................................... 19

M.   The Port Demanded HPEC Give Exclusive Intra-Port Drayage To
     The ILWU ...................................................................................................... 20

N.   The ILWU Demanded Exclusive Jurisdiction Over Intra-Port Drayage
     From HPEC .................................................................................................... 21

O.   Seroka Extorted Rent Payments From HPEC To Pressure HPEC ............... 23

P.   The Port Reported To The Mayor That HPEC Was Off Track
     Due To Labor Issues With The Union But Falsely Reported
     The Port Still Intended To Go Forward With The Pilot Study ..................... 24

Q.   The Port Provided False Reassurances To HPEC While
     Conspiring With The ILWU To Kill The Project ......................................... 25

R.   Seroka Invalidly Terminated The Port's Agreements With
     HPEC As Part Of Defendants' Conspiracy To Restrain Trade And The
     Secondary Boycott ....................................................................................... 27

S.   After Wrongfully Terminating HPEC's Rights, The Port Pursued A Deal
     With An ILWU Ally To Develop The Project Site ...................................... 29

SPECIFIC CLAIMS ................................................................................................. 30

PRAYER FOR RELIEF ............................................................................................ 35

DEMAND FOR JURY TRIAL ................................................................................. 36

**NATURE OF THE ACTION**

1.      With the coronavirus pandemic gripping our nation, it is more important than ever that our nation's supply chain and cargo movement chain run as efficiently as possible.  The Ports of Los Angeles/Long Beach, known as America's Trade Gateway, are the busiest ports in the Western Hemisphere and supply the nation with roughly 40% of its imported goods.  But the Ports have been plagued for years with severe congestion.  Plaintiff Harbor Performance Enhancement Center, LLC ("HPEC") developed an innovative plan to improve overall port efficiency by repurposing unused Port property into a container staging hub.  HPEC invested years and millions of dollars into what was billed by the Port of Los Angeles as its "signature project."  This case arises from the wrongful termination of the HPEC project as a result of a conspiracy between certain corrupt union leaders and Port officials and seeks relief under federal law for Defendants' violation of the Sherman Act and unfair labor practices as well as state law for Defendants' breach of contract and breach of the implied covenant of good faith and fair dealing.

2.      The project started in 2015, when the Port invited proposals from the development community to develop and operate a terminal support facility on a 110-acre site at Terminal Island that had been vacant for more than 10 years.  Following a competitive process that involved multiple bidders, on October 28, 2015, the Port selected HPEC as the "superior proposer," finding its proposal most responsive to its stated goals to enhance cargo velocity and relieve congestion on Terminal Island.

3.      HPEC and the Port first negotiated and executed an exclusive negotiating agreement (the "ENA").  The ENA was of critical importance to HPEC because it required the Port to "act in good faith" and not to engage with any other party regarding use of the property.  After a few months, the parties recognized that the term of the ENA would need to be extended and agreed to extend it until the lease agreements were finalized or the project was determined to be "infeasible."

The Los Angeles Board of Harbor Commissioners (the "Board") gave the Port's Executive Director the green light to proceed, the City Attorney approved the amendment as to form and legality, and the parties executed the amendment. The important promises in the ENA and the amendment induced HPEC to spend thousands of hours and millions of dollars on the project and enabled HPEC to raise hundreds of millions of dollars in funding for the project.

4.     For years, HPEC devoted significant effort and resources and worked diligently with Port staff, the environmental community, shippers, labor, marine terminal operators and other stakeholders to move the project forward. In March 2018, HPEC raised $130 million of financing from the largest global investor in infrastructure, Macquarie.

5.     After the press reported on HPEC's deal with Macquarie, the President of ILWU Local 13 Mark Mendoza threatened the Port with war over the HPEC project. Unbeknownst to HPEC at the time, the Port's Executive Director Eugene Seroka ("Seroka") caved to the union's pressure and secretly conspired with the International Longshore and Warehouse Union ("ILWU") and ILWU Local 13 to either force HPEC to give the drayage (trucking) jobs to union members or kill the project in favor of another project where its members would get the jobs (and not a rival union).

6.     First, Executive Director Seroka forced HPEC to hold off on its pilot study to determine the feasibility of the project even though the Board had already approved the permit for the pilot study and HPEC had spent more than $250,000 improving the property. Port executives reassured HPEC that the delay was temporary and the pilot study would run at a later time. The Port agreed that HPEC would not have to pay the rent due under the permit until the Port allowed HPEC to use the land for its pilot study.

7.     Next, Deputy City Attorney Steve Otera ("Otera") told HPEC that the Board had never properly approved the amendment to the ENA that extended the

exclusivity period.  For over a year, the Port had led HPEC to believe that the amendment was valid.  Executive Director Seroka had only signed the amendment after the Board gave him the "green light" to proceed.  The Port knew HPEC was expending resources in the belief that the amendment was valid and Macquarie was investing millions in the project on the belief that the amendment was valid.

8.     After the Port told HPEC that the amendment supposedly had not been properly approved, Executive Director Seroka then told HPEC that it would have to grant exclusive jurisdiction over intra-port drayage to the ILWU.  Seroka told HPEC the ILWU "run the port and will put up a fight every step of the way.  The board will be hard pressed without their support at any level."

9.     The Port encouraged HPEC to get the ILWU's support for the project. Executive Director Seroka opened the first meeting between HPEC and the ILWU by commenting on the importance of the project to the Port and admonishing the ILWU that there is to be no disruption.  Seroka's comments gave HPEC the false reassurance that objections from the ILWU did not threaten the future of HPEC's critical project.

10.     After HPEC had four negotiation sessions with the ILWU without reaching any agreement, Executive Director Seroka turned up the pressure on HPEC.  Seroka repudiated the Port's agreement to abate rent due under the pilot study permit and demanded that HPEC pay back rent and rent going forward even though he expressly forbid HPEC from using the land.  When HPEC protested, Seroka told HPEC he was not going to have 15,000 longshoremen marching on the property to save 10 Teamster jobs.

11.     For over a year, HPEC attempted to reach a reasonable resolution with the ILWU and Local 13 to garner their support for its project.  But the ILWU and Local 13 did not want to work with HPEC or share jurisdiction with any other union.  Since the Port, ILWU and Local 13 could not coerce HPEC into agreeing to monopolize the drayage jobs for ILWU members, the Port agreed not to work with

HPEC.  Defendants conspired to kill the project and replace it with a different project that would better benefit the ILWU and Local 13.

12.     In breach of its obligations, the Port secretly negotiated with HPEC's competitor to develop an alternative project that would benefit the ILWU and Local 13 while letting HPEC continue to expend valuable resources on the environmental review necessary for the project to proceed.  In May 2019, in furtherance of its conspiracy with the ILWU and Local 13, the Port wrongly and in bad faith purported to terminate HPEC's rights in the project on the false pretext that the project was infeasible.

13.     Defendants' acts were wrongful and caused great harm to HPEC. HPEC lost the historic opportunity to develop one of the most valuable and unique assets in the country.  The pilot study alone would have generated an estimated $4.9 million to $5.8 million in revenue to HPEC.  At full build-out, the project was expected to generate an estimated $59 million per year in profit for HPEC as well as tens of millions of dollars for the Port.

14.     Defendants' acts have also greatly harmed the public.  HPEC's project has been hailed by virtually every stakeholder, including the Air Quality Management District, the Los Angeles Chamber of Commerce, the Southern California Association of Governments, the National Resource Defense Council, the California Trucking Association, the Harbor Trucking Association and more than 20 labor unions.  The project would have generated significant revenue for the Port and provided significant benefits to the public by boosting productivity, reducing congestion and pollution, and creating more than 100,000 regional jobs.  Had HPEC been partially operational as planned, it would have been able to deal with the massive port congestion that can soon be expected when the backlog of Chinese shipments hit the Port of Los Angeles now that the restrictions in China due to the coronavirus pandemic have been loosened.  An inefficient Port of Los Angeles threatens the flow of critical supplies to the nation.

15.     The Port's bad faith and fraudulent conduct breached the parties' agreements and was done in furtherance of the illegal conspiracy with the ILWU and Local 13 to restrain trade.  HPEC brings this action to recover damages and penalties based upon Defendants' wrongful actions.

## JURISDICTION AND VENUE

16.     Defendants' acts and omissions, as more fully alleged herein, violate federal and state laws.  This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331.

17.     An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2202, which is of sufficient immediacy and reality to warrant declaratory relief.

18.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) and (2), in that the unlawful acts and practices occurred in the County of Los Angeles, an area that is within this judicial district.  The claims for relief from the violations of California law alleged in this complaint, and the claims for relief from the violations of federal law also alleged and which predominate this complaint, are based on a common nucleus of operative facts.  Judicial economy, convenience and fairness to the parties will result if the Court assumes and exercises jurisdiction of the action for relief from the violations of California law below alleged.

## THE PARTIES

19.     Plaintiff Harbor Performance Enhancement Center, LLC is a Delaware limited liability company.  HPEC's principal place of business is 11400 W. Olympic Blvd., Suite 1400, Los Angeles, CA 90064.

20.     HPEC is informed and believes, and thereon alleges, that Defendant City of Los Angeles Harbor Department ("POLA" or the "Port") is a proprietary department of the City of Los Angeles.  At all times, the Port has acted in its proprietary capacity with respect to the project.  The Port holds the LAXT site in trust, granted rights with respect to the site as a proprietor, and made decisions with

respect to parties' rights and obligations regarding the site under its proprietary capacity.

21.    HPEC is informed and believes, and thereon alleges, that Defendant City of Los Angeles ("City") is a political subdivision of the State of California and a charter city organized and existing under the Constitution and laws of the State of California.

22.    HPEC is informed and believes, and thereon alleges, that Defendant Eugene D. Seroka is an individual who works and resides in Los Angeles County. At all times relevant hereto, Seroka was, and is currently, the Executive Director of POLA.  Seroka is sued in both his individual and official capacities.

23.    HPEC is informed and believes, and thereon alleges, that Defendant International Longshore and Warehouse Union is, and at all times mentioned herein was, an unincorporated association commonly known as a labor union and maintains its principal offices in San Francisco, California.  The ILWU represents workers in longshore and other occupations, employed by waterfront companies who are members of the Pacific Maritime Association, at all West Coast ports, including the Port of Los Angeles.

24.    HPEC is informed and believes, and thereon alleges, that Defendant International Longshore and Warehouse Union Local 13 ("Local 13") is one of ILWU's longshore locals and is the representative for longshore workers at the Port of Los Angeles.

25.    HPEC is informed and believes, and thereon alleges, that Defendants, and each of them, were and are the agents, employees, co-conspirators, principals and/or employers of the remaining Defendants, and at all times herein mentioned were and are acting within the course and scope of such agency, employment, partnership, conspiracy and/or joint venture.  HPEC is further informed and believes and, based on the acts and conduct herein alleged, states that each such

Defendant was known to, authorized by and/or ratified by the other Defendants, and each of them.

## NOTICE TO THE CITY

26.     Pursuant to the California Tort Claims Act, on December 13, 2019, HPEC provided the City with notice of its claim for damages,  substantially setting forth the facts and claims alleged herein.  On January 27, 2020, the City notified HPEC that it rejected HPEC's claim.

## FACTS COMMON TO ALL CLAIMS

27.     This complaint arises from a series of agreements and promises relating to the development of a Container Terminal Support Facility ("CTSF") at the former Los Angeles Export Terminal ("LAXT") located at 750 Eldridge Street, San Pedro, CA 90731 and the former U.S. Customs House located at 300 S. Ferry Street, San Pedro, CA 90731 ("Customs House") (collectively, the "Project").

**A.     The Port Selected HPEC's Transformational Plan**

28.     On June 15, 2015, the Port published a Request for Proposals (the "RFP") to "Develop, Operate, and Maintain Land for a Container Terminal Support Facility" to invite proposals from the development community regarding the development, operation and maintenance of the LAXT and Customs House sites for use as a facility that supports container activity for nearby container terminals.  A true and correct copy of the RFP is attached hereto as Exhibit A.  The RFP does not place any labor restrictions or conditions on facility operations, including the offloading and transport of goods to any proposed CTSF.  The Port never disclosed to proposers or HPEC that the Port would require the ILWU's approval of the project or that the project would have to benefit only the ILWU.

29.     On or about August 10, 2015, HPEC submitted a proposal in response to the RFP.  A true and correct copy of HPEC's proposal is attached hereto as Exhibit B.  HPEC's proposal sets forth its goal of reducing traffic congestion at the Port while increasing overall cargo handling by approximately 10%.  HPEC also

planned for containers to be off-loaded from ships and transported to the CTSF without preference to a particular drayage company or the ILWU.  The HPEC proposal expressly stated that the Project would "[n]eutrally serve all container terminals in the Port of Los Angeles" and "[n]eutrally serve all 1,600 drayage companies operating at the Port of Los Angeles."  Access to everyone without bias is key to the Project's mission.  Moreover, HPEC's proposal expressly identified Eco-Flow as the non-exclusive member of the HPEC consortium specializing in drayage, and stated that "Eco Flow is setting the new standards for clean trucks and favorable employment of drayage. . . ."  However, HPEC never suggested that any drayage company including Eco Flow would have exclusive drayage rights to and from HPEC.  As for the ILWU, HPEC's proposal merely states that "[t]he higher throughput of marine terminals should ensure no loss of jobs to ILWU."  In fact, HPEC is confident that the Project would increase ILWU jobs at the Port.  The Project is also expected to add more than 100,000 jobs to the regional economy.

30.     Following a competitive process that involved multiple bidders, on October 28, 2015, the Port selected HPEC to develop the Project.  The Port never disclosed that there were any conditions on its approval relating to the ILWU; never demanded any particular arrangement for intra-port drayage to or from the CTSF; and, again, never expressed to HPEC that it conditioned any element of the Project upon the affirmative approval of the ILWU.

**B.      The Port Agreed To Negotiate In Good Faith And Exclusively With HPEC**

31.     After the Port selected HPEC, the Port and HPEC came to terms on several agreements setting forth how development of the Project would proceed. The parties first agreed upon an Exclusive Negotiating Agreement ("ENA") granting HPEC an exclusive right to "negotiate a term sheet, option agreement and form of entitlement as may be appropriate for subsequent use and occupancy."  A true and correct copy of the ENA is attached hereto as Exhibit C.

COMPLAINT

32.     On July 21, 2016, the Board approved the ENA in a closed session meeting.  On September 2, 2016, the Port executed the agreement.

33.     Paragraph 1(B) of the ENA obligated the City not to negotiate for a permit or any other entitlement, or for the development of the Site or any portion thereof, with any party other than HPEC during the exclusivity period.  The ENA specifically provided that "[n]egotiations under the [ENA] shall be undertaken by City and by Developer in good faith."  Based on the ENA, HPEC expected that if it agreed to reasonable terms it would obtain authorization from the City and Port to build and operate the Project.

34.     The ENA provides, in relevant part, that "[a]ny action or proceeding arising out of or related to this Agreement shall be filed and litigated in the state or federal courts located in the County of Los Angeles, State of California, in the judicial district mandated by applicable court rules."

35.     As originally contemplated, the ENA had an initial term of 12 months with an option to extend for an additional six months.  Thus, in the event that HPEC exercised its option, the ENA would expire no later than March 2, 2018.  However, three months following execution, on December 8, 2016, the Port and HPEC recognized that the entitlement process for the Project would exceed the original term, requiring the parties to amend the agreement.  It is common to have extended ENA terms given lengthy requirements in California for a robust environmental impact review under the California Environmental Quality Act.

36.     On February 2, 2017, HPEC CEO Jonathan Rosenthal ("Rosenthal") informed the Port's Executive Director Seroka and other executives that HPEC had determined to engage international real estate consultancy group Jones Lang LaSalle ("JLL") to, among other things, prepare a feasibility study and market analysis.  Rosenthal specifically informed the Port that HPEC's financial commitment was "material" and HPEC did not want to pull the trigger until getting the green light from Seroka and the Board in the form of an executed MOU and

amendment to the ENA.  The Port's Director of its Real Estate Division Jack Hedge ("Hedge") responded that he personally approved of JLL and the Port would let HPEC know if there was a reason not to proceed with JLL.

37.  On February 9, 2017, the Port and HPEC agreed to modify the term of the ENA to the earlier of (i) the completion of "all approval processes" or (ii) the termination of the ENA under the terms defined in the agreement.  A true and correct copy of this "First Amendment" to the ENA (the "Amendment") is attached hereto as Exhibit D.

**C.  The ENA Was Amended To Extend The Exclusivity Period And Two MOUs Were Executed**

38.  On March 2, 2017, the Port's staff presented a report to the Board outlining the scope of the Project along with a recommendation that the Board approve the Amendment and work toward finalization of the terms of lease agreements.  The Amendment was brought before the Board in a closed session meeting.  The Board approved the Amendment and two Memorandums of Understanding ("MOUs") outlining potential lease terms "that would allow use and occupancy of certain premises" at the LAXT and Customs House sites.  True and correct copies of these Memoranda (excluding exhibits) are attached hereto as Exhibits E and F, respectively.

39.  Executive Director Seroka reported to HPEC by text message from the closed session that the Board unanimously approved the Amendment: "100 % support from our Board on HPEC just now.  Onward and upward we go!"  Hedge similarly confirmed approval in his March 2, 2017 email to HPEC:  "Good Closed Session today with the Board giving us the green light to proceed on the basis outlined in the MOU.  We need to proceed with getting the MOU and ENA amendment signed and to proceeding with next steps."  Hedge also offered his "congratulations."

40.     Only after having first received Board approval, Executive Director Seroka executed the MOUs and the Amendment on behalf of the Port and the City. The Amendment was also executed by Deputy City Attorney Otera as to "form and legality" and by HPEC.  Seroka and HPEC CEO Jonathan Rosenthal celebrated the milestone with a meeting in the Mayor's office at City Hall on March 10, 2017.

41.     Even though the Deputy City Attorney had approved the Amendment as to form and legality after the Board first approved the Amendment, on March 24, 2017, Hedge informed HPEC in an email that the City Attorney was "now of the opinion" that the Amendment to the ENA needs to be acted on by the Board which would require scheduling for the next available board meeting.  Since the Port had informed HPEC that the Board fully supported the Project and had directed Seroka to execute the Amendment and proceed with the next steps, this hardly suggested any issue with the Project.  HPEC reasonably assumed that the Port would proceed with the next steps and obtain whatever additional action the City Attorney thought appropriate or necessary.  Indeed, even though the Port and HPEC met weekly, the Port never disclosed to HPEC that the Board supposedly had not acted on the Amendment or that the Amendment was not valid and HPEC reasonably relied on the Port's representations (and lack of disclosure of material facts) to its detriment.

D.     **The MOUs Obligated The Port To Act In Good Faith And Did Not Restrict Drayage To The ILWU**

42.     The MOUs imposed an obligation on the Port to operate cooperatively, reasonably, and in good faith to negotiate long-term lease agreements for the Project.  The MOUs provided, "Until such time (if any) as this MOU is terminated, the Parties agree to work together cooperatively and in good faith to negotiate, prepare and execute the Lease, reflecting the terms summarized in this MOU." Likewise, the MOUs may be terminated only upon "written notice to HPEC that the Harbor Department has determined in its sole reasonable discretion that the project is infeasible."  Like the agreements that came before, the MOUs did not place

restrictions on drayage, obligate HPEC to secure ILWU jurisdiction over drayage jobs historically performed in part by the Teamsters and others, or otherwise grant the ILWU veto authority over the Project.  In fact, other than a requirement to use trade union labor for construction of the site under a Project Labor Agreement, the MOU had no express labor requirements.

43.     The MOU for the LAXT site stated that the City would issue a "Temporary Use and Entry Permit" and promised "HPEC shall reasonably be permitted to enter the LAXT site for purposes of environmental and other property due diligence and investigations."  Accordingly, any failure of the Port to grant access to the LAXT site to HPEC violated the promise that HPEC could be "reasonably" permitted to conduct "other property due diligence and investigations."  Of course, such investigations were relevant to determine the feasibility of the Project.

**E.     The Port's Public Statements Led HPEC To Believe It Supported The Project**

44.     Shortly after the execution of the amended ENA and the MOUs, the Port publicized the Project in news articles published by the *Long Beach Business Journal*, *American Journal of Transportation*, and *American Shipper* on April 24, 2017, August 9, 2017, and August 14, 2017.  Executive Director Seroka pointed out that the Port was embarking on a "signature project," explaining that "[i]t is one of collaboration and work and how government, [the] private sector[,] and investors can come together at one time."  Executive Director Seroka also described HPEC CEO Jonathan Rosenthal as "a close friend over the past couple of years to our supply chain community" and lauded Mr. Rosenthal for having "already done an extensive job of reaching out to neighborhood organizations [and] environmental organizations as well as shippers, stevedores, truckers and longshore labor."  These statements gave HPEC confidence that its position with the Port related to this

project was secure and caused HPEC to expend material time and money to support development activities.

**F.    HPEC Initiated Marketing Efforts That Were Intended To Result In Substantial Income To HPEC**

45.    The primary sources of income to HPEC were expected to be container valet and parking operations at the former LAXT site.  HPEC expected to earn additional income from lease revenues at the Customs House site.  At full build-out, HPEC expected to earn an estimated $59 million in profit per year.

46.    With the amendment to the ENA and MOUs in place, HPEC began marketing the Project with an announcement at the Trans-Pacific Maritime conference in Long Beach with 3,000 attendees.  HPEC anticipated securing lucrative contracts with ocean carriers and beneficial cargo owners.

**G.    The Port Continued To Develop The Project With HPEC**

47.    In addition to publicly supporting the HPEC Project, the Port continued to work with HPEC to develop the project.  By June 1, 2017, HPEC and the Port initiated the first of a series of meetings to jointly coordinate work to prepare an environmental assessment of the Project.  The Port required HPEC to enter into an agreement to indemnify the City in connection with the Project.  On August 17, 2017, the Board approved the Indemnity Agreement.  A true and correct copy of the Indemnity Agreement is attached hereto as Exhibit G.  Had there been no operative ENA, HPEC would not have entered into an Indemnity Agreement.

48.    The Port and HPEC negotiated a permit to allow for a "Pilot Study" of the Project to test feasibility by assessing the environmental and market impact of the Project.  Under the Pilot Study, HPEC would test 400 container spots for its "peel-off program" and was expected to generate an estimated $4.9 million to $5.8 million in revenue to HPEC.  In the Board report that accompanied the permit, the Port stated that the proposed project was expected to include a 50-year lease agreement.

49.     On November 16, 2017, the Board approved a permit to operate a Pilot Study on 10 acres of the former LAXT site and a Private Railroad Crossing Agreement (the "Permit").  On December 12, 2017, the Port executed the Permit. The Permit required HPEC to pay a monthly rent of $24,119.86 for a 13-month term.  Consistent with prior agreements and approvals, the approval of the Permit and the right to access property as promised under the Permit were not subject to ILWU consent and did not obligate HPEC to grant ILWU exclusive or any jurisdiction over drayage jobs historically performed in part by the Teamsters and others.  A true and correct copy of this Permit is attached hereto as Exhibit H.

50.     The Permit provides, in relevant part, that "[a]ny action or proceeding arising out of or related to this Permit shall be filed and litigated in the state or federal courts located in the County of  Los Angeles, State of California."

51.     After the City executed the Permit, HPEC worked to commence pilot operations as quickly as possible, investing approximately $250,000 to develop engineering plans which were approved by the Port, grade approximately 10 acres of the property, construct below grade drainage, and lay aggregate surface material.

**H.     Executive Director Seroka's State Of The Port Address Included HPEC As A Highlight**

52.     On January 11, 2018, Executive Director Seroka gave a State of the Port address.  Seroka specifically mentioned HPEC in the highlights of the Port's accomplishments.

**I.     The Port Delayed The Start Of The Pilot Study**

53.     By February 2018, the Port had not yet allowed HPEC to commence pilot operations, prohibiting HPEC from using the land.  On or about February 9, 2018, the Port represented that the revocable permit would be modified to extend the start date and assured HPEC that it would not be charged rent until the Port allowed the pilot study to begin.  On February 26, 2018, the Port emailed HPEC proposing "to amend the Revocable Permit issued for the purposes of the pilot

study." The Port agreed to defer the Pilot Study until it granted HPEC access to the LAXT site for commencement of operations, which the Port indicated it would do no later than June 1, 2018.

54. A month passed, but the Port did not issue a permit amendment. HPEC had completed construction but still did not have operational access to the LAXT site. Since the Port had not given HPEC operational access, it promised to abate rent. Despite the Port-mandated delay, the Port publicly announced that the Pilot Study would eventually begin. For example, on April 2, 2018, in an article about the Project published on *JOC.com*, a spokesperson for the Port stated that "the intention is to run the pilot for one year until May or June 2019 to determine if it is feasible."

## J.    HPEC Raised The Financing Needed For The Project

55. With the Port's full knowledge, participation and approval, HPEC and JLL worked to secure additional financing for the Project. HPEC enjoyed a high profile in the infrastructure community with an innovative project that was a "win-win" for all parties. HPEC and JLL engaged 114 institutional investors globally, brought 39 investors into the project data room, and secured several letters of intent from some of the largest and most prominent investors in the world. Several institutional investors toured the Project sites.

56. Executive Director Seroka, Harbor Commissioner Edward Renwick and others at the Port met with Macquarie PF Inc., a subsidiary of the largest global infrastructure investor Macquarie Group Limited ("Macquarie"). In its discussions with Macquarie, the Port never claimed or disclosed to either HPEC or Macquarie that in its view, the Amendment to the ENA had not been properly approved. Moreover, the Port never claimed or disclosed that the Project was contingent on the ILWU's approval.

57. As a result of this process and again with the Port's approval and encouragement, in March 2018, Macquarie became a 50% equity stakeholder in

HPEC and the Project, pledging up to $130 million in financing.  These activities were predicated on the understanding, shared by all participants, that the Amendment was valid and binding, and obligated the Port to negotiate exclusively and in good faith with HPEC concerning the Project.  A press release detailed Macquarie's investment in the Project.

**K.      The Port Repeatedly Met In Secret With The ILWU And Local 13 About HPEC**

58.      HPEC now knows that the Port was conspiring with the ILWU and Local 13.  After the Port wrongfully terminated HPEC's rights in the Project, HPEC obtained some of the Port's email and text communications through a Public Records Act Request.  Although the Port has withheld thousands of communications on purported privilege grounds, HPEC learned from those select communications that the Port did produce that the Port had repeatedly met in secret with the ILWU and Local 13.  They met in secret to discuss HPEC even though the union has no jurisdiction over the Project nor any expertise or capabilities in the drayage work it later attempted to extort from HPEC and HPEC does not have a single employee (truck driver or otherwise).  The emails reveal the union's pressure on and coercion of the Port and the conspiracy that ultimately developed between them.  The Port agreed not to work with HPEC if the ILWU and Local 13 objected to the Project proceeding.  The Port, the ILWU and Local 13 agreed to try to monopolize the drayage jobs at the Project or kill the Project and develop an alternative project that would better benefit the union.

59.      By the time HPEC and the Port were negotiating the pilot study permit, Executive Director Seroka was already secretly meeting with the ILWU and Local 13.  On September 6, 2017, Executive Director Seroka wrote to the Deputy Executive Director Michael DiBernardo: "Can you be available for dinner tonight with Familathe and Mendoza re: LAXT?"  At that time, Ray Familathe was an ILWU Vice President and Mark Mendoza was the President of Local 13.

60.     On September 14, 2017, Hedge sent an email to other Port staff asking if the HPEC pilot study permit would be ready to be presented at the October 6 board meeting.  Deputy Executive Director DiBernardo replied:  "Gene [Seroka] and I are meeting with the ILWU today.  From that we will decide."  While the Permit was eventually approved, the conspirators were later successful in first interfering with and then derailing the pilot study altogether.

61.     On September 29, 2017, Executive Director Seroka met with ILWU Local 13 President Mark Mendoza to discuss HPEC.

62.     The day before the Board was due to approve the Indemnity Agreement and Permit, on November 15, 2017, David Libatique, the Port's Deputy Executive Director, Stakeholder Engagement, emailed ILWU Vice President Ray Familathe with the draft board resolution.

63.     By February 2018, emails reveal that Port executives were secretly planning alternative uses of the Project site that did not involve HPEC.  On February 6, 2018, Vice President at Environmental Compliance Solutions, Inc. Tara Tisopulos wrote to Deputy Executive Director DiBernardo as follows: "[T]he chassis pool element is a project alternative if there is full EIR.  You can then select it as the preferred project if that's how they are leaning prior to the BHC [Board of Harbor Commissioners] hearing."

64.     The above-referenced conduct breached the parties' agreements, was kept hidden from HPEC at the time, and was in furtherance of Defendants' conspiracy.

L.      **In April 2018, The Port Claimed In Bad Faith That The Amendment Still Needed Board Approval**

65.     On April 2, 2018, more than a year after the Board approved and the Port executed the Amendment, Deputy City Attorney Otera advised HPEC that, in the Port's view, the Amendment still required Board approval.  The timing of the Port's claim smacks of bad faith – under its original terms, the ENA would have

expired by the time Otera told HPEC the Amendment was supposedly invalid. Internal Port emails show that certain Port staff members (who were not part of the conspiracy) expressed surprise at Otera's belated claim and initiated a process to secure approval from the Board in public session.  While Port staff assured HPEC that this alleged lack of Board approval was an oversight and would be corrected promptly by placing the approval request on the agenda for the April 16, 2018 Board public session, Executive Director Seroka then tabled this approval request in furtherance of the conspiracy with the ILWU.

66.   The Port's May 2019 termination letter does not dispute the validity of the ENA but the Port has since claimed it was not validly amended.  Either the amendment to the ENA is valid and the Port's claim is false or the Port failed to get the amendment properly approved and concealed the truth from HPEC.  If it is the latter, had HPEC known the Amendment had not been properly approved before the expiration of the ENA's initial 12-month term, HPEC reasonably would have acted differently. The Port's actions are wrongful and it should be estopped from claiming the amendment to the ENA is not valid.

**M.   The Port Demanded HPEC Give Exclusive Intra-Port Drayage To The ILWU**

67.   Unbeknownst to HPEC, the ILWU and Local 13 pressured the Port into agreeing to monopolize the drayage jobs at HPEC for the union or kill the Project.  On April 11, 2018, in a telephone call with the Port, President of the ILWU Local 13, Mark Mendoza, told the Port that the ILWU would start a "war" if HPEC did not accede to the union's demands for exclusive jurisdiction over intra-port drayage.  On April 13, 2018, Executive Director Seroka and other Port executives met with Mark Mendoza and other local ILWU leaders, and an ILWU lobbyist to discuss HPEC.

68.   In furtherance of the conspiracy to monopolize jobs for the ILWU, Executive Director Seroka told HPEC in April 2018 that it would be required to

guarantee that the ILWU would be granted jurisdiction and exclusive rights to provide all intra-port trucking services to and from the Project.

69.     The ILWU's demand for exclusive jurisdiction over intra-port drayage completely undermined the express cost and strategic analyses on which HPEC's proposal was based and made no sense.  Moreover, HPEC has no control over drayage jobs, nor could it gain such control.  Beneficial cargo owners hire their own drayage companies and drayage companies hire their own drayage drivers.  Some drayage companies have collective bargaining agreements with the Teamsters.  HPEC does not control those jobs and has no employees or trucks of its own.  Furthermore, HPEC is not a terminal operator but rather an infrastructure developer.  It will develop the project but ultimately the project will be operated by a third party.

70.     For its part, the ILWU has no jurisdiction over the Project sites, no members properly licensed to perform drayage work, no trucks and no collective bargaining agreement with any drayage company.  The ILWU had no competency to perform the drayage jobs they demanded and had historically been performed by the Teamsters and others.

## N.    **The ILWU Demanded Exclusive Jurisdiction Over Intra-Port Drayage From HPEC**

71.     Unbeknownst to HPEC at the time, on May 1, 2018, Port executives David Libatique and Avin Sharma secretly met with Local 13 President Mark Mendoza to discuss strategy and coordinate their positions.  The Port then met with HPEC two days later to discuss the ILWU conditions for approval of the Project.  At the meeting, the Port reiterated to HPEC that to appease the ILWU, HPEC needed to give jurisdiction over intra-port drayage to the ILWU.

72.     With the Port's encouragement, HPEC spent considerable time and effort attempting to reach an acceptable compromise with the ILWU.  In May 2018, HPEC and the ILWU participated in multiple negotiation sessions.  Executive

Director Seroka opened the first meeting, commenting that HPEC is a signature project for the port and is expected to increase velocity.  He added that there is to be no disruption or no beneficial cargo owner in the nation would touch this property.  Seroka's comments gave HPEC the false reassurance that objections from the ILWU did not threaten the future of HPEC's project.

73.    In these negotiation sessions, Ray Familathe ("Familathe"), Frank Ponce De Leon ("Ponce De Leon") and Mark Mendoza participated on behalf of the ILWU and Local 13 as well as other union members.  At the time, Familathe was an ILWU Vice President, Ponce De Leon was an ILWU Coast Committeeman, and Mendoza was President of Local 13.  Familathe, Ponce De Leon and Mendoza developed, coordinated, directed, approved and furthered the conspiracy against HPEC on behalf of the ILWU and Local 13.

74.    At the May 11, 2018 meeting, Mendoza told HPEC that the ILWU wanted "a labor peace agreement" and an up-front commitment that the ILWU (and no one else) would get the work.  At the May 18, 2018 meeting, Mendoza told HPEC to hold off on the pilot study until he met with Ponce De Leon and others.

75.    On June 4, 2018, HPEC met with the Port.  Executive Director Seroka told HPEC that the Project would not go forward absent unanimous support from the ILWU.  Seroka explained that in his discussions with the 3 local ILWU Presidents, he learned that they had flown up to San Francisco (the ILWU's headquarters) to meet with a "war council," something Seroka claimed had not happened in 50 years.

76.    The Port continued to restrict HPEC from operating the Pilot Study at the LAXT site.  On June 4, 2018, and again on June 11, 2018, the Port promised to formalize an agreement to abate rent until HPEC could perform its Pilot Study and toll the start date.  On June 13, 2018, the Port even circulated to HPEC a draft board resolution explaining that previous rent billings "will be reversed due to non-allowance of the proposed Pilot Study."

77.     On June 19, 2018, HPEC and the ILWU held what ended up being the last of four negotiation sessions prior to ILWU leadership elections.  At the meeting, the ILWU confirmed that it would only approve the Project if given jurisdiction over intra-port drayage.  HPEC explained that satisfying such a demand (even if it were within HPEC's control – which it is not) could create a financial loss of up to $14 billion over the life span of the Project.  The ILWU told HPEC that it did not want to work on the same property as any other union.

**O.     Seroka Extorted Rent Payments From HPEC To Pressure HPEC**

78.     On June 25, 2018, Executive Director Seroka met with the three Local ILWU presidents and their vice presidents at his office to discuss HPEC.

79.     That same morning, the Port's David Libatique emailed the first step in HPEC's environmental impact report ("EIR") process, the Initial Study/Notice of Preparation, to ILWU Vice President Familathe.

80.     That afternoon, HPEC had a telephonic meeting with Executive Director Seroka, Deputy Executive Director DiBernardo, David Libatique and Avin Sharma.  Executive Director Seroka told HPEC about his meeting with the ILWU earlier that morning and conveyed the ILWU's message that they do not want to work with HPEC on the Project.  Seroka, however, told HPEC that progress might be made once their new officers had been elected and encouraged HPEC to continue to work with the ILWU.  HPEC expressed its surprise at the negative report and detailed the meetings and proposals that it had made to the ILWU.  Seroka also told HPEC that regardless of what Port staff had told HPEC about abating the rent due on the Pilot Study Permit, he expected HPEC to pay back rent and rent going forward.  When HPEC asked Seroka if that meant it could use the property for its pilot study, Seroka told HPEC "absolutely not" because he was not going to have 15,000 longshoremen marching on this property to save 10 Teamster jobs.

81.     After meeting with HPEC, Executive Director Seroka texted ILWU Vice President Familathe:  "Tough discussion with Rosenthal.  He was really shocked to hear you didn't want to work with him.  He is now pressuring us on the lease."  Seroka's text to Familathe evidences the conspiracy between Defendants to coerce HPEC into either granting intra-port drayage to the ILWU or abandon the Project.

82.     Still later that day, some Port staff members had a meeting to discuss "project alternatives for HPEC."  This meeting did not include HPEC.

83.     Faced with a threatened termination of the Permit, HPEC complied with the Port's demands, paying back rent on June 29, 2018, for the period from February 1, 2018, to June 30, 2018, and ultimately paying rent all the way back from December 12, 2017.  HPEC also made a commitment that it would satisfy future rent payments.  Payments were made on HPEC's belief, and the Port's continued representations, that it supported the Project and wanted to see it come to fruition.

**P.     The Port Reported To The Mayor That HPEC Was Off Track Due To Labor Issues With The Union But Falsely Reported The Port Still Intended To Go Forward With The Pilot Study**

84.     According to documents produced by the Port, on June 29, 2018, Executive Director Seroka gave his mid-year fiscal update to Mayor Garcetti. Seroka reported that the HPEC matter was "Off Track" due to issues with "union labor over drayage."  But Seroka falsely reported to the Mayor that the Port's goal was to continue to move forward with the pilot study.

85.     HPEC has recently learned that Port staff internally shared their view that HPEC should stop working on the EIR given the labor impasse but had no such discussion with HPEC.  Instead, the Port continued to work on the EIR with HPEC because it planned to use the expensive environmental work being done by HPEC

for other projects, something it was not entitled to do under its agreements with HPEC.

**Q.  The Port Provided False Reassurances To HPEC While Conspiring With The ILWU To Kill The Project**

86.  HPEC made repeated efforts over the next few months to reach an agreement with the ILWU as to drayage operations.  Throughout the fall of 2018 and the first quarter of 2019, the Port provided false reassurances to HPEC that it still supported the Project and told HPEC to keep "chipping away" at getting the ILWU to buy into the Project.

87.  In a call with HPEC and representatives of Macquarie on September 21, 2018, Executive Director Seroka told HPEC and Macquarie that while the ILWU had told him not to bring anything related to HPEC before the board or the ILWU will protest, "this happens all the time."  Seroka reassured HPEC and Macquarie that the Port is always very supportive of people who want to invest in the Port and Los Angeles.

88.  HPEC continued to pay rent, which the Port accepted, and the Port did not revoke the Permit.

89.  On November 29, 2018, the Port purported to "clarify" its illegal demand that HPEC grant the ILWU jurisdiction over drayage.  Executive Director Seroka stated in an email that "[n]either the Harbor Department nor I have demanded any particular type of labor, organized or otherwise, be hired for the HPEC work.  I hope this email clarifies the positions of the Department and me personally."

90.  In December 2018, at a holiday party at the Propeller Club, Executive Director Seroka told HPEC that the Port needed HPEC's Project more than ever, again providing false reassurance to HPEC that the Project would go forward.

91.  During this same time period, however, an internal Port email suggests that the Port was looking at developing a chassis yard project with Pacific Crane

Maintenance Corporation ("PCMC"), a powerful ILWU ally.  Port documents also suggest that PCMC toured the Project site at least two times, including one time during the initial 12-month exclusivity period under the original ENA.

92.     Just a few months prior to the purported termination, on January 31, 2019, Janna Sidley (the Port's in-house General Counsel) and Executive Director Seroka participated in a call with the HPEC team regarding the status of the Project. Following the call, Jonathan Rosenthal of HPEC thanked Ms. Sidley for her participation in the call.  In response, Ms. Sidley responded by text as follows: **"Happy to help. POLA has always been supportive of your project and your efforts so I'm baffled about how the message got garbled but glad we seem to be back on track."**

93.     Throughout the first and second quarters of 2019, HPEC continued to work with Port staff on processing the CEQA environmental review and expected completion of the draft report in May 2019 and continued to work toward a reasonable resolution with the ILWU's new leadership.

94.     In April 2019, the Port met with HPEC's partner Macquarie in Washington D.C. and reassured Macquarie that it believed the Project could go forward.

95.     The Port's reassurances to HPEC and Macquarie were false. Executive Director Seroka conspired with the ILWU, Local 13 and other parties to plan alternative uses for the Project site that did not involve HPEC, violating the terms of the ENA and the implied covenant of good faith and fair dealing.

96.     In a January 10, 2019 text message POLA's Director of Environmental Management Chris Cannon advised Deputy Executive Director DiBernardo: "Did some research on the LAXT chassis storage yard idea.  I think you could do a temporary (1 year) ten-acre storage yard immediately."  A later email dated February 11, 2019 also related to the evaluation of a chassis yard.

97.    Port documents show that on January 13, 2019, Seroka contacted the Mayor's Chief of Staff Ana Guerrero to arrange a meeting at City Hall on January 22, 2019 to discuss "HPEC and workforce opportunities."  While HPEC was not invited, President of ILWU's Local 13 Mendoza was.

98.    Port documents show that Executive Director Seroka met again with the Mayor's Chief of Staff on March 14, 2019 to discuss HPEC.  Again, HPEC was not present.

**R.    Seroka Invalidly Terminated The Port's Agreements With HPEC As Part Of Defendants' Conspiracy To Restrain Trade And The Secondary Boycott**

99.    In a May 10, 2019 letter, Executive Director Seroka purported to terminate the ENA, the MOUs and the Indemnity Agreement, as well as HPEC's rights in the Project on the false pretense that the Port had purportedly "determined the proposed project to be infeasible."  Seroka's letter was sent in furtherance of Defendants' conspiracy to restrain trade and the ILWU and Local 13's secondary boycott.  A true and correct copy of this May 10, 2019 letter is attached hereto as Exhibit I.

100.   Notably absent from Seroka's May 10, 2019 letter is any suggestion that (as the Port and the City now contend) the ENA rights had expired in early 2018.  Quite the contrary, Seroka's letter purports to invoke the ENA's own infeasibility clause and distinguishes the (other) agreements that had already expired on their own terms.  Also absent from this letter is any indication that Janna Sidley, the Board, or the City Council were consulted with regard to this purported termination, or that they believed the Project to be "infeasible."  To the contrary, the Port consistently and publicly supported and endorsed the efficiency, environmental and other benefits of the Project.  And certainly, Seroka's belated notice of, and subsequent insistence upon accommodating ILWU's demands for

exclusive drayage jurisdiction on the Project, do not constitute valid reasons to declare the Project infeasible.

101.   Prior to May 2019, HPEC did not have any reason to believe that the Port would breach its contractual obligations and purport to terminate the ENA and HPEC's rights in the Project in order to illegally restrain trade.  The Project had faced a number of unforeseen hurdles since its beginning, obstacles which HPEC and the Port had managed to resolve.  Indeed, right up until the May 2019 purported termination, the Port repeatedly reassured HPEC and its partner Macquarie that it supported the Project.

102.   Contrary to Executive Director Seroka's assertion in his May 10 termination letter, the Project was at all times highly feasible, remains so, and is well-capitalized.  Indeed, prior to the May 10 termination letter, the Port and HPEC had jointly and consistently touted the Project at dozens of stakeholder meetings and conferences from coast to coast, including at the U.S. Commerce Department, the Southern California Association of Governments, the California Air Resources Board, the Air Quality Management District, the Harbor Trucking Association, the California Center for Environmental Research and Technology, and the Marine Transportation System National Advisory Board.  Moreover, in the four years of HPEC's community outreach regarding the Project, HPEC is unaware of having received any critical comment from any constituent group other than the ILWU. The Project has been unanimously endorsed by Mayor Garcetti's own San Pedro Bay Port Sustainable Supply Chain Advisory Committee, the Los Angeles/Orange Counties Building and Construction Trades Council, and the Los Angeles Chamber of Commerce.

103.   If completed, the Project would provide significant benefits acknowledged publicly by the Port, including significantly improving the flow of cargo, reducing wait times for truckers and shippers, and providing environmental benefits by reducing trucker idling time and terminal gate congestion at the port

complex.  In fact, the Port has publicly stated that the Project will increase port throughput by 20%.  The Project, if completed, would also provide significant benefits to HPEC and the Port, including tens of millions of dollars in fees from Project customers. The University of Southern California Center for Global Supply Chain Management has estimated that the decongestion could add 100,000 – 150,000 regional jobs.

**S.**     **After Wrongfully Terminating HPEC's Rights, The Port Pursued A Deal With An ILWU Ally To Develop The Project Sites**

104.   HPEC is informed and believes, and thereon alleges, that within days of this purported termination of the Project, Port executives were discussing alternative uses of the Project site with PCMC.

105.   HPEC is informed and believes, and thereon alleges, that the Port negotiated a lease with PCMC for approximately twenty-five acres of the LAXT site for use as a chassis yard.  HPEC understands that PCMC is the ILWU's largest employer in the Port, and therefore the ILWU has a greater interest in aligning with PCMC than with HPEC.  One objective of the conspiracy between the Port, ILWU and Local 13 was to develop a project that would benefit the union.

106.   The Port, the City, and Executive Director Seroka deliberately and fraudulently withheld from HPEC that the Amendment purportedly needed further ratification and continued to improperly represent that it would be ratified, while simultaneously taking steps to ensure that the Project would not proceed unless HPEC agreed to provide labor concessions to the ILWU and Local 13.  At all relevant times, the Port, the City, Executive Director Seroka, and other employees were acting with corrupt intent so as to avoid widespread labor action at the Port and garner favor with the ILWU, an organization to which the Port is beholden due to the union's immense political power in the City and at the Port.  At all relevant times, the City, the Port, Executive Director Seroka, and other employees were

acting with corrupt intent despite the impact their conduct may have on the public good.

## FIRST CLAIM FOR VIOLATION OF 15 U.S.C. § 1

### (Against All Defendants)

107.   HPEC re-alleges and incorporates by this reference the allegations contained in Paragraphs 1 through 106, above as though set forth herein.

108.   Defendants conspired to restrain trade between Defendants City and Port on the one hand and HPEC on the other.  Specifically, Defendants agreed that Defendants City and Port will refuse to deal with HPEC unless HPEC agrees to provide labor concessions to the ILWU and Local 13.  When HPEC would not accede to the ILWU and Local 13's demands, Defendants agreed to terminate HPEC's rights in the Project.

109.   By engaging in the acts alleged herein, including terminating the Project in furtherance of the conspiracy, Defendants have also aided and abetted a secondary boycott engaged in by the ILWU and Local 13 against HPEC (to punish HPEC for its association with ILWU's rival, the Teamsters).

110.   In addition, Defendants City and Port control access to POLA business, and thus control an essential facility.  By terminating the Project, Defendants have wrongfully denied HPEC access to this essential facility for the purpose of restraining trade and competition in the market.

111.   Defendants City and Port have market power and monopsony power in the markets for the purchase of container terminal support services and the purchase of construction services for container terminal support facilities in the Port of Los Angeles, and have sought to maintain and further this monopsony power by the conduct alleged herein, designed to restrain trade and competition in this market.

112.   No pro-competitive justifications exist for Defendants' conduct.

113.   Defendants' conduct is harmful to competition in the markets for the purchase of container terminal support services and the purchase of construction of

container terminal support facilities, because it will reduce the number of potential suppliers, increase prices, output, or quality in these markets and is designed to further the anticompetitive goal of the ILWU and Local 13, in concert with the other Defendants, of securing monopoly control over the jobs in the market.

114.   The above-referenced conduct caused anticompetitive injury to HPEC's business or property by precluding HPEC from participating in the relevant markets, and depriving HPEC of its rights under the ENA, the Amendment, the MOUs and the Permit and the profits it would have obtained from the pilot study and the Project.

**SECOND CLAIM FOR VIOLATION OF 29 U.S.C. § 158(b)(4)(B)**

**(Against Defendants ILWU and Local 13)**

115.   HPEC re-alleges and incorporates by this reference the allegations contained in Paragraphs 1 through 106, above as though set forth herein.

116.   By threatening the Port that the union would engage in labor disruption at the Port unless the Port stopped doing business with HPEC (because the HPEC project envisioned working with the ILWU's rival union the Teamsters), Defendants ILWU and Local 13 engaged in unlawful secondary activity in violation of 29 U.S.C. § 158(b)(4)(B).

117.   Defendants ILWU and Local 13 successfully forced the Port to stop the HPEC Pilot Project from proceeding and ultimately were successful in forcing the Port to stop the entire HPEC Project from proceeding, in an effort to block the Teamsters from performing jobs at the Port and monopolize the jobs at the Project site for the ILWU.

118.   The conduct alleged herein constitutes unlawful secondary activity in violation of 29 U.S.C. § 158(b)(4)(B).

119.   The above-referenced conduct caused injury to HPEC's business or property by precluding HPEC from participating in the relevant markets, and depriving HPEC of its property, its rights under the ENA, the Amendment, the

MOUs, and the Permit, and the profits it would have obtained from the pilot study and the Project.  HPEC has suffered substantial financial damages as a result of the Defendants' conduct in an amount to be proven at trial.

### THIRD CLAIM FOR BREACH OF CONTRACT

**(Against Defendants City and Port)**

120.   HPEC re-alleges and incorporates by this reference the allegations contained in Paragraphs 1 through 106, above as though set forth herein.

121.   The Port and HPEC entered into a series of agreements concerning the Project, including the ENA, the Amendment, two MOUs, an Indemnification Agreement, and the Permit.

122.   These agreements expressly require, or contemplate, that a) the Port will negotiate exclusively with HPEC regarding the Project, b) the Port will negotiate in good faith with HPEC regarding the Project, c) the Port will terminate these agreements and HPEC's rights in the Project only if the Port reasonably and in good faith determines that the Project is infeasible, d) HPEC will have exclusive use of the Project site, and e) HPEC will have exclusive use of HPEC's own work product generated in connection with the Project.

123.   The Port has breached each of these contractual requirements.

124.   In addition to breaching the contractual requirements set forth above in paragraph 122, the Port breached the ENA, the Amendment, two MOUs and the Permit by failing to disclose material facts.  Although the Port accepted HPEC's proposal which expressly stated it was neutral on drayage and one of its joint venture partners employed Teamsters, the Port failed to disclose that it would require the ILWU's approval for the Project before HPEC would be allowed to run its pilot study and it would terminate the Project based on objections from the ILWU.  The Port also failed to disclose prior to the expiration of the original ENA, that in its view, the Amendment to the ENA had not been properly approved and was not valid.

125.   At all times, HPEC has operated in full compliance with its rights and obligations under each Agreement between the Port and HPEC.  HPEC relied on the Port and City's representations, investing substantial resources in developing the Project.  Had the Port and City disclosed the material information they were concealing, HPEC reasonably would have behaved differently.

126.   HPEC has suffered substantial financial damages as a result of the Port's breaches of these Agreements and concealment of material facts in an amount to be proven at trial.

## FOURTH CLAIM FOR BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

### (Against Defendants City and POLA)

127.   HPEC re-alleges and incorporates by this reference the allegations contained in Paragraphs 1 through 106, above as though set forth herein.

128.    The Port and HPEC have entered into a series of agreements concerning the Project, including the ENA, the Amendment, two MOUs, an Indemnification Agreement, and the Permit.

129.   These agreements expressly require, or contemplate, that a) the Port will negotiate exclusively with HPEC regarding the Project, b) the Port will negotiate in good faith with HPEC regarding the Project, c) the Port will terminate these agreements and HPEC's rights in the Project only if the Port reasonably and in good faith determines that the Project is infeasible, d) HPEC will have exclusive use of the Project site, and e) HPEC will have exclusive use of HPEC's own work product generated in connection with the Project.

130.   These agreements also impose upon the parties the implied covenant of good faith and fair dealing, which precludes either party from doing anything that would unfairly interfere with the right of the other party to receive the benefits of the contract.

131.    The Port has breached the implied covenant of good faith and fair dealing by, among other things, failing to negotiate in good faith, conspiring with the ILWU and Local 13, failing to disclose that the Amendment was supposedly invalid, failing to seek and obtain Board approval for the Amendment, failing to disclose that it would require the ILWU's approval for the Project before HPEC would be allowed to run its pilot study, failing to disclose that it would terminate the Project because of objections from the ILWU, purporting to impose an ILWU exclusivity requirement, purporting to terminate HPEC's rights in the Project based on a false pretext of infeasibility, negotiating with other developers regarding use of Project sites, allowing other developers to use HPEC work product, and refusing HPEC access to the pilot study site while insisting that HPEC pay rent.  The Port conspired with the ILWU and Local 13 to restrict HPEC's access to the Port, deprive HPEC of its ability to participate in the market for the purchase of container terminal support services and the purchase of construction services for container terminal support facilities in the Port of Los Angeles, and to deprive HPEC of the benefits of the ENA, the Amendment, the MOUs and the Permit.

132.    At all times, HPEC has operated in full compliance with its rights and obligations under each Agreement between the Port and HPEC.

133.    HPEC has suffered substantial financial damages as a result of the Port's breaches of the implied covenant of good faith and fair dealing in an amount to be proven at trial.

## FIFTH CLAIM FOR DECLARATORY RELIEF

### (Against Defendants City and Port)

134.    HPEC re-alleges and incorporates by this reference the allegations contained in Paragraphs 1 through 106, above as though set forth herein.

135.    There is an actual and present controversy between the parties.  HPEC contends that (1) the Amendment is valid and enforceable; and (2) the Port's May

2019 termination of its rights in the Project is invalid.  Defendants deny these contentions.

136.   HPEC desires a judicial declaration that (1) the Amendment is valid and enforceable; and (2) the Port's May 2019 termination of its rights in the Project is invalid.

137.   HPEC is presently and continuously injured by Defendants' termination of its rights in the Project.  If not enjoined by this Court from transferring HPEC's rights in the Project to another entity and proceeding with an alternative project at the Project site, Defendants will proceed with an alternative project at the Project site.

138.   HPEC has no plain, speedy, and adequate remedy at law.  Damages would not fully redress any harm suffered by HPEC.

## **PRAYER FOR RELIEF**

139.   WHEREFORE, HPEC prays for judgment against the Defendants, and each of them, as follows:

a.      For compensatory, consequential and incidental damages in an amount to be proven at trial;

b.      For general damages in an amount to be proven at trial;

c.      For special damages, according to proof;

d.      For declaratory and injunctive relief;

e.      For prejudgment interest;

f.      For reasonable attorneys' fees;

g.      For the costs of suit herein incurred;

h.      For restitution;

i.      For treble damages;

//

//

j.       For such other and further relief as this Court may deem proper.

Dated:  April 7, 2020                          VALLE MAKOFF LLP

By*:*    */s/ Jeffrey B. Valle*
Jeffrey B. Valle
Katherine Balatbat
Attorneys for Plaintiff Harbor
Performance Enhancement Center,
LLC

## **<u>DEMAND FOR JURY TRIAL</u>**

HPEC hereby demand trial of its claims by jury to the extent authorized by law.

Dated:  April 7, 2020                          VALLE MAKOFF LLP

By*:*    */s/ Jeffrey B. Valle*
Jeffrey B. Valle
Katherine Balatbat
Attorneys for Plaintiff Harbor
Performance Enhancement Center,
LLC

COMPLAINT