Steven R. Holguin (SBN 115768)
*steven@srholguin.com*
Marisa R. Holguin (SBN 324299)
*marisa@srholguin.com*
SR HOLGUIN, PC
800 West 6th Street, Suite 788
Los Angeles, CA 90016
Telephone: (213) 395-0956

*Attorneys for Defendants*
International Longshore and Warehouse Union; and International Longshore and Warehouse Union Local 13

David W. Kesselman (SBN 203838)
*dkesselman@kbslaw.com*
Trevor V. Stockinger (SBN 226359)
*tstockinger@kbslaw.com*
KESSELMAN BRANTLY STOCKINGER LLP
1230 Rosecrans Ave., Suite 400
Manhattan Beach, CA 90266
Telephone: (310) 307-4555
Facsimile: (310) 307-4570

*Attorneys for Defendant*
International Longshore and Warehouse Union Local 13

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

HARBOR PERFORMANCE ENHANCEMENT CENTER, LLC,

Plaintiff,

v.

CITY OF LOS ANGELES HARBOR DEPARTMENT; CITY OF LOS ANGELES; INTERNATIONAL LONGSHORE AND WAREHOUSE UNION; INTERNATIONAL LONGSHORE AND WAREHOUSE UNION LOCAL 13; and EUGENE D. SEROKA,

Defendants.

CASE NO. 2:20-cv-03251-PSG-MAA

*Honorable Philip S. Gutierrez*

**DECLARATION OF TREVOR V. STOCKINGER IN SUPPORT OF DEFENDANT ILWU AND ILWU LOCAL 13'S JOINT MOTION TO DISMISS SECOND AMENDED COMPLAINT**

Date: March 22, 2020
Time: 1:30 p.m.
Courtroom: 6A

Complaint Filed: April 7, 2020

**DECLARATION OF TREVOR V. STOCKINGER**

I, Trevor V. Stockinger, declare under penalty of perjury as follows:

1. I am a Partner of Kesselman Brantly Stockinger LLP, which represents Defendant International Longshore and Warehouse Union Local 13. I have personal knowledge of the facts set forth below, and if called to testify I could and would do so competently.

2. On January 4, 2021, pursuant to Local Rule 7-3, I attended a telephonic meet and confer in which Defendants' counsel discussed with HPEC's counsel the grounds on which Defendants would be moving to dismiss HPEC's Second Amended Complaint. Specifically, I discussed the grounds on which Union Defendants' joint motion to dismiss is based.

3. On December 4, 2020, after receiving HPEC's Second Amended Complaint, I asked my firm's paralegal to create a document comparing the differences between HPEC's newly-filed Second Amended Complaint and its First Amended Complaint. A true and correct copy of that document is attached as **Exhibit A**.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on January 11, 2021 in Los Altos Hills, California.

Trevor V. Stockinger

# EXHIBIT A



**VALLE MAKOFF LLP**
JEFFREY B. VALLE (State Bar No. 110060)
jvalle@vallemakoff.com
KATHERINE BALATBAT (State Bar No. 196758)
kbalatbat@vallemakoff.com
11777 San Vicente Blvd., Suite 890
Los Angeles, California 90049
Telephone: (310) 476-0300
Facsimile: (310) 476-0333

Attorneys for
Harbor Performance Enhancement Center, LLC

**UNITED STATES DISTRICT COURT**

**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

HARBOR PERFORMANCE ENHANCEMENT CENTER, LLC, a Delaware limited liability company,

Plaintiff,

v.

CITY OF LOS ANGELES HARBOR DEPARTMENT; CITY OF LOS ANGELES; INTERNATIONAL LONGSHORE AND WAREHOUSE UNION; and INTERNATIONAL LONGSHORE AND WAREHOUSE UNION LOCAL 13.

Defendants.

Deleted: <object><object>

Deleted: 11911

Deleted: 324

Deleted: <object>11¶
12¶

Moved (insertion) [1]

Deleted: 14¶
15¶
16¶
17¶
18¶
19¶

Deleted: <object>

## TABLE OF CONTENTS

Page

NATURE OF THE ACTION ........ 4

JURISDICTION AND VENUE ........ 9

THE PARTIES ........ 10

NOTICE TO THE CITY ........ 11

FACTS COMMON TO ALL CLAIMS ........ 11

A. The Port Selected HPEC's Transformational Plan ........ 12

B. The Authority And Role Of The Los Angeles Board Of Harbor Commissioners And The Executive Director In Approving The Parties' Contracts And The Project ........ 13

C. The Port Agreed To Negotiate In Good Faith And Exclusively With HPEC ........ 15

D. The ENA Was Amended To Extend The Exclusivity Period And The MOUs Were Executed ........ 19

E. The MOUs Obligated The Port To Act In Good Faith And Did Not Restrict Drayage To The ILWU ........ 21

F. The Port's Public Statements Led HPEC To Believe It Supported The Project ........ 22

G. HPEC Initiated Marketing Efforts That Were Intended To Result In Substantial Income To HPEC And The Port ........ 23

H. The Port Continued To Develop The Project With HPEC ........ 23

I. As HPEC Prepared The Pilot Site, ILWU Questioned The Work Being Done And Who Would Be Doing It ........ 25

J. Executive Director Seroka's State of The Port Address Included HPEC As A Highlight ........ 26

K. The Port Delayed The Start Of The Pilot Study ........ 26

Deleted: <object><object>
Deleted: 3¶
Deleted: 8
Deleted: 8
Deleted: 10
Deleted: 10
Deleted: 11
Deleted: 11
Deleted: 12
Deleted: 12¶
Deleted: 13
Deleted: 14
Deleted: 14¶
Deleted: 15
Deleted: 16
Deleted: 16¶
Deleted: 17
Deleted: 17
Deleted: 18¶
Deleted: 19
Deleted: 18
Deleted: 20¶
Deleted: 18
Deleted: 21¶ 22 H.
Deleted:
Deleted: 20
Deleted: 23¶ 24 I.
Deleted: 20
Deleted: 25¶ J.
Deleted: 20
Deleted: K
Deleted: <object>

L. HPEC Raised The Financing Needed For The Project ..... 28

M. The Port Repeatedly Met In Secret With Union Defendants About HPEC ..... 30

N. In April 2018, The Port Finally Disclosed That It Had Failed To Submit The Amendment To The Board To Be Acted Upon ..... 33

O. The Port Illegally Demanded HPEC Give Exclusive Intra-Port Drayage To The ILWU ..... 34

P. The ILWU Illegally Demanded Exclusive Jurisdiction Over Intra-Port Drayage From HPEC ..... 36

Q. Seroka Extorted Rent Payments From HPEC To Pressure HPEC ..... 44

R. The Port Reported To The Mayor That HPEC Was Off Track Due To Labor Issues With The Union And The Effort To Complete The Pilot Study Would Continue In FY2018-2019 ..... 46

S. HPEC's Supporter On The Board Is Recused From Participating On Matters Relating To HPEC ..... 47

T. The Port Provided False Reassurances To HPEC While Conspiring With The ILWU To Kill The Project ..... 48

U. Seroka Invalidly Terminated The Port's Agreements With HPEC As Part Of Defendants' Conspiracy To Restrain Trade And The Secondary Boycott ..... 52

V. After Wrongfully Terminating HPEC's Rights, The Port Pursued A Deal With An ILWU Ally To Develop The Project Sites ..... 56

W. HPEC Filed A Writ Proceeding In Los Angeles Superior Court ..... 57

X. The City Has Demanded That HPEC Pay Property Tax ..... 58

THE UNION DEFENDANTS' CONDUCT IS NOT PROTECTED BY THE *NOERR-PENNINGTON* DOCTRINE ..... 58

SPECIFIC CLAIMS ..... 60

Deleted: 22

Deleted: 28¶ L

Deleted:

Deleted: . 23

Deleted: 1¶ <object><object>¶ ¶ ¶ M

Deleted: Claimed In Bad Faith

Deleted: The

Deleted: Still Needed

Deleted: Approval 26

Deleted: N.

Deleted: 27

Deleted: O.

Deleted: 29

Deleted: P.

Deleted: 35

Deleted: 8¶ Q

Deleted: But Falsely Reported

Deleted: The Port Still Intended To Go Forward With

Deleted: 36

Deleted: R.

Deleted:

Deleted: ¶

Deleted: 37

Deleted: S.

Deleted: 37

Deleted: T.

Deleted: Secondary Boycott 41

Deleted: 17¶ 18 U

Deleted:

Deleted: 41

Deleted: 19¶ THE CITY DEFENDANTS AND SEROKA ARE NOT PROTECTED BY¶ PARKER IMMUNITY 45¶

Deleted: 47

Deleted: 49

Deleted: <object>

PRAYER FOR RELIEF ........................................................................................ 71

DEMAND FOR JURY TRIAL ............................................................................. 72

Deleted: 59

Deleted: 60

Deleted: 2¶
<object><object>¶

Deleted: <object>

**NATURE OF THE ACTION**

1. With the coronavirus pandemic gripping our nation, it is more important than ever that our nation's supply chain and cargo movement chain run as efficiently as possible. The Ports of Los Angeles/Long Beach, known as America's Trade Gateway, are the busiest ports in the Western Hemisphere and supply the nation with roughly 40% of its imported goods. The Port of Los Angeles ("POLA" or the "Port") has ranked as the number one container port in the United States each year since 2000. But the Ports have been plagued for years with severe congestion and pollution. The Ports are the largest source of pollution in Southern California. Plaintiff Harbor Performance Enhancement Center, LLC ("HPEC") developed an innovative plan to improve overall port efficiency by repurposing unused Port property into a container distribution hub. HPEC invested years and millions of dollars into what POLA billed as its "signature project." This case arises from the wrongful termination of the HPEC project as a result of the conspiracy of certain corrupt union leaders and Port officials whose illegal goal was to coerce HPEC into granting the union exclusive jurisdiction over intra-port drayage (trucking) and seeks relief under federal law for Defendants' violations of the Sherman Act and labor laws as well as state law for Defendants' breach of contract and breach of the implied covenant of good faith and fair dealing.

2. The project started in 2015, when the Port invited proposals from the development community to develop and operate a terminal support facility on a 110-acre site at Terminal Island that had been vacant for more than 10 years. Following a publicly noticed Request for Proposals and a competitive process that involved multiple bidders, on October 28, 2015, the Port selected HPEC as the "superior proposer," finding its proposal most responsive to its stated goals to enhance cargo velocity and relieve congestion on Terminal Island.

3. HPEC and the Port first negotiated and executed a binding exclusive negotiating agreement (the "ENA"). The ENA was of critical importance to HPEC

**Deleted:** ,

**Deleted:** and 42 U.S.C. § 1983

**Deleted:** ¶

**Deleted:**

**Deleted:** 3¶
<object><object>¶

**Deleted:** <object>

because it required the Port to "act in good faith" and prohibited the City from "negotiat[ing] for a permit or any other entitlement, or for the development of the Site or any portion thereof" with any other party regarding use of the property. Without an ENA, no institutional investor would have committed the necessary funding for the project.

4. After a few months, the parties recognized that the term of the ENA would need to be extended and agreed to extend it until the lease agreements were finalized or the project was determined to be "infeasible." The Los Angeles Board of Harbor Commissioners (the "Board") gave the Port's Executive Director the green light to proceed, the City Attorney approved the amendment as to form and legality, and the parties executed the amendment. The important promises in the ENA and the amendment induced HPEC to spend thousands of hours and millions of dollars on the project and enabled HPEC to raise hundreds of millions of dollars in funding for the project.

5. For years, HPEC devoted significant effort and resources and worked diligently with Port staff, the environmental community, shippers, labor, marine terminal operators and other stakeholders to move the project forward. In March 2018, HPEC raised $130 million of financing from the largest global investor in infrastructure, Macquarie.

6. After the press reported on HPEC's deal with Macquarie, the President of ILWU Local 13 Mark Mendoza ("Mendoza") threatened the Port with "war" over the HPEC project. Unbeknownst to HPEC at the time, the Port's Executive Director Eugene Seroka ("Seroka") caved to the union's pressure and secretly conspired with the International Longshore and Warehouse Union ("ILWU") and ILWU Local 13 (together with ILWU, the "Union Defendants") to either coerce HPEC to give the drayage (trucking) jobs to union members or kill the project in favor of another project where its members would get the jobs (and not a rival union).

Deleted: 4¶
<object><object>¶

Deleted: <object>

7. First, Executive Director Seroka prohibited HPEC from starting its pilot study to determine the feasibility of the project even though the Board had already approved the permit for the pilot study and HPEC had spent more than $250,000 improving the property in preparation. Port executives reassured HPEC that the delay was temporary and the 12-month pilot study would be allowed to run at a later time. The Port agreed that HPEC would not have to pay the rent due under the permit until the Port allowed HPEC to use the land for its pilot study.

8. Next, Deputy City Attorney Steve Otera ("Otera") told HPEC that the Board had never properly approved the amendment to the ENA that extended the exclusivity period. For over a year, the Port had led HPEC to believe that the amendment was valid. The Port knew HPEC was expending resources in the belief that the amendment was valid. Moreover, even though the Port knew that HPEC and Macquarie were operating under the belief that the amendment was valid, the Port waited until after Macquarie had invested in the Project to disclose that it had failed to submit the amendment to the Board to be acted upon. The ENA and amendment were material to HPEC and Macquarie and without those bargained for protections, neither HPEC nor Macquarie would have invested in the project.

9. After the Port told HPEC that the amendment supposedly had not been properly approved, on May 3, 2018, Executive Director Seroka then told HPEC that it would have to give exclusive jurisdiction over intra-port drayage to the ILWU – an illegal demand that violates federal labor law. Seroka told HPEC that the ILWU was having a stop-work meeting that evening and "will come with pitchforks."

10. HPEC met directly with the Union Defendants in May and June 2018. During one of their discussions, President of ILWU Local 13 Mark Mendoza threatened HPEC: "The 2-3 miles of waterfront is ours, we're going to get it. We've told Seroka, we've talked with them. There will be some animosity, could be some civil unrest." Mendoza further told HPEC, "If we're used, we're good.

Deleted: Executive Director Seroka had only signed the amendment

Deleted: after the Board gave him

Deleted: "green light" to proceed. The

Deleted: was

Deleted: expending resources in

Deleted: . The

Deleted: also

Deleted: never disclosed

Deleted: Macquarie, who was investing millions in the project, that, in its¶ view, the amendment had not been properly approved and was not valid. The ENA¶ and

Deleted: ¶

Deleted:

Deleted: and 42 U.S.C. § 1983.

Deleted: HPEC that the ILWU

Deleted: ¶

Deleted:

Deleted: ¶

Deleted:

Deleted: ¶

Deleted:

Deleted: ¶

Deleted:

Deleted: ¶

Moved (insertion) [2]

Deleted:

Deleted: <object>

I'm not going to work double breasted with another union." Mendoza threatened HPEC again: "You guys. If you work with us, there's no problem."

11. When HPEC could not reach a compromise with the ILWU, Executive Director Seroka turned up the pressure on HPEC. Seroka repudiated the Port's agreement to abate rent due under the pilot study permit and demanded that HPEC pay months of back rent and rent going forward even though he expressly forbid HPEC from using the land. When HPEC protested, Seroka made clear that the restriction was because HPEC had not caved to the Union Defendants' illegal demands, telling HPEC he was "not going to have 15,000 longshoremen marching on the property to save 10 Teamster jobs."

12. For over a year, HPEC attempted to reach a reasonable resolution with the Union Defendants to garner their support for its project. But the Union Defendants did not want to work with HPEC or share jurisdiction with any other union and they prevented HPEC from access to the Board's processes for approval of the amendment to the ENA, the amendment to the pilot study permit and approval of the Project's long-term leases. Seroka told HPEC: "This is a company town owned by the ILWU" and "they run the port."

13. Since the Port and the Union Defendants could not coerce HPEC into agreeing to monopolize the drayage jobs for ILWU members, the Port secretly agreed not to work with HPEC. Defendants conspired to kill the project and replace it with a different project that would better benefit the Union Defendants.

14. When the Port's general counsel Janna Sidley learned that Seroka had been making the illegal demand that HPEC grant exclusive jurisdiction over intra-port drayage to the ILWU, Seroka purported to "clarify" his demand in an email to HPEC, falsely claiming that he had never demanded that any particular type of labor be hired for the HPEC work.

15. In breach of its contractual obligations, the Port secretly negotiated with HPEC's competitor to develop an alternative project that would benefit the

Deleted: ¶
¶
5¶
<object><object>¶
¶
¶
Deleted:
Deleted: ¶
Deleted: and
Deleted: . Seroka
Deleted:
Deleted: <object>

Union Defendants while letting HPEC continue to expend valuable resources on the environmental review necessary for the project to proceed. In May 2019, in furtherance of its conspiracy with the Union Defendants, the Port (acting through Seroka) wrongly and in bad faith purported to terminate HPEC's rights in the project on the false pretext that the project was infeasible.

16. Defendants' acts were wrongful and caused great harm to HPEC. HPEC lost the historic opportunity to develop one of the most valuable and unique assets in the country. The pilot study alone would have generated an estimated $4.9 million to $5.8 million in revenue to HPEC. At full build-out, the project was expected to generate an estimated $59 million per year in profit which would have resulted in a profit participation share for POLA of an estimated $20 million per year.

17. Unfortunately, for the residents of Los Angeles, Defendants' illegal behavior has stifled development, innovation, competition and commerce in Los Angeles. HPEC's project has been hailed by virtually every stakeholder, including the Air Quality Management District, the Los Angeles Chamber of Commerce, the Southern California Association of Governments, the National Resource Defense Council, the California Trucking Association, the Harbor Trucking Association and more than 20 labor unions. It would have provided significant benefits to the public by boosting productivity, reducing congestion and pollution, and creating more than 100,000 regional jobs

18. As the Port recognized, the project would have "greatly augmented the Harbor Department's core cargo-handling function" and generated "substantial" revenue that "far exceeds the rental value of the land in its current state." Seroka himself told HPEC in January 2019 "it would have been great to have HPEC this year" because the port was dealing with record volumes. He added, "This project has the potential to be a game-changer."

**Deleted:** ¶
6¶
*<object><object>*¶
¶
¶

**Deleted:**

**Moved (insertion) [3]**

**Deleted:** *<object>*

19. The Port's bad faith and fraudulent conduct breached the parties' agreements and was done in furtherance of the illegal conspiracy with the Union Defendants to restrain trade and commit unfair labor practices. HPEC brings this action to recover damages and penalties based upon Defendants' wrongful actions.

**JURISDICTION AND VENUE**

20. Defendants' acts and omissions, as more fully alleged herein, violate federal and state laws. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and § 1337 because the First Amended Complaint arises under federal statutes: the NLRA, 29 U.S.C. § 158; the LMRA, 29 U.S.C. § 187; the Sherman Act, 15 U.S.C. §1; and the Clayton Act, 15 U.S.C. § 15 and § 26.

21. An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2202, which is of sufficient immediacy and reality to warrant declaratory relief.

22. The conduct alleged in the Second Amended Complaint occurred in interstate commerce and has substantially and directly affected and will continue to substantially and directly affect interstate commerce.

23. The Court has personal jurisdiction over the Defendants and venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) and (2), in that the unlawful acts and practices occurred in the County of Los Angeles, an area that is within this judicial district. The claims for relief from the violations of California law alleged in this complaint, and the claims for relief from the violations of federal law also alleged and which predominate this complaint, are based on a common nucleus of operative facts. Judicial economy, convenience and fairness to the parties will result if the Court assumes and exercises jurisdiction of the action for relief from the violations of California law below alleged.

Deleted: ¶
7¶
<object><object>¶
¶
¶

Deleted: 8

Deleted: ; and 42 U.S.C. § 1983

Deleted: 9

Deleted: First

Deleted:

Moved (insertion) [4]

Deleted: <object>

**THE PARTIES**

24. Plaintiff Harbor Performance Enhancement Center, LLC is a Delaware limited liability company. HPEC's principal place of business is 11400 W. Olympic Blvd., Suite 1400, Los Angeles, CA 90064.

25. HPEC is informed and believes, and thereon alleges, that Defendant City of Los Angeles Harbor Department ("POLA" or the "Port") is a proprietary department of the City of Los Angeles. At all times, the Port has acted in its proprietary capacity with respect to the project. The Port holds the LAXT site in trust, granted rights with respect to the site as a proprietor, and made decisions with respect to parties' rights and obligations regarding the site under its proprietary capacity. The Port is not supported by City taxes but rather operates as a landlord port with more than 200 leaseholders. The Port generates its revenues from leasing and shipping fees.

26. HPEC is informed and believes, and thereon alleges, that Defendant City of Los Angeles ("City" and together with the Port, the "City Defendants") is a political subdivision of the State of California and a charter city organized and existing under the Constitution and laws of the State of California.

27. HPEC is informed and believes, and thereon alleges, that Defendant International Longshore and Warehouse Union is, and at all times mentioned herein was, an unincorporated association commonly known as a labor union and maintains its principal offices in San Francisco, California. The ILWU represents workers in longshore and other occupations, employed by waterfront companies who are members of the Pacific Maritime Association, at all West Coast ports, including the Port of Los Angeles. The ILWU is a labor organization within the meaning of Section 152 (4)-(5) of the NLRA, 29 U.S.C. § 152 (4)-(5).

28. HPEC is informed and believes, and thereon alleges, that Defendant International Longshore and Warehouse Union Local 13 ("Local 13") is one of ILWU's longshore locals and is the representative for longshore workers at the Port

**Deleted:** 28¶
¶
8¶
*<object><object>*¶
¶
¶

**Moved down [5]:** <#>28. HPEC is informed and believes, and thereon alleges, that Defendant¶
<#>International Longshore and Warehouse Union

**Deleted:** <#>Eugene D. Seroka is an individual who works and resides in Los Angeles County.¶
<#>At all times relevant hereto, Seroka was, and is currently, the Executive Director of¶
<#>POLA. Seroka is sued in both his individual and official capacities.¶

**Moved (insertion) [5]**

**Moved down [6]:** 29. HPEC is informed and believes, and thereon alleges, that

**Deleted:** Defendant¶
International Longshore and Warehouse Union

**Deleted:** 9¶
*<object><object>*¶

**Deleted:** *<object>*

of Los Angeles. Local 13 is a labor organization within the meaning of Section 152 (4)-(5) of the NLRA, 29 U.S.C. § 152 (4)-(5).

29. HPEC is informed and believes, and thereon alleges, that Defendants, and each of them, were and are the agents, employees, co-conspirators, principals and/or employers of the remaining Defendants, and at all times herein mentioned were and are acting within the course and scope of such agency, employment, partnership, conspiracy and/or joint venture. HPEC is further informed and believes and, based on the acts and conduct herein alleged, states that each such Defendant was known to, authorized by and/or ratified by the other Defendants, and each of them.

Moved (insertion) [6]

Deleted: 30. HPEC is informed and believes, and thereon alleges, that

**NOTICE TO THE CITY**

30. Pursuant to the California Tort Claims Act, on December 13, 2019, HPEC provided the City with notice of its claim for damages, substantially setting forth the facts and claims alleged herein. On January 27, 2020, the City notified HPEC that it rejected HPEC's claim.

Deleted: 31

**FACTS COMMON TO ALL CLAIMS**

31. This Second Amended Complaint arises from a series of agreements and promises relating to the development of a Container Terminal Support Facility ("CTSF") at the former Los Angeles Export Terminal ("LAXT") located at 750 Eldridge Street, San Pedro, CA 90731 and the former U.S. Customs House located at 300 S. Ferry Street, San Pedro, CA 90731 ("Customs House") (collectively, the "Project").

Deleted: 32

Deleted: First

Deleted:

Deleted: ¶

32. The process of transporting containers from a given marine terminal to a nearby Port property is known as "intra-port drayage." A marine terminal is defined by the Pacific Maritime Association as a "dock" adjacent to water. Neither LAXT nor the Customs House sites are adjacent to water and are therefore not within the jurisdiction of the ILWU under the ILWU's collective bargaining agreement with its employer Pacific Maritime Association.

Deleted: 33

Deleted: Collective Bargaining

Deleted: <#>Agreement.¶
<#>¶
<#>10¶
<#><object><object>¶

Deleted: <object>

**A. The Port Selected HPEC's Transformational Plan**

33. On June 15, 2015, the Port published a Request for Proposals (the "RFP") to "Develop, Operate, and Maintain Land for a Container Terminal Support Facility" to invite proposals from the development community regarding the development, operation and maintenance of the LAXT and Customs House sites for use as a facility that supports container activity for nearby container terminals. A true and correct copy of the RFP is attached hereto as Exhibit A. The RFP does not place any labor restrictions or conditions on facility operations, including the offloading and transport of goods to any proposed CTSF. The Port never disclosed to proposers or HPEC that the Port would require that the ILWU be assigned the intra-port drayage jobs, or that the ILWU approved the project, or that no union other than the ILWU could work at the site and the project would have to benefit only the ILWU.

34. On or about August 10, 2015, HPEC submitted a proposal in response to the RFP. A true and correct copy of HPEC's proposal is attached hereto as Exhibit B. HPEC's proposal sets forth its goal of reducing traffic congestion at the Port while increasing overall cargo handling by approximately 10%. HPEC also planned for containers to be off-loaded from ships and transported to the CTSF without preference to a particular drayage company or the ILWU. The HPEC proposal expressly stated that the Project would "[n]eutrally serve all container terminals in the Port of Los Angeles" and "[n]eutrally serve all 1,600 drayage companies operating at the Port of Los Angeles." Access to everyone without bias is key to the Project's mission. Moreover, HPEC's proposal expressly identified Eco-Flow as the non-exclusive member of the HPEC consortium specializing in drayage, and stated that "Eco Flow is setting the new standards for clean trucks and favorable employment of drayage. . . ." However, HPEC never suggested that any drayage company including Eco Flow would have exclusive drayage rights to and from HPEC. As for the ILWU, HPEC's proposal merely states that "[t]he higher

Deleted: 34

Deleted: 35

Deleted:

Deleted: 11¶
<object><object>¶

Deleted: <object>

throughput of marine terminals should ensure no loss of jobs to ILWU." In fact, HPEC is confident that the Project would increase ILWU jobs at the Port's terminals because of the increased container throughput. The Project is also expected to add more than 100,000 jobs to the regional economy.

35. HPEC was intended to solve a number of problems at the Port. In 2018, POLA moved more cargo than at any time in its history. It was the third consecutive year of record-breaking volumes. In 2019, container volumes overall were up and put POLA within 5,000 container units of its second-best year in its history. The Port suffers from congestion, long wait times and pollution. HPEC would have reduced the wait time for trucking companies which would lead to higher velocity, less fuel and increased labor efficiency. For terminal operators, it would have provided greater inventory control and visibility and increased productivity. Higher velocity meant less congestion and 75% better distribution dispersion. For the Port, greater throughput meant more revenue.

36. Following a competitive process that involved multiple bidders, on October 28, 2015, the Port selected HPEC to develop the Project. The Port never disclosed that there were any conditions on its approval relating to the ILWU; never demanded that the ILWU be assigned the drayage jobs or that the Teamsters not be assigned any jobs at the CTSF; and, again, never expressed to HPEC that it conditioned any element of the Project upon the affirmative approval or consent of the ILWU.

**B. The Authority and Role of the Los Angeles Board of Harbor Commissioners and The Executive Director In Approving The Parties' Contracts And The Project**

37. The Los Angeles City Charter created the Harbor Department as a Proprietary Department. Pursuant to Section 600(b) of the City Charter, the Harbor Department is "under the control and management of a board of commissioners that shall be the head of the department."

Deleted: 36

Deleted:

Deleted: 37

Moved (insertion) [7]

Deleted: B

Deleted: <object>

38. The Board is comprised of five members who are appointed by the Mayor of Los Angeles and confirmed by the Los Angeles City Council. The commissioners serve five-year terms and elections are typically held every July for the offices of president and vice president.

39. Regular meetings of the Board are scheduled at least twice a month. The Ralph M. Brown Act, Cal. Gov. Code, § 54950 et seq. ("Brown Act"), obligates government agencies to meet and act in public and prohibits a majority of the Board's members from using a series of communications outside a meeting authorized by the Brown Act to discuss, deliberate, or take action on any item of business that is within the subject matter jurisdiction of the Board. Members of the public are given the opportunity to directly address the Board on any items of interest within the subject matter jurisdiction of the Board before or during the Board's consideration of the item by attending a Board of Harbor Commissioners' meeting and filling out a speaker card.

40. Pursuant to City Charter Sections 600 and 501, the Board oversees the management and operation of the Port.

41. Under City Charter Section 651, the Board has "possession, management and control" of "all harbor and port improvements, works, utilities, facilities and watercraft owned, controlled or operated by the department."

42. Under Section 652(c) of the City Charter, the Board has the power and duty to, among other things, "regulate and control the construction, maintenance, operation and use of any railroad, wharf, warehouse or other facility, utility, structure or improvement used in connection with the Harbor District."

43. Under Section 509(a) of the City Charter, the Executive Director has the authority to "administer the affairs of [POLA] as its chief administrative officer." Under City Charter Section 604(c), "the Board of each Proprietary Department may authorize its general manager to contract on behalf of the department where the contract does not involve payment or receipt of money or

Deleted: <object>

consideration reasonably valued in excess of a monetary limit provided by ordinance."

44. Under Section 506(c) of the City Charter, subject to Section 373, any action by the Harbor Department approving of contracts which obligate the City for a longer period of time than as provided by ordinance shall be taken by the head of the department by order or resolution. Section 373 requires City Council approval for certain long-term contracts that obligate the City or any department to make or receive payments of money or other valuable consideration for a period longer than such period as provided by ordinance.

45. Under City Charter Section 606, "Board action … approving leases shall be taken by order or resolution. If the board's order or resolution … approves a lease for a term greater than five years, it shall be submitted to Council for its approval or disapproval."

46. Los Angeles Administrative Code Section 10.1.1(a) provides that the Board of Harbor Commissioners may authorize its General Manager "to contract on behalf of its department where the contract does not involve consideration reasonably valued in excess of One Hundred-Fifty Thousand Dollars ($150,000)." Section 10.1.1(c) further provides that notwithstanding the provisions of subsection (a), the Board of Harbor Commissioners may authorize the General Manager to enter into contracts on behalf of the Department "that satisfy all of the following: (1) The contract is not for personal services; and (2) The contract does not obligate the City for a term of longer than three years including all extensions, renewals and amendments; and (3) The contract does not involve consideration reasonably valued in excess of One Hundred Fifty Thousand Dollars ($150,000) annually."

**C. The Port Agreed To Negotiate In Good Faith And Exclusively With HPEC**

47. After the Port selected HPEC, the Port and HPEC came to terms on several agreements setting forth how development of the Project would proceed.

Deleted: 38

Deleted: <object>



The parties first agreed upon an Exclusive Negotiating Agreement ("ENA") granting HPEC an exclusive right to "negotiate a term sheet, option agreement and form of entitlement as may be appropriate for subsequent use and occupancy." A true and correct copy of the ENA is attached hereto as Exhibit C.

48. On July 21, 2016, the Board approved the ENA in a closed session meeting. On September 2, 2016, the Port executed the agreement, which started the running of the initial 12-month period.

49. Paragraph 1(B) of the ENA obligated the City not to negotiate for a permit or any other entitlement, or for the development of the Site or any portion thereof, with any party other than HPEC during the exclusivity period. The ENA specifically provided that "[n]egotiations under the [ENA] shall be undertaken by City and by Developer in good faith."

50. Paragraph 1(C) of the ENA recognized that "pursuit of the proposed development including issuance of a ground lease document or any other entitlement or agreement is subject to approval of Board and City's City Council."

51. The ENA provides, in relevant part, that "[a]ny action or proceeding arising out of or related to this Agreement shall be filed and litigated in the state or federal courts located in the County of Los Angeles, State of California, in the judicial district mandated by applicable court rules."

52. Based on the ENA, HPEC expected that if it agreed to reasonable economic terms it would obtain authorization from the City and Port to build and operate the Project.

53. As originally contemplated, the ENA had an initial term of 12 months with an option to extend for an additional six months. HPEC could exercise the option to extend no later than 30 days prior to the expiration of the ENA by written notice to the City. With the option, the ENA would expire no later than March 2, 2018. However, three months following execution, on December 8, 2016, the Port decided that the project required a full Environmental Impact Report rather than a

Moved up [2]: 28¶
¶
Deleted: 12¶
<object><object>¶
¶
¶
Deleted: 39
Deleted: .
Deleted: 40

Deleted:  Based on the ENA, HPEC expected that if it
Deleted: <#>agreed to reasonable economic terms it would obtain authorization from the City¶
<#>and Port to build and

Moved down [8]: operate the Project.¶
Deleted: 41

Moved (insertion) [8]
Deleted: 42
Deleted: Thus, in
Deleted:  event that HPEC
Deleted: exercised its
Deleted:
Deleted: ¶
Deleted:
Deleted: ¶
Deleted:
Deleted: <object>

more limited review and therefore the entitlement process for the Project would exceed the original term of the ENA, requiring the parties to amend the agreement. It is common to have extended ENA terms given lengthy requirements in California for a robust environmental impact review under the California Environmental Quality Act.

54. The parties negotiated a Memorandum of Understanding ("MOU") for both sites that provided the framework for finalizing a long-term lease agreement as well as an amendment that would extend the ENA. During their negotiations, HPEC repeatedly informed the Port that the ENA's exclusivity provision was materially important to HPEC. In a November 9, 2016 email, HPEC CEO Jonathan Rosenthal ("Rosenthal") memorialized his discussion with the Port's Director of Real Estate Division Jack Hedge ("Hedge") and copied Hedge on his email "so he can correct anything I may have misunderstood." Rosenthal wrote in relevant part: "As to 'exclusivity', Jack understood we agreed to exclusivity so long as we are working on the project in good faith, until we have either abandon the project or determined it is infeasible. . . the 'exclusivity' provision must be a binding contractual obligation that shall survive until the execution of the long term lease agreement, unless early terminated as described." Hedge responded to Rosenthal's email, "I think this covers everything…"

55. On February 2, 2017, Rosenthal informed the Port's Executive Director Seroka and other executives that HPEC had determined to engage international real estate consultancy group Jones Lang LaSalle ("JLL") to, among other things, prepare a feasibility study and market analysis. Rosenthal specifically informed the Port that HPEC's financial commitment was "material" and HPEC did not want to pull the trigger until getting the green light from Seroka and the Board in the form of an executed MOU and amendment to the ENA. Hedge responded that he personally approved of JLL and the Port would let HPEC know if there was a reason not to proceed with JLL.

Deleted: ¶
Deleted:
Deleted: ¶
Deleted:
Deleted: ¶
Deleted:
Deleted: ¶
Deleted:
Deleted: ¶
Deleted: 43

Deleted: ¶
13¶
<object><object>¶
¶
¶
44. On February 2, 2017,
Deleted:

Deleted:
Deleted: ¶
Deleted:
Deleted: ¶
Deleted:
Deleted: ¶
Deleted:
Deleted: ¶
Deleted:
Deleted: ¶
Deleted:
Deleted: ¶
Deleted: The Port's Director of its Real Estate Division Jack Hedge
Deleted: ("Hedge") responded
Deleted: ¶
Deleted:
Deleted: <object>

56. On February 10, 2017, the parties were still revising the MOU and amendment to the ENA. Rosenthal sent an email to Hedge and others in which he stated the "ENA is a very important part of the puzzle since we will be relying on our exclusivity as we invest dollars in the project."

57. HPEC and the Port met on February 13, 2017. In his email to Executive Director Seroka and Deputy Director DiBernardo, Hedge wrote that he discussed with HPEC "the plan to do Closed Session on March 2, execute thereafter."

58. In an email dated February 20, 2017, Rosenthal emailed Hedge and Frank Sanchez in the Port's Real Estate group asking when the Port would circulate the draft ENA amendment. He wrote, "I know we are all committed to getting this before the Board on March 2nd. It has always been our collective understanding (and requirement) that both the ENA extension and the MOU would be adopted simultaneously." Sanchez responded: "The proposed Amendment to the ENA will be finalized and will reflect the understanding between you and Jack [Hedge]."

59. In an email dated February 21, 2017, Rosenthal again emphasized the importance of the ENA to the Port, writing "[h]aving the MOU in place WITHOUT an ENA does us no good because we can't move forward."

60. In an email dated February 22, 2017, Rosenthal wrote to several Port staff, including Hedge and Deputy Director DiBernardo: "We have been told that the ENA will be extended throughout the CEQA process, until we can actually execute a lease – or we jointly determine that the project is infeasible. This was baked into the deal from the outset. It is merely an extension of our existing ENA. We were told several months ago that the ENA (which has been fully negotiated and language agreed upon) must now be transferred to a City form. I don't know if this is true or not since the existing ENA is not on a City form, or perhaps I've misunderstood. We have been asking for a copy of the revised ENA for several

Moved (insertion) [9]

Deleted: 45

Deleted: 9

Deleted: Port and HPEC agreed to modify the term of

Deleted: the ENA

Deleted: earlier

Deleted: (i)

Deleted: completion of "all approval processes" or (ii)

Deleted: termination of

Deleted: ENA under

Deleted: terms defined

Deleted: agreement.

Moved down [10]: A true and¶ correct copy of this "First Amendment" to the ENA (the "Amendment") is attached¶ hereto as Exhibit D.

Deleted: ¶ C

Deleted: <object>

months, but have received nothing. We must execute both [the Amendment and the MOU] simultaneously."

61. Later that same day, the Port's Frank Sanchez circulated a draft closed-session memo regarding the HPEC MOU and ENA Amendment to Hedge.

**D. The ENA Was Amended To Extend The Exclusivity Period And The MOUs Were Executed**

62. On March 2, 2017, the Port's staff presented a report to the Board outlining the scope of the Project along with a recommendation that the Board approve the Amendment to the ENA and the MOUs and work toward finalization of the terms of lease agreements. The subject line of the report was "Advice to Negotiators – Development of Former US Customs House And LAXT Sites by Harbor Performance Enhancement Center, LLC." In describing the project, the staff explained the "Harbor Department will, in a sense, become a 'partner' in this project and as such will participate in the revenue generated from the proposed operations," which it characterized as "substantial." The staff further explained that the Port's "participation share of Net Operating Income (NOI), at +/- $17 million per year, far exceeds the rental value of the land in its current state." This is because the Port opted to participate in the profits as a partner rather than accept a fixed rental amount. Port staff estimated the existing value of the property at $2.5 million per year.

63. The Amendment was brought before the Board in a closed session meeting. The Board approved the Amendment and two Memorandums of Understanding ("MOUs") at the LAXT and Customs House sites. A true and correct copy of this "First Amendment" to the ENA (the "Amendment") is attached hereto as Exhibit D. True and correct copies of these Memoranda (excluding exhibits) are attached hereto as Exhibits E and F, respectively.

64. Executive Director Seroka reported to HPEC by text message from the closed session that the Board unanimously approved the Amendment: "100 %

Deleted: 46
Deleted: In describing the project, the staff explained the
Deleted:
Deleted: ¶
Deleted:
Deleted: ¶
Deleted:
Deleted: ¶
Deleted:
Deleted: ¶
Deleted:
Deleted: ¶
Deleted:
Moved up [3]: 28¶ ¶
Deleted: ¶
Deleted: 14¶ <object><object>¶ ¶ ¶
Deleted:
Deleted: ¶
Deleted: 47
Moved (insertion) [10]
Deleted: ¶
Deleted:
Deleted: ¶
Deleted: 48
Deleted: <object>

support from our Board on HPEC just now. Onward and upward we go!" Hedge similarly confirmed approval in his March 2, 2017 email to HPEC: "Good Closed Session today with the Board giving us the green light to proceed on the basis outlined in the MOU. We need to proceed with getting the MOU and ENA amendment signed and to proceeding with next steps." Hedge also offered his "congratulations."

65. After receiving Board approval, Hedge prepared an interoffice memorandum for Seroka dated March 10, 2017 summarizing the MOU and Amendment to the ENA. Hedge wrote: "[T]he Cargo and Industrial Real Estate Division would like to enter into an MOU with HPEC and amend the existing ENA between the parties. The attached First Amendment has been approved as to form and legality."

66. Only after having first received Board approval, Executive Director Seroka executed the MOUs and the Amendment on behalf of the Port and the City. Deputy City Attorney Steve Otera executed the Amendment as to "form and legality." Like Seroka, Otera only executed the Amendment after first receiving Board approval and knowing that the Board had acted only in closed session and took no reportable action. HPEC also executed the MOUs and the Amendment. On March 10, 2017, Seroka and HPEC CEO Jonathan Rosenthal celebrated the milestone by meeting with Mayor Garcetti and his Chief of Staff at City Hall.

67. In the Amendment to the ENA, the Port and HPEC agreed to modify the term of the ENA to the earlier of (i) the completion of "all approval processes" or (ii) the termination of the ENA under the terms defined in the agreement. The Amendment to the ENA substantially satisfies the requirements under the ENA for the exercise of HPEC's option to extend the exclusivity period by six months to March 2018.

68. Even though Deputy City Attorney Otera had approved and executed the Amendment as to form and legality following the Board meeting, on March 24,

Deleted: 49

Deleted: 50

Deleted: .

Deleted:

Deleted: ¶

Deleted:

Deleted: ¶

Deleted: ¶
15¶
<object><object>¶
¶
¶
51

Deleted: <object>

2017, Hedge informed HPEC in an email that the City Attorney was "now of the opinion" that the Amendment to the ENA needs to be acted on by the Board which would require scheduling for the next available board meeting. Since the Port had informed HPEC that the Board fully supported the Project and had directed Seroka to execute the Amendment and proceed with the next steps, this hardly suggested any issue with the Project. HPEC reasonably assumed that the Port would proceed with the next steps and obtain whatever additional action the City Attorney now thought appropriate or necessary. Indeed, even though HPEC met weekly with the Port (often with Otera present), the Port never disclosed to HPEC that the Board supposedly had not acted on the Amendment or that the Amendment was not valid. Nor did the Port cast any doubt on the validity of the Amendment when Port officials met with Macquarie prior to its investment. Even though the Port was aware that HPEC and Macquarie believed that the ENA had been amended, the Port waited to disclose that it had failed to submit the Amendment to the Board to be acted upon until after Macquarie's investment closed. HPEC reasonably relied on the Port's representations (and lack of disclosure of material facts) to its detriment.

**E. The MOUs Obligated The Port To Act In Good Faith And Did Not Restrict Drayage Exclusively To The ILWU**

69. The MOUs imposed an obligation on the Port to operate cooperatively, reasonably, and in good faith to negotiate long-term lease agreements for the Project. The MOUs provided, "Until such time (if any) as this MOU is terminated, the Parties agree to work together cooperatively and in good faith to negotiate, prepare and execute the Lease, reflecting the terms summarized in this MOU." The MOUs recognized that any lease would have to be approved by both the Board and City Council.

70. Pursuant to Section 605(a) of the City Charter, the Board has the power to grant and set the terms and conditions for any lease concerning any property under its control. Pursuant to Section 606 of the City Charter, Board

Deleted: D

Deleted: 52

Deleted: Likewise,

Deleted: <object>

action approving leases "shall be taken by order or resolution." Any leases for a term greater than five years also require the approval of the City Council.

71. The MOUs provided that they may be terminated only upon "written notice to HPEC that the Harbor Department has determined in its sole reasonable discretion that the project is infeasible." Like the agreements that came before, the MOUs did not place any restrictions on drayage, obligate HPEC to secure ILWU jurisdiction over drayage jobs historically performed in part by the Teamsters and other truckers, or otherwise grant the ILWU veto authority over the Project.

72. The MOU for the LAXT site stated that the City would issue a "Temporary Use and Entry Permit" and promised "HPEC shall reasonably be permitted to enter the LAXT site for purposes of environmental and other property due diligence and investigations." Accordingly, any failure of the Port to grant access to the LAXT site to HPEC violated the promise that HPEC could be "reasonably" permitted to conduct "other property due diligence and investigations." HPEC and the Port intended to use the pilot project to determine the feasibility of the Project.

73. Both MOUs contained the following provision regarding labor: "HPEC acknowledges and agrees that construction at the Customs House Site shall be subject to the Project Labor Agreement, a copy of which has been delivered to HPEC, and HPEC shall be required to comply with such agreement during construction, but does not apply to its business operation." (emphasis added). The MOUs do not contain any other labor provision, restriction or covenant.

**F. The Port's Public Statements Led HPEC To Believe It Supported The Project**

74. Shortly after the execution of the amended ENA and the MOUs, the Port publicized the Project in news articles published by the *Long Beach Business Journal*, *American Journal of Transportation*, and *American Shipper* on April 24, 2017, August 9, 2017, and August 14, 2017. Executive Director Seroka pointed out

Deleted:
Deleted: ¶
Deleted:
Deleted: ¶
Deleted:
Deleted: ¶
Deleted:
Deleted: ¶
Deleted:
Deleted: ¶
Deleted: ¶
16¶
<object><object>¶
¶
¶
53
Deleted: the feasibility
Deleted: and the Port's initial delay and later refusal to allow HPEC to run the
Deleted: <#>pilot project breached the MOU for the LAXT site.¶
<#>54
Deleted: E
Deleted: 55
Moved (insertion) [11]
Deleted: <object>

that the Port was embarking on a "signature project," explaining that "[i]t is one of collaboration and work and how government, [the] private sector[,] and investors can come together at one time." Executive Director Seroka also described HPEC CEO Jonathan Rosenthal as "a close friend over the past couple of years to our supply chain community" and lauded Mr. Rosenthal for having "already done an extensive job of reaching out to neighborhood organizations [and] environmental organizations as well as shippers, stevedores, truckers and longshore labor." These statements gave HPEC confidence that its position with the Port related to this project was secure and caused HPEC to raise funding and expend thousands of hours and millions of dollars to support development activities.

**G.    HPEC Initiated Marketing Efforts That Were Intended To Result In Substantial Income To HPEC And The Port**

75.    The primary sources of income to HPEC were expected to be container valet and parking operations at the former LAXT site. HPEC expected to earn additional income from lease revenues at the Customs House site. At full build-out, HPEC expected to earn an estimated $59 million in profit per year, roughly a third of which would be distributed to the Port as its profit participation.

76.    With the belief that the amendment to the ENA and MOUs were in place, HPEC began marketing the Project internationally with an announcement at the Trans-Pacific Maritime conference in Long Beach with 3,000 attendees. HPEC anticipated securing lucrative contracts with ocean carriers and beneficial cargo owners seeking to avoid historic congestion.

**H.    The Port Continued To Develop The Project With HPEC**

77.    In addition to publicly supporting the HPEC Project, the Port continued to work with HPEC to develop the project. By June 1, 2017, HPEC and the Port initiated the first of a series of meetings to jointly coordinate work to prepare an environmental assessment of the Project. The Port required HPEC to enter into an agreement to indemnify the City in connection with the Project. On

Deleted: ¶
17¶
<object><object>¶
¶
¶

Deleted: F

Deleted: 56

Deleted: 57

Deleted:

Deleted: ¶

Deleted:

Deleted: ¶

Deleted:

Deleted: ¶

Deleted:

Deleted: ¶

Deleted: G

Deleted: 58

Moved (insertion) [12]

Deleted: <object>

August 17, 2017, the Board approved the Indemnity Agreement. A true and correct copy of the Indemnity Agreement is attached hereto as Exhibit G.

78. Had HPEC known that the Amendment to the ENA was not operative, HPEC would not have entered into an Indemnity Agreement. This is because the Indemnity Agreement allowed for reimbursement of up to $200,000 of Port costs related to the processing of CEQA documents. HPEC would not have agreed to invest capital in the Project sites if the Port was free to encumber the property in a way that restricted HPEC's use of the Project sites or to negotiate with another developer or potential lessee, causing HPEC to lose the property to another party.

79. The Port and HPEC negotiated a 13-month permit (lease) to facilitate a "Pilot Study" of the Project to test feasibility by assessing the environmental and market impact of the Project. Under the Pilot Study, HPEC would test 400 container spots for its CTSF and was expected to generate an estimated $4.9 million to $5.8 million in revenue to HPEC. In the Board report that accompanied the permit, the Port stated that the proposed project was expected to include a 50-year lease agreement.

80. During their negotiations over the permit, HPEC raised an issue with respect to the integration clause proposed by the Port in its drafts of the permit. In an email to the Port's attorney Steve Otera (the same attorney who claimed that the Amendment still needed to be acted on by the Board after the March 2 closed session meeting), HPEC's counsel expressed concern that the Port's proposed language would inadvertently cancel existing agreements, more specifically the ENA and the Indemnity Agreement. Otera never disclosed to HPEC's attorney that the Amendment to the ENA still had not been acted upon by the Board and was not an "existing" agreement. Rather, Otera incorporated the language proposed by HPEC into the final permit, leading HPEC to reasonably believe that the Amendment was valid.

Deleted: 22
Deleted: 59
Deleted: there been no
Deleted: ENA,
Deleted: ¶
Deleted:
Deleted: ¶
Deleted:
Deleted: ¶
Deleted:
Deleted: ¶
Deleted:
Deleted: ¶
¶
18¶
<object><object>Case
Moved up [1]: 2:20-cv-03251-PSG-MAA
Deleted: Document 36 Filed 07/20/20 Page 20 of 62 Page ID #:530¶
¶
¶
Deleted:
Deleted: ¶
Deleted: 60
Deleted: 61

Deleted: <object>

81. Board approval of the permit, however, was repeatedly delayed and Seroka even pulled the HPEC item from the agenda because of ILWU opposition to the Board considering the permit.

82. On November 7, 2017, Board Vice President David Arian called Deputy Director DiBernardo. DiBernardo texted Seroka and other Port executives: "Guys, Arian called. ILWU okay to move forward with HPEC on Thursday. Thanks."

83. On November 16, 2017, the Board approved the permit to operate a Pilot Study on 10 acres of the former LAXT site and a Private Railroad Crossing Agreement (the "Permit"). President of ILWU Local 13 Mendoza spoke at the public hearing in support of HPEC.

84. On December 12, 2017, the Port executed the Permit. The Permit required HPEC to pay a monthly rent of $24,119.86 for the 13-month term. Consistent with prior agreements and approvals, the approval of the Permit and the right to access property as promised under the Permit were not subject to ILWU consent and did not obligate HPEC to grant ILWU exclusive or any jurisdiction over drayage jobs historically performed in part by the Teamsters and others. A true and correct copy of this Permit is attached hereto as Exhibit H.

85. The Permit provides, in relevant part, that "[a]ny action or proceeding arising out of or related to this Permit shall be filed and litigated in the state or federal courts located in the County of Los Angeles, State of California."

**I. As HPEC Prepared The Pilot Site, ILWU Questioned The Work Being Done And Who Would Be Doing It**

86. After the City executed the Permit, HPEC worked to commence pilot operations as quickly as possible. The ILWU was monitoring the site as HPEC began leveling and paving the site to create parking spaces. On December 27, 2017, the ILWU reached out to the Port to question the purpose of the construction work being done at the site. The ILWU visited the site with the Port's Deputy

Deleted: .
Deleted: ¶
Deleted:
Deleted: ¶
Deleted:
Deleted: ¶
Deleted:
Deleted: 62
Deleted: 63
Deleted: 64
Deleted: ¶ 19¶ <object><object>¶ ¶ ¶ H
Deleted: 65
Deleted: <object>

Director DiBernardo and questioned what chassis repair work would be done. Neither the Port's RFP nor HPEC's proposal contemplated chassis maintenance operations, work often done by ILWU labor.

87. HPEC invested approximately $250,000 to develop engineering plans which were approved by the Port, grade approximately 10 acres of the property, construct below grade drainage, and lay aggregate surface material.

88. At the end of January 2018, as the Port was aware, HPEC advertised that it would be taking reservations for parking of wheeled containers on Terminal Island and 400 parking spots would be available at the beginning of February. There was a lot of positive interest in the pilot program and HPEC was confident that the pilot study would yield positive results.

**J. Executive Director Seroka's State Of The Port Address Included HPEC As A Highlight**

89. On January 11, 2018, Executive Director Seroka gave a State of the Port address. Seroka specifically mentioned HPEC in the highlights of the Port's accomplishments.

**K. The Port Delayed The Start Of The Pilot Study**

90. By February 2018, HPEC wanted to begin operating the pilot, but the Port repeatedly delayed the start date, had not yet allowed HPEC to commence pilot operations and prohibited HPEC from using the land, always representing that the delay was temporary.

91. By this time, the ILWU had let the Port and HPEC know it wanted the drayage jobs at HPEC. In late January 2018, Vice President Arian asked Deputy Director DiBernardo how the pilot project would work – "i.e., where are the containers coming from and who is draying them." On January 30, 2018, Vice President Arian asked Deputy Director DiBernardo again about "day 1 operation." On January 31, 2018, Deputy Director DiBernardo texted Vice President Arian. While a portion of the text is redacted, the message that was produced reads: "Hi

Deleted: 66

Deleted: 67

Deleted: I

Deleted: 68

Deleted: J

Deleted: 69

Deleted: ¶ 20¶ <object><object>¶ ¶ ¶ 70

Deleted: On or about

Deleted: 31,

Deleted: ¶

Deleted:

Deleted: Rosenthal texted Deputy

Deleted: <object>

Dave I got stuck in another meeting this morning…[Redacted]…I will see if there's anything going on at HPec and I'm waiting for Jonathan to call me back maybe we can go tomorrow after the board meeting. I will keep u posted."

92. In response to DiBernardo's email about Vice President Arian's questions, Rosenthal texted Deputy Director DiBernardo that "David [Arian] needs to understand that HPEC has no drivers, no trucks, no DOT [license], no employees other than lawyers, developer types." In another text, Rosenthal told DiBernardo to keep in mind that HPEC would contract with third parties for all services. Rosenthal explained to DiBernardo that the ILWU is claiming "approximately 377,000 relevant intra-Port repositionings annually" as their work. DiBernardo responded with his thoughts: "I think the key message tomorrow is you are not controlling dray. BCO [beneficial cargo owners] are and ILWU needs to provide a business case and pricing to use their drivers."

93. On January 31, 2018, Deputy Director DiBernardo sent an email to Executive Director Seroka and other Port officials. In his email, DiBernardo wrote: "Gene. Jonathan [Rosenthal] says you were going to tell ILWU that we want to get the pilot going and who ever orders the dray will pick the dray company. Once ILWU gets equipment they can compete for the business. Was that discussion ever had with ILWU?"

94. On February 9, 2018, Port staff met with Mark Mendoza from Local 13 and other local ILWU union leaders to discuss HPEC. HPEC is informed and believes that Vice President Arian attended the meeting. That same day, the Port represented to HPEC that the revocable permit would be modified to extend the start date and assured HPEC that it would not be charged rent until the Port allowed the pilot study to begin.

95. On February 26, 2018, the Port emailed HPEC proposing "to amend the Revocable Permit issued for the purposes of the pilot study." The Port agreed to defer the Pilot Study until it granted HPEC access to the LAXT site for

Moved (insertion) [13]

Moved (insertion) [14]

Deleted:

Deleted: ¶

Deleted:

Deleted: ¶

Deleted:

Deleted: ¶

Deleted:

Deleted: ¶

Deleted:

Deleted: ¶

Deleted:

Deleted:

Deleted: ¶

Deleted:

Deleted: ¶

Deleted:

Deleted: ¶

Deleted: 71

Deleted: 72

Moved (insertion) [15]

Deleted: <object>

commencement of operations, which the Port indicated it would do no later than June 1, 2018. The Port acknowledged that it was the cause of the delay and promised to abate rent until HPEC had operational access.

96. In an email dated March 16, 2018, Rosenthal informed Seroka, DiBernardo and Hedge that HPEC was planning on a May 1st start. In his response, DiBernardo wrote: "Great thank you." DiBernardo also asked how the first day would look. In response to this question, Rosenthal wrote that "there will be a number of LMCs [licensed motor carriers] doing both in-bound and out-bound dray. We have 4 to begin with that have committed."

97. The Port publicly announced that the Pilot Study would eventually begin. On April 2, 2018, in an article about the Project published on *JOC.com*, a spokesperson for the Port stated that "the intention is to run the pilot for one year until May or June 2019 to determine if it is feasible."

**L. HPEC Raised The Financing Needed For The Project**

98. With the Port's full knowledge, participation and approval, HPEC and JLL worked to secure additional financing for the Project. HPEC enjoyed a high profile in the international infrastructure community with an innovative project that was a "win-win" for all parties. HPEC and JLL engaged 114 institutional investors globally, brought 39 investors into the project data room, and secured several letters of intent from some of the largest and most prominent investors in the world. Several institutional investors toured the Project sites and met with Port officials.

99. The Port reviewed the investment memorandum prepared by JLL dated October 2017. In the memorandum under the description of the property, it reads: "Harbor Performance Enhancement Center (HPEC) is situated on approximately 110 acres owned by the Port of Los Angeles (POLA). HPEC is located on Terminal Island—on what is known as the former LAXT site—and controlled via a memorandum of understanding (MoU) and exclusive negotiation agreement (ENA) that will ultimately lead to the signing of a 50-year lease." At

**Deleted:** 23
**Deleted:** .
**Deleted:** <#>73. A month passed, but the Port did not issue a permit amendment.¶
**Deleted:** <#>completed construction but still did not have …
**Deleted:** <#> to the
**Deleted:** <#>LAXT site. Since the Port had not given HPEC operational access, it promised to¶ <#>abate rent. Despite the Port-mandated delay, the
**Deleted:** ¶
**Deleted:**
**Deleted:** For example, on
**Deleted:** ¶ ¶ 21¶ *<object><object>*¶ ¶ ¶
**Deleted:**
**Deleted:** ¶
**Deleted:**
**Deleted:** ¶
**Deleted:** K
**Deleted:** 74
**Deleted:** 75
**Deleted:** *<object>*

this point in time (October 2017), there would only be an ENA in place if the Amendment was valid or the option had been exercised. Yet the Port did not disclose to HPEC that it had failed to submit the Amendment to the Board to be acted upon and thus it was not valid.

100. The largest global infrastructure investor in the world, Macquarie Group Limited ("Macquarie"), became interested in financing the Project. Macquarie representatives traveled from Australia to conduct due diligence and on November 26, 2017, they met with HPEC and the Port's Director of Real Estate Jack Hedge and others. On December 18, 2017, Commissioner Renwick met with HPEC and Macquarie representatives. On December 19, 2017, Executive Director Seroka and others at the Port met with Macquarie representatives. On or about January 20, 2018, Macquarie representatives toured the Port with Deputy Director DiBernardo and other Port staff. Among other things, Macquarie questioned the Port about whether the Port and City leadership and the Board supported the project. In its discussions with Macquarie, the Port never claimed or disclosed to either HPEC or Macquarie that, in its view, the Amendment to the ENA had not been properly approved. Moreover, the Port never claimed or disclosed that the Project was contingent on the ILWU's approval or the assignment of drayage jobs to the ILWU. That the Port represented that the Port, Board and City leadership supported the Project but failed to disclose that the Amendment to the ENA had not been acted upon by the Board, that it did not intend to negotiate or act in good faith, or that the Project was contingent on the ILWU's approval or assignment of drayage jobs made its disclosure deceptive. These facts were only known to the Port and HPEC could not have discovered them. Had the Port made these disclosures, neither Macquarie nor HPEC would have proceeded with the investment.

101. On or about February 1, 2018, Macquarie and HPEC entered into a term sheet which contained a section entitled "Existing Agreements." The ENA

Deleted: 15

Deleted: 19

Deleted:

Deleted: Had

Deleted: made these disclosures, neither Macquarie nor HPEC…

Deleted:

Moved (insertion) [16]

Deleted: <object>

"dated July 5, 2016, and amended March 10, 2017" is listed therein. HPEC believes that it shared the term sheet with the Port. Yet the Port never claimed or disclosed to HPEC that the ENA had not been properly amended in March 2017. HPEC was harmed because the Port concealed the fact that it had failed to submit the Amendment to the Board to be acted upon.

102. As a result of this process and again with the Port's prior approval and encouragement, in March 2018, Macquarie became a 50% equity stakeholder in HPEC and the Project, pledging up to $130 million in financing. These activities were predicated on the understanding, shared by all participants, that the Amendment was valid and binding, and obligated the Port to negotiate exclusively and in good faith with HPEC concerning the Project and to terminate the Project only if it had determined the Project to be infeasible. A press release, approved by the Port, detailed Macquarie's investment in the Project. Seroka was quoted as saying: "HPEC could be one of the nation's most important supply chain projects. Its innovative approach and emphasis on industry education will result in improved efficiency, increased freight flow, lower handling costs, and further reductions in emissions and congestion."

**M. The Port Repeatedly Met In Secret With The Union Defendants About HPEC**

103. After May 2019, HPEC discovered that the Port was secretly conspiring with the Union Defendants in breach of its contractual obligations and federal law. After the Port wrongfully terminated HPEC's rights in the Project, HPEC obtained some of the Port's email and text communications through a Public Records Act Request. The Port, however, withheld thousands of documents, communications and recordings on purported privilege grounds. For unknown reasons, the Port also suppressed other highly relevant documents, including communications between the Union Defendants and the Board, most notably the Board's Vice President David Arian. Prior to his appointment to the Board, Arian

Deleted: 28¶

Moved up [11]: ¶ 22¶

Deleted: <object><object>¶ ¶ ¶ 76

Deleted: . A press release, approved by

Deleted: L

Deleted: <#>HPEC¶ <#>77.

Deleted: <#> now knows

Deleted: ¶

Deleted:

Deleted: ¶

Deleted:

Deleted: ¶

Deleted:

Deleted: ¶

Deleted: has

Deleted:

Deleted: ¶

Deleted:

Deleted: ¶

Deleted:

Deleted: ¶

Deleted:

Deleted: ¶

Deleted:

Deleted:

Deleted: <object>

had served as President of both Local 13 and the International ILWU. Vice President Arian was deeply involved in regular discussions and meetings with the Union Defendants relating to HPEC. Further discovery will reveal whether the ILWU used Vice President Arian to communicate with a majority of the other Board members outside of a public Board meeting to discuss or deliberate on HPEC in violation of the Brown Act.

104. Although the Port withheld thousands of communications on purported privilege grounds and suppressed highly relevant communications with the Union Defendants, the select communications produced reveal the Port repeatedly met in secret with the Union Defendants. They met in secret to discuss HPEC even though the union has no jurisdiction over the Project nor any expertise or capabilities in the drayage work it later attempted to extort from HPEC and HPEC does not have a single employee (truck driver or otherwise) and cannot legally commit potential future employees to ILWU representation. The emails reveal the union's pressure on and coercion of the Port and the conspiracy that ultimately developed between them. In violation of its contractual obligations and in furtherance of an illegal secondary boycott, the Port agreed not to work with HPEC if the Union Defendants objected to the Project proceeding. The Port and the Union Defendants agreed to coerce HPEC into monopolizing the intra-port drayage at the Project for the ILWU or kill the Project and develop an alternative project that would better benefit the union. Their agreement violated the Sherman Act and the Labor Management Relations Act as well as the Port's contractual obligations under the ENA and the Permit.

105. By the time HPEC and the Port were negotiating the pilot study permit, Executive Director Seroka was already meeting with the Union Defendants. On September 6, 2017, Executive Director Seroka wrote to the Deputy Executive Director Michael DiBernardo: "Can you be available for dinner tonight with

Deleted: ¶
Deleted:
Deleted: ¶
Deleted:
Deleted: <#>HPEC.¶ <#>78
Deleted: has
Deleted: ¶
Deleted:
Deleted: the Union
Deleted: ¶
Deleted:
Deleted: ¶
Deleted:
Deleted: or
Deleted: HPEC
Deleted: ¶
Moved up [12]: ¶ 23¶
Deleted: <object><object>¶ ¶ ¶
Deleted:
Deleted: reveal the
Deleted: ¶
Deleted:
Deleted: in
Deleted: HPEC
Deleted: ¶
Deleted:
Deleted: ¶
Deleted:
Deleted: ¶
Deleted:
Deleted: Act, the
Deleted: and 42 U.S.C. § 1983
Deleted: ¶
Deleted: .
Deleted: 79
Moved (insertion) [17]
Deleted: <object>

Familathe and Mendoza re: LAXT?" At that time, Ray Familathe ("Familathe") was an ILWU Vice President and Mark Mendoza was the President of Local 13.

106. On September 14, 2017, Hedge sent an email to other Port staff asking if the HPEC pilot study permit would be ready to be presented at the October 6 board meeting. Deputy Executive Director DiBernardo replied: "Gene [Seroka] and I are meeting with the ILWU today. From that we will decide." While the Union Defendants held up the Permit from being considered at the October 6 board meeting, it was eventually approved in a later Board meeting. Nonetheless, the conspirators were successful in first interfering with and then derailing the pilot study altogether by threatening an illegal strike or work stoppage and by preventing the Board from approving the amendment to the permit.

107. On September 29, 2017, Executive Director Seroka met with ILWU Local 13 President Mendoza to discuss HPEC.

108. On November 7, 2017, Executive Director Seroka met with Vice President Arian to discuss HPEC.

109. The day before the Board was due to approve the Indemnity Agreement and Permit, on November 15, 2017, the Port's David Libatique emailed ILWU Vice President Familathe with the draft board resolution.

110. On December 4, 2017, Vice President Arian texted Seroka: "Do you have any time today? I want to talk about LAXT."

111. By February 2018, emails reveal that Port executives were secretly planning alternative uses of the Project site that did not involve HPEC in violation of the ENA's exclusivity provision. On February 6, 2018, Vice President at Environmental Compliance Solutions, Inc. Tara Tisopulos wrote to Deputy Executive Director DiBernardo as follows: "[T]he chassis pool element is a project alternative if there is full EIR. You can then select it as the preferred project if that's how they are leaning prior to the BHC [Board of Harbor Commissioners] hearing."

**Deleted:** 80

**Deleted:** .

**Deleted:** 81

**Deleted:** 82

**Deleted:** ¶
24¶
*<object><object>*¶
¶
¶
83

**Deleted:** 84

**Deleted:** January 31, 2018, Deputy Director DiBernardo texted …

**Deleted:** ¶

**Deleted:** . While a portion of the text is redacted, the message that was

**Deleted:** <#>produced reads: "Hi Dave I got stuck in another meeting this¶
<#>morning…[Redacted]…I will see if there's anything going on at HPec and I'm¶
<#>waiting for Jonathan to call me back maybe we can go tomorrow after the board¶
<#>meeting.

**Moved up [13]:** I will keep u posted."¶

**Deleted:** 85

**Deleted:** ENA.

**Deleted:**

**Deleted:** ¶

**Deleted:**

**Deleted:** ¶

**Deleted:**

**Deleted:** ¶

**Deleted:**

**Deleted:** ¶

**Deleted:**

**Moved (insertion) [18]**

**Deleted:** *<object>*

112. A Port privilege log describes a communication dated March 28, 2018 between Deputy Director DiBernardo and Seroka. The subject line is "re: Meeting with Gene" and the email is described as a communication between Port personnel regarding HPEC project and labor. While this communication is directly relevant to crucial issues in this case, the Port has withheld it on purported privilege grounds. Whether the email refers to another meeting between Seroka and the Union Defendants is unknown.

113. The above-referenced conduct breached the parties' agreements, was kept hidden from HPEC at the time, and was in furtherance of Defendants' conspiracy.

**N. In April 2018, The Port Finally Disclosed That It Had Failed To Submit The Amendment To The Board To Be Acted Upon**

114. On April 2, 2018, more than a year after the Board approved and the Port executed the Amendment, Deputy City Attorney Otera advised HPEC that, in the Port's view, the Amendment still required Board approval. The timing of the Port's claim smacks of bad faith – under its original terms, the ENA would have expired by the time Otera told HPEC the Amendment extending the exclusivity period was supposedly invalid. Moreover, just a month earlier, Macquarie had completed its investment in the Project. Had HPEC known the Amendment had not been properly approved before the expiration of the ENA's initial 12-month term, HPEC reasonably would have acted differently.

115. Internal Port emails show that certain Port staff members (who were not part of the conspiracy) expressed surprise at Otera's belated claim. Prior to the call in which Otera advised HPEC that the Amendment still needed Board Approval, Deputy Director DiBernardo emailed Hedge: "[J]anna wants resolution of the steve issue before that meeting. [M]ay need to set up a pre meeting at 2:30 today with janna and steve." Roughly thirty minutes later, Hedge responded to

Deleted: 86

Deleted: 87

Moved up [4]: 27¶ 28¶ ¶

Deleted: 25¶ <object><object>¶ ¶ ¶ M

Deleted: Claimed In Bad Faith

Deleted: ¶ Still Needed

Deleted: Approval

Deleted: 88

Deleted: was supposedly invalid.

Deleted: 89

Moved (insertion) [19]

Deleted: <object>

DiBernardo: "BTW – just read the closed session memo from over a year ago where we took the MOU and ENA to the Board and they told us to proceed."

116. Port staff initially assured HPEC that this alleged lack of Board approval was an inadvertent oversight and would be corrected promptly by placing the approval request on the agenda for the April 19, 2018 Board public session. An internal April 5, 2018 Port email stated that the Board's approval of the Amendment "was walked on to the Agenda Preview meeting on Tuesday, April 3" and transmitted a draft report recommending approval.

117. Executive Director Seroka, however, tabled this approval request in furtherance of the conspiracy with the ILWU. On April 10, 2018, Deputy Director DiBernardo received a text informing him that "Gene [Seroka] pulled HPEC from the April 19 meeting and wants to go into closed session with it instead." This is just one of several instances where the Defendants prevented HPEC meaningful access to the Board's processes for approval or disapproval of the Amendment to the ENA and the amendment to the Permit.

118. A Port internal email dated April 11, 2018 discussed setting an HPEC matter relating to the ENA and permit for a closed session meeting of the Board. But since the Amendment to the ENA was originally acted upon by the Board in closed session and the Port later claimed that it was insufficient, a closed session meeting of the Board was meaningless.

## O. The Port Illegally Demanded HPEC Give Exclusive Intra-Port Drayage To The ILWU

119. Unbeknownst to HPEC, the Union Defendants pressured the Port into agreeing to monopolize the drayage jobs at HPEC for the union or kill the Project – a violation of the Sherman Act and federal labor laws and a clear breach of the ENA's exclusivity and good faith obligations.

120. On April 11, 2018, Local 13 President Mendoza told the Port's Avin Sharma that the ILWU would start a "war" if HPEC did not accede to the union's

Deleted: 90

Deleted: 91

Deleted: This is just one of several instances

Deleted:

Deleted: .

Moved up [14]: <#>92.

Deleted: <#>The Port's May 2019 termination letter does not dispute the validity of¶

Deleted: <#>indeed, is purportedly based on the ENA. The Port has since claimed¶
<#>the ENA was not validly amended. Either

Deleted: <#>ENA is valid and

Deleted: Port's claim is false or

Deleted: Port failed to get

Deleted: amendment properly approved¶
¶
26¶
*<object><object>*¶
¶
¶
and concealed the truth from HPEC. If it is the latter, had HPEC known the¶

Deleted: had not been properly approved before the expiration of the ENA's¶
initial 12-month term, HPEC reasonably would have

Deleted: differently. The Port's

Deleted: actions are wrongful

Deleted: it should be estopped from claiming

Deleted: amendment to

Deleted: <#>ENA is not valid.¶
<#>N

Deleted: 93

Deleted: ,

Deleted: 42 U.S.C. § 1983 and

Deleted: breach of the Port's contractual

Deleted: 94

Deleted: *<object>*

demands for exclusive jurisdiction over intra-port drayage. The ILWU, however, had no right to strike or engage in a work stoppage at the Port under their collective bargaining agreement. Section 11.1 of the Pacific Coast Longshore Contract Document between the ILWU and the Pacific Maritime Association for 2014 to 2019 prohibited the ILWU from engaging in a strike, lockout or work stoppage for the life of the agreement (as does the agreement for the subsequent period 2019 to 2022.)

121. On April 13, 2018, Executive Director Seroka and other Port executives met with Mendoza and other local ILWU leaders, and an ILWU lobbyist to discuss HPEC.

122. That same day, Seroka texted Rosenthal: "Any way it is sliced, they run the port and will put up a fight every step of the way. Your lack of engagement has not helped. The Board will be hard pressed without their support at any level."

123. In furtherance of the conspiracy to monopolize jobs for the ILWU, Executive Director Seroka told HPEC in April 2018 that it would be required to guarantee that the ILWU would be granted jurisdiction and exclusive rights to provide all intra-port trucking services to and from the Project.

124. The ILWU's demand for exclusive jurisdiction over intra-port drayage completely undermined the express cost and strategic analyses on which HPEC's proposal was based because ILWU labor rates are more than 5 times general market rates. Its demand also made no sense since the ILWU represents no off-dock truckers in Los Angeles. Moreover, HPEC has no control over drayage jobs, nor could it gain such control. Beneficial cargo owners (i.e., Target and Walmart) hire their own drayage companies to move containers and drayage companies hire their own drayage drivers. Some drayage companies have collective bargaining agreements with the Teamsters and some do not. No licensed motor carrier operating in the Port of Los Angeles, however, has a collective bargaining agreement with the ILWU since it is not work typically performed by

Deleted: 95

Deleted: 96

Deleted: 97

Deleted: 98

Moved up [15]: ¶
27¶

Deleted: <object><object>¶
¶
¶

Deleted: <object>

longshoreman. HPEC has no employees, no collective bargaining agreement with any union (except for the Project Trade Labor Agreement with trade labor), and no trucks of its own. Furthermore, HPEC is not a terminal operator but rather an infrastructure developer. HPEC will develop the project and ultimately operate it through multiple third-party vendors of its choosing who will in turn employ labor. It has no authority or power to contract with the ILWU which has a collective bargaining agreement with its employer, the Pacific Maritime Association.

125. For its part, the ILWU has no jurisdiction over the Project sites, no members properly licensed to perform drayage work, no trucks and no collective bargaining agreement with any drayage company. The ILWU had no competency to perform the drayage jobs they demanded and had historically been performed by the Teamsters and others. HPEC is unaware of a single intra-port drayage company operating at the Port whose employees are represented by the ILWU.

126. The National Labor Relations Act prohibits prehire agreements in which a union and an employer agree to use only union labor. Prehire agreements are expressly forbidden. 29 U.S.C. § 158(e). The NLRA defines "employer" broadly to include a direct or indirect agent of an employer such as HPEC.

127. This was the first time in the Port's 100-year history that any non-Marine Terminal lessee was prohibited from using their drayage of choice for intra-port drayage.

**P. The ILWU Illegally Demanded Exclusive Jurisdiction Over Intra-Port Drayage From HPEC**

128. Unbeknownst to HPEC at the time, on May 1, 2018, Port executives David Libatique and Avin Sharma secretly met with Local 13 President Mendoza to discuss strategy and coordinate their positions.

129. On May 2, 2018, ILWU Vice President Familathe texted Seroka. The Port redacted the purported "non responsive information" from most of the text but the last line reads: "We are also scheduled for Friday 1PM for the HPEC Mtg with

Deleted: It

Deleted: .

Deleted: <#>the ILWU.¶
<#>99

Deleted: 100

Deleted: 101

Moved down [20]: 26¶
27¶
28¶
¶

Deleted: 28¶
<object><object>¶
¶
¶
O

Deleted: 102

Deleted: 103

Deleted: <object>

Rosenthal. Thanks Ray." Roughly an hour later, Familathe texted Seroka again: "Standing by for your reply Thx Ray." Two minutes later, Seroka replied: "Ray, I'm in transit and will get back to you before my flight. This issue is of my highest priority. Thx, Gene."

130. On May 3, 2018, the Port met with HPEC to discuss the ILWU conditions for approval of the Project. At the meeting, the Port reiterated to HPEC that to appease the ILWU, HPEC needed to give jurisdiction over intra-port drayage to the ILWU. Executive Director Seroka told HPEC that he was meeting with Familathe in minutes. Seroka further told HPEC that the ILWU was having a stop-work meeting that evening and "will come with pitchforks." Seroka told HPEC that "you are going to have to extend the terminal property to the yard" because the ILWU "see the property as an extension of the terminal." The ILWU collective bargaining agreement only applies to property that is "water adjacent" so by annexing the property to a terminal and extending the terminal gate, the property would arguably become water adjacent. Rosenthal explained that HPEC "is not a trucking company and the dray is going to be handled by multiple vendors without exclusivity, including those directed by BCOs etc." He asked Seroka: "Are you saying that we need to give them the dray?" Seroka responded, "Yes." Rosenthal questioned how the ILWU could economically perform the service (since their hourly rates are 5 times market). Seroka told Rosenthal that the ILWU would provide an "operational plan" and asked Rosenthal to "hear out what their business plan is." Rosenthal told Seroka that "this is a requirement that no other port tenant has."

131. Seroka's demand that HPEC extend the terminal property to the yard fundamentally changes the agreements between HPEC and the Port and violates the ENA. The ENA prohibits the Port from negotiating for any entitlement with any third party, including but not limited to the Union Defendants or an adjacent landowner or leaseholder. The annexation of the property to the nearest adjacent

Deleted: 104

Deleted:

Moved up [16]: ¶
29¶

Deleted: <object><object>¶
¶
¶

Deleted: 105

Deleted: <object>

terminal as proposed by Seroka violates this restriction. Recharacterizing LAXT as "water adjacent" would mean that it is burdened with the extremely high cost of ILWU labor, without the benefit of having a dock where you can unload ships.

132. With the Port's encouragement, HPEC spent considerable time and effort attempting to reach an acceptable compromise with the ILWU. In May and June 2018, HPEC and the Union Defendants participated in multiple negotiation sessions. In these negotiation sessions, Familathe, Frank Ponce De Leon ("Ponce De Leon") and Mark Mendoza participated on behalf of the Union Defendants as well as other union members. At the time, Familathe was an ILWU Vice President, Ponce De Leon was an ILWU Coast Committeeman, and Mendoza was President of Local 13. Familathe, Ponce De Leon and Mendoza developed, coordinated, directed, approved and furthered the conspiracy against HPEC on behalf of the Union Defendants.

133. The first meeting took place on May 4, 2018 at the Port and was the only meeting that Port representatives attended. Executive Director Seroka opened the first meeting, commenting that HPEC is a "signature project for the port and is expected to increase velocity." He added that "there is to be no disruption or no BCO [beneficial cargo owner] in the nation will touch this property." Seroka's comments gave HPEC the false reassurance that objections from the ILWU did not threaten the future of HPEC's project.

134. At the May 4, 2018 meeting, HPEC explained its operation and business model to the ILWU. Among other things, HPEC explained that it is a developer of infrastructure and would utilize third party operators. The ILWU explained that they see HPEC as an extension of the terminal and could see a circumstance where the clock does not start ticking until the container is picked up from HPEC. The ILWU claimed that it does this work already and told HPEC that it wants "to bring stuff to your place."

Deleted: 106

Deleted: 14

Deleted: 107

Deleted: .

Deleted: ¶

Deleted:

Deleted: ¶

Deleted:

Deleted: ¶

Deleted:

Deleted: ¶

Deleted:

Deleted: ¶

Deleted:

Deleted: 28¶ ¶ 30¶ <object><object>¶ ¶ ¶ 108

Moved (insertion) [21]

Moved (insertion) [22]

Deleted: <object>

Deleted: 109.

135. The other meetings between the ILWU and HPEC did not involve anyone from the Port and were direct negotiations between them. At the May 11, 2018 meeting, Mendoza told HPEC that the ILWU wanted "a labor peace agreement" and an up-front commitment that the ILWU (and no one else) would get the work. When HPEC questioned Mendoza asking what if someone wanted to bring in their own container, Mendoza responded, "That's not gonna happen." HPEC told the ILWU representatives that they were willing to discuss operations. In response, an ILWU representative threatened HPEC: "We've been through the development process a lot. We've been able to add value on CEQA and get it moving fast, or we could go the opposite way. We could pave a path to get the process done." Another ILWU representative followed up this threat with this: "Bottom line is, tell us that whoever you hire will use longshore labor." The ILWU clearly understood that even if HPEC was not a direct employer, it was a direct or indirect agent of an employer.

Deleted:
Deleted: ¶
Deleted:
Deleted: ¶
Deleted:
Deleted: ¶
Deleted:
Deleted: ¶
Deleted: 110

136. At the May 18, 2018 meeting, HPEC and the Union Defendants discussed HPEC's operation model and financials. HPEC explained that the numbers the Union Defendants had shared with HPEC were from rail operators and would not apply to HPEC's operations because the ILWU would have to go over public roads, through stop lights and terminal gates, and travel longer distances to get from the terminals to HPEC. In that context, Mendoza told HPEC that "if you have your own dray, you have to pay for that. If we do it, it's free." When HPEC questioned why it would be free, Mendoza told HPEC, "We got 5 days free, that's from Seroka. If you pull it, it's $20/day. If we do it, it's free. That's seeing it as an extension of the terminal." What the Port and Union Defendants were proposing is that the daily fee for the chassis would not start accruing until the chassis left the HPEC facility as opposed to accruing when it left the terminal as it should. Mendoza's comment makes clear that Seroka had agreed to this.

Deleted: Mendoza told

Moved (insertion) [23]

Moved (insertion) [24]

Deleted: <object>

137. Mendoza asked HPEC: "If someone breaks down, who would do your M&R [chassis maintenance and repair work]? I remember JR [Jonathan Rosenthal] saying you wouldn't do M&R." HPEC clarified that if there was M&R work, it would likely use a PMA member. If HPEC used a PMA member, that would mean work for the ILWU. At the end of the meeting, Mendoza told HPEC to hold off on the pilot study until he met with Ponce De Leon and others.

138. Also that same day, the Port's Avin Sharma had a "challenged lunch with Eric Tate," an Executive Board member of a local Teamsters union. Sharma reported by text message to Seroka, DiBernardo and Libatique that Tate asked what the Teamsters could do to help this project get off the ground. Sharma told Tate that "Rosenthal has got to work something out to get a supportive position from the ILWU." Sharma reported that Tate said if the Port doesn't have an answer then the Teamsters will move forward with a NLRB petition against the ILWU. "Their lawyers think there's enough for a claim now even with no active HPEC bc IBT would argue – HPEC would be operational today if not for hold up by POLA which is really holding this up bc of lack of ILWU support." Sharma told Seroka, DiBernardo and Libatique that Tate's message was a "warning shot to us and we should take threat from Eric seriously."

139. On June 4, 2018, HPEC's Dan Pimentel called Deputy Director DiBernardo to discuss the Amendment and "updated RP" (permit). DiBernardo responded with an email in which he stated: "I heard you called regarding the ENA and updated RP. At this time, the POLA is not ready to move this item forward until a firm business plan is presented to Senior Managers." Pimentel responded: "Let's discuss in the meeting this afternoon…Specifically, we need to set a timetable for resolution of the ENA issue. Additionally, it is unclear to us what you mean by a 'firm business plan' in the context of the ENA so let's discuss." DiBernardo responded: "As indicated in many meetings and I believe Gene mentioned to Jonathan, we have to go to the board for approval of the ENA and RP.

Deleted:

Deleted: 111

Moved up [17]: ¶
31¶

Deleted: <object><object>¶
¶
¶

Deleted: 112

Moved (insertion) [25]

Deleted: <object>

If there is opposition from any entity, it will not get approved by our board. Therefore, all i's need to be dotted and t's crossed with ILWU before you we go to the board." DiBernardo's email evidences the Defendants' exploitation and weaponization of the Board's processes as a means to coerce HPEC into illegal labor agreements and prevent HPEC meaningful access to the Board and City Council.

140. That same day, the Port circulated an agenda for a meeting with HPEC. The agenda included, among other things, items on "labor discussions" and "ENA Ratification." Under the ENA Ratification heading, there was a bullet point stating "discussion around timing of getting ENA to POLA Board and City." HPEC then met with the Port. Executive Director Seroka told HPEC that the Project would not go forward "absent unanimous support from the ILWU." Seroka explained that he "met with the 3 presidents and there is conflict. We have to have labor peace." He explained that in his discussions with the 3 local ILWU Presidents, he learned that they had flown up to San Francisco (the ILWU's headquarters) to meet with a "war council," something Seroka claimed had not happened in 50 years. When HPEC asked what it needed to get past this, Seroka responded, "They've shared an easy path forward and were told it would not work." HPEC responded that it had shared its numbers with the ILWU and "if the ILWU performed the dray for the property over its 50 year life, the drayage associated with movement from terminal to HPEC would lose almost $15 billion." Seroka also told HPEC that the rent stay on the pilot program needs to go to board so it is official. Otera said that the Port "will prepare the rent stay amendment, re suspension of the invoice."

141. The Port continued to restrict HPEC from operating the Pilot Study at the LAXT site. On June 4, 2018, and again on June 11, 2018, the Port promised to formalize an agreement to abate rent until HPEC could perform its Pilot Study and toll the start date.

Deleted: of the
Deleted:
Deleted: ¶
Deleted: .
Deleted: 113
Deleted: afternoon,
Deleted: ¶
Deleted:
Deleted: ¶
Moved up [18]: ¶ 32¶
Deleted: <object><object>¶ ¶ ¶ ILWU
Deleted: 114
Deleted: 115
Deleted: <object>

142. On June 11, 2018, at a meeting between the Port and HPEC, Deputy Director DiBernardo informed HPEC that the Port was looking to put the amendment to the permit that would formalize the rent stay agreement before the Board on June 21 but would pull it from the agenda if there was any opposition. "If anyone puts in a speaker card, we would need to pull it." DiBernardo suggested that it "might be to our advantage that the ILWU elections are underway so hopefully it will keep the ILWU at bay for a while." HPEC informed DiBernardo that Macquarie would not have entered into a relationship with HPEC absent an ENA and that Macquarie was "concerned that the Port is not a partner they can count on." In response, DiBernardo said, "We're taking action, as in the NOP going out and are moving along as we're partners." Rosenthal told DiBernardo that Macquarie expected the Port to "fix the ENA mistake" and was concerned that HPEC will spend money moving the project along without the exclusivity that was bargained for and agreed to. DiBernardo told HPEC that the Port was "skittish about bringing the ENA to the Board and having the ILWU using that as a force so you need to use them."

143. On June 13, 2018, the Port circulated to HPEC a draft board resolution explaining that previous rent billings "will be reversed due to non-allowance of the proposed Pilot Study."

144. On June 13, 2018, Seroka texted Deputy Director DiBernardo and Hedge with his "directions." "Tell JR [Rosenthal] to sign [RP amendment] right now or RP will be unilaterally revoked with appropriate notice." "Issues like adding Macquarie Can and will be discussed with JR when the burning labor issue is, at least, solved in order to direct a proof of concept pilot."

145. Later that same evening, Deputy Director DiBernardo texted Seroka and Hedge: "Jack. Please talk to Julie. I hear Arian does not want Hpec on June 21 agenda." Three minutes later, Seroka responded: "Does Arian understand this is compliance only and no concessions." This is another instance where the ILWU

Deleted: Deputy

Deleted: ¶

Deleted:

Deleted: ¶

Deleted:

Deleted: ¶

Deleted: DiBernardo told HPEC that the Port was "skittish"…

Deleted: about bringing the amendment

Deleted: the ENA

Deleted: the Board because of

Deleted: .

Deleted:

Deleted: ¶

Deleted:

Deleted: ¶

Deleted:

Deleted: ¶ 116

Deleted: 117

Deleted: ¶ 33¶ <object><object>¶ ¶ ¶

Deleted: This is another

Deleted: <#>instance where the Defendants prevented HPEC meaningful access to the Board's¶ <#>processes.¶ <#>118

Deleted: 119

Deleted: <object>

was in communication with Board Vice President Arian and used him to block HPEC from being put on the Board's agenda, barring HPEC from having meaningful access to the Board's processes for approval of the amendments to the ENA and Permit.

146. On June 14, 2018, DiBernardo texted Hedge: "what the f with Otera and Hpec?" Hedge responded: "Man! He HATES this thing!" Otera is the same in-house attorney who approved the Amendment to the ENA as to form and legality even though he was aware that the Board had approved it in closed session only and took no reportable action according to the minutes. Otera is also the same attorney who concealed the true facts from HPEC and Macquarie and waited to disclose that the Port had not submitted the Amendment to the Board to be acted upon until after Macquarie had invested in the Project. These texts suggest that Otera has a personal animus toward HPEC motivating his actions or is part of the Port's conspiracy with the Union Defendants.

147. On June 19, 2018, HPEC and the Union Defendants held what ended up being the last of four negotiation sessions prior to ILWU leadership elections. No one from the Port was present or participated in the negotiation. HPEC explained that the financials do not work with ILWU on all the dray but that they had discussed how some of "M&R" may work with a PMA member. At the meeting, the Union Defendants confirmed that they would only approve the Project if given jurisdiction over intra-port drayage. Mendoza told HPEC, "Let's talk about the 800lb gorilla in the room. What's with the Teamsters." He threatened HPEC with violence, saying "The 2-3 miles of waterfront is ours, we're going to get it. We've told Seroka, we've talked with them. There will be some animosity, could be some civil unrest." When HPEC explained that they "can't have exclusivity with anyone" because "[w]hoever the BCOs [beneficial cargo owners], terminals, whoever wants to use us, we don't control that." Mendoza responded, "We only care about drays from the terminal to there, not outbound." When asked if

Deleted: These texts

Deleted: suggest that Otera,

Deleted: belatedly claimed that

Deleted: validly approved,

Deleted:

Deleted: ¶

Deleted:

Deleted: 120

Deleted:

Deleted: ,

Deleted:

Deleted: ¶

Deleted:

Deleted: ¶

Deleted:

Deleted: ¶

Deleted:

Deleted: ¶

Deleted:

Deleted:

Deleted: ¶

Deleted:

Moved (insertion) [26]

Deleted: <object>

Southern Counties (a third-party drayage operator) brings it in, Mendoza said, "If we're used, we're good. I'm not going to work double breasted with another union." Mendoza further threatened HPEC: "You guys. If you work with us, there's no problem." The message was clear – the Union Defendants did not want to work on the same property as any other union and they wanted the intra-port drayage or else there would be trouble for HPEC. Again, the Union Defendants treated HPEC as an agent for the employer.

148. HPEC explained that satisfying the Union Defendants' demand for the intra-port drayage (even if it were within HPEC's control – which it is not) could create a financial loss of up to $14 billion over the life span of the Project.

**Q. Seroka Extorted Rent Payments From HPEC To Pressure HPEC**

149. On June 25, 2018, Executive Director Seroka met with the three Local ILWU presidents and their vice presidents at his office to discuss HPEC. ILWU Vice President Familiathe texted Seroka: "Just checking in for update regarding your 11AM meeting." Seroka texted back: "Will keep you posted."

150. That same morning, the Port's David Libatique emailed the first step in HPEC's environmental impact report ("EIR") process, the Initial Study/Notice of Preparation, to Familathe.

151. That afternoon, HPEC had a telephonic meeting with Executive Director Seroka, Deputy Executive Director DiBernardo, David Libatique and Avin Sharma. Executive Director Seroka told HPEC about his meeting with the ILWU earlier that morning and conveyed the ILWU's message that they do not want to work with HPEC on the Project. Seroka, however, told HPEC that progress might be made once their new officers had been elected and encouraged HPEC to continue to work with the ILWU, inducing HPEC not to take any action with respect to the City's breaches of the ENA but to instead continue to spend time and money and undertake joint activities with the Port to move the Project forward. HPEC expressed its surprise at the negative report and detailed the meetings and

Deleted:

Deleted: ¶

Deleted:

Deleted: ¶

Deleted:

Deleted: ¶

Deleted:

Deleted: ¶
¶
34¶
<object><object>¶
¶
¶

Deleted:

Deleted: ¶

Deleted:

Deleted: .

Deleted: 121

Deleted: P

Deleted: 122

Deleted: 123

Deleted: 124

Deleted: .

Deleted: expressed its surprise at the negative

Deleted:

Deleted: <object>

proposals that it had made to the ILWU. In response, Seroka told Rosenthal: "They don't want to work with you Jon, that's what they took away."

152. Seroka also told HPEC that regardless of what Port staff had told HPEC about abating the rent due on the Pilot Study Permit, he expected HPEC to pay back rent and rent going forward. Seroka admitted that the Port had told HPEC to hold off on operations until things were settled with the ILWU and that rent would be suspended until HPEC started operations. When HPEC asked Seroka if HPEC paid the rent it could use the property for its pilot study "starting tomorrow", Seroka told HPEC "absolutely not" because he was "not going to have 15,000 longshoremen marching on this property to save 10 Teamster jobs." Rosenthal stated that "we need to use the property if we're paying rent." Seroka responded, "It will cause disruption."

153. After meeting with HPEC, Executive Director Seroka texted ILWU Vice President Familathe: "Tough discussion with Rosenthal. He was really shocked to hear you didn't want to work with him. He is now pressuring us on the lease." Seroka's texts with Familathe evidences the conspiracy between Defendants to coerce HPEC into either granting intra-port drayage to the ILWU or abandoning the Project.

154. Still later that day, some Port staff members had a meeting to discuss "project alternatives for HPEC." This meeting did not include HPEC.

155. Faced with a threatened termination of the Permit, HPEC complied with the Port's extortionist demands, paying back rent on June 29, 2018, for the period from February 1, 2018, to June 30, 2018, and ultimately paying rent all the way back from December 12, 2017. HPEC also made a commitment that it would satisfy future rent payments in fear that the Port would terminate the pilot project for non-payment. Payments were made on HPEC's belief, and the Port's continued representations, that it supported the pilot project and wanted to see it come to fruition.

Deleted: ¶
Deleted:
Deleted: ¶
Deleted: 125
Deleted: ¶
35¶
<object><object>¶
¶
¶
Deleted: 126
Deleted: 127
Deleted: 128
Deleted:
Deleted: <object>
Deleted: Section Break (Next Page)
<object><object>¶
<object><object>¶
¶
¶
labor over drayage." But
Deleted: <object>

**R.   The Port Reported To The Mayor That HPEC Was Off Track Due To Labor Issues With The Union And The Effort To Complete The Pilot Study Would Continue In FY 2018-2019**

156.   According to documents produced by the Port, on June 29, 2018, Executive Director Seroka gave his mid-year fiscal update to Mayor Garcetti. Seroka's written report included four long-term priority areas. The first was cargo business. In his report on overall priority status, Seroka's report stated: "Another key challenge is Port competition. While the San Pedro Bay Port complex has superior infrastructure compared to other ports serving the Transpacific trade, shipping lines will spend more money with labor, infrastructure and environmental initiatives at the POLA or Port of Long Beach (POLB) compared to other North American gateways….Our strategy will be to improve cargo velocity by digitizing the supply chain and providing incentives to shipping lines that actively participate in this process while increasing cargo volumes through POLA." Under the heading "FY 2017-2018 KEY GOALS," the report includes HPEC as the fourth key goal: "Key Goal: Complete Pilot study for the Terminal Island Support Facility/LAXT, notwithstanding labor issues (By June 2018 – OFF TRACK) – CONTINUE IN FY 2018-2019. In the description underneath, it states that "the developer has not reached consensus on an operational plan. This effort will continue in FY 2018-19 (see new goal No. 1 below)." Under the heading "FY 2018-2019 KEY GOALS:", Seroka's written report stated: "NEW 1. Attract new container cargo business and improve cargo velocity (By June 2019). To attract new business and increase the Port's market share, we will work with our customers on a compensation structure that provides flexibility on where vessels call (within POLA)….In terms of velocity we continue to move forward with the 12 month Pilot study for the Terminal Island Support Facility that will be extended due to a late start by the developer.  Other delays were the result of issues with union labor over drayage and yard operations. The CEQA process began in May 2018." Thus, as of June 2018, the Port was

Deleted: falsely reported

Deleted: the

Deleted: the

Deleted: goal

Deleted: was to

Deleted: <object>

telling the Mayor that the effort to complete HPEC's pilot program would continue into Fiscal Year 2018-2019.

Deleted: study.

Deleted: 130

157. HPEC has recently learned that Port staff internally shared their view that HPEC should stop working on the EIR given the labor impasse but had no such discussion with HPEC. Instead, the Port continued to work on the EIR with HPEC because it planned to use the expensive environmental work being done by HPEC for other projects, something it was not entitled to do under its agreements with HPEC.

**S. HPEC'S Supporter On The Board Is Recused From Participating On Matters Relating To HPEC**

Deleted: R

158. The Board was scheduled to meet on July 17, 2018 and the agenda included an item related to HPEC for discussion in closed session. The Board was scheduled to "provide instructions to its real estate negotiators with respect to proposed amendment to permit and proposed future permit with HPEC."

Moved (insertion) [27]

Deleted: 131

159. Prior to the July 17, 2018 Board meeting, Janna Sidley called HPEC CEO Jonathan Rosenthal to tell him that Commissioner Renwick had been recused by the Ethics Commission from participating at board meetings on matters relating to HPEC. The purported basis for Renwick's recusal was his meeting on December 18, 2017 with HPEC and Macquarie. Although Vice President Arian met and communicated with the Union Defendants regularly as well as meeting with HPEC, he was not recused from matters relating to HPEC. Unlike Vice President Arian, Commissioner Renwick was viewed as an HPEC supporter. His recusal from decisions relating to HPEC, while Vice President Arian was not recused, shifted power and control to supporters of the Union Defendants to carry out their conspiracy.

Moved (insertion) [20]

Moved (insertion) [28]

Deleted: <object>

**T. The Port Provided False Reassurances To HPEC While Conspiring With The ILWU To Kill The Project**

160. HPEC made repeated efforts over the next few months to reach an accommodation with the Union Defendants. Throughout the fall of 2018 and the first quarter of 2019, the Port provided false reassurances to HPEC that it still supported the Project and told HPEC to keep "chipping away" at getting the ILWU to buy into the Project. HPEC was induced by the Port not to take action but instead to wait until situation creating conflict – the ILWU's objection to the Project – had stabilized.

161. In a call with HPEC and representatives of Macquarie on September 21, 2018, Executive Director Seroka told HPEC and Macquarie, "I have been instructed by the ILWU not to bring anything forward, or they will protest. I spend an incredible amount of time with cargo owners and if there is any disruption…We've seen this move before and we do not want to do it again, so that is my recommendation." Seroka explained further, "2002 lockout. 97 ships off coast, POLA share went from 80% to 66%. The BCO's will stay away. It's not a threat, but it's how decisions are made." When Macquarie asked about bringing the amendment to the ENA before the Board and stated "you're still of the position where there's nothing besides this [ILWU] blocking the ENA", Seroka responded, "We've been over this and I asked you why the ENA was so important. The ENA is toothless. We'll bring it before the board, we'll see how these other things resolve." Macquarie asked, "So you'll bring this before the board when we have ILWU support?" Seroka responded, "The ILWU has told me specifically not to bring anything with this before the board or they will protest, this happens all the time." Seroka then reassured HPEC and Macquarie, "We are always very supportive of people who want to invest in our Port and our city, and I will let the mayor thank you directly for being involved." Seroka's message was again clear that the Union Defendants prevented HPEC from meaningful Board access to

Deleted: S

Deleted: 132

Deleted: ¶
37¶
<object><object>¶
¶
¶
133

Deleted: , Seroka responded, "We've been over this

Deleted:

Deleted: ¶

Deleted:

Deleted: ¶

Deleted:

Deleted: ¶

Deleted:

Deleted: ¶

Deleted:

Deleted:

Deleted: ¶

Deleted:

Deleted: ¶

Deleted:

Deleted: ¶

Deleted:

Deleted: ¶

Deleted: .

Deleted: 134

Deleted: <object>

approve the Amendment to the ENA and proceed with approval for the long term leases envisioned in the MOUs. Seroka also failed to disclose to HPEC and Macquarie that the Port was not abiding by its obligations in the Amendment to the ENA that it had signed.

162. HPEC continued to pay monthly rent in the amount of $24,119.86, which the Port accepted, and the Port did not revoke the Permit. The Port in fact continued to invoice HPEC for rent past the Permit's expiration in January 2019 and HPEC continued to pay rent through March 2019.

163. On September 19, 2018, the Port's Engineering Division extend HPEC's construction permit to June 30, 2019 "to accommodate your [HPEC's] project schedule." The permit related to further build-out needed for the pilot program.

164. In late November 2019, Executive Director Seroka's illegal demand that HPEC grant exclusive jurisdiction over intra-port drayage to the ILWU came to the Port's in-house general counsel Janna Sidley's attention.

165. In a blatant attempt to cover up his wrongdoing, on November 29, 2018, Seroka purported to "clarify" his illegal demand in an email he sent to HPEC, copying Janna Sidley and HPEC's attorney. In his email, Executive Director Seroka stated that "[n]either the Harbor Department nor I have demanded any particular type of labor, organized or otherwise, be hired for the HPEC work. I hope this email clarifies the positions of the Department and me personally." This "clarification" is an admission that Seroka's demand was illegal and shows consciousness of guilt. It also admits that the Port viewed HPEC as an agent for the employer.

166. In December 2018, at a holiday party at the Propeller Club, Executive Director Seroka told HPEC that the Port needed HPEC's Project more than ever, again providing false reassurance to HPEC that the Project would go forward.

Deleted: ,

Deleted: ¶

Deleted: 135

Deleted: 136

Deleted: ¶

Moved up [22]: 38¶

Deleted: <object><object>¶ ¶ ¶

Deleted: 137

Deleted: 138

Deleted: <object>

167. During this same time period, however, an internal Port email suggests that the Port was looking at developing a chassis yard project with Pacific Crane Maintenance Corporation ("PCMC"), a powerful ILWU ally. Port documents also suggest that PCMC toured the Project site at least two times, including one time during the initial 12-month exclusivity period under the original ENA. In May 2019, HPEC was informed that Executive Director Seroka had told PCMC's President Joe Gregorio to tell him when PCMC is ready and the Port will provide HPEC with the 30-day notice required to terminate the project so "PCMC can step into the permit." Before this conversation and HPEC's later review of the City Defendant's internal documents obtained through its California Public Records Act Request, HPEC had no reason to suspect that the City Defendants had violated the ENA's exclusivity period by negotiating with PCMC for a permit or development of the Project site. The breach was committed in secret and the harm flowing from the breach was not reasonably discovered until after the Port purported to terminate HPEC's rights in the Project.

168. In a January 10, 2019 text message POLA's Director of Environmental Management Chris Cannon advised Deputy Executive Director DiBernardo: "Did some research on the LAXT chassis storage yard idea. I think you could do a temporary (1 year) ten-acre storage yard immediately." A later email dated February 11, 2019 also related to the evaluation of a chassis yard.

169. On January 13, 2019, Seroka contacted the Mayor's Chief of Staff Ana Guerrero to arrange a meeting at City Hall on January 22, 2019 to discuss "HPEC and workforce opportunities." While HPEC was not invited, President of ILWU's Local 13 Mendoza was.

170. On January 29, 2019, Seroka's assistant Eileen Tankersley texted Seroka: "This morning I spoke to Alexa re dinner in SFO, that week looks good but she still wants to run it by Willie and officers tomorrow and will confirm what works best." The Executive Assistant to the ILWU President is named Alexa and

Deleted: HPEC is
Deleted: and believes
Deleted:
Deleted: ¶
Deleted:
Deleted: ¶
Deleted: .
Deleted: 139
Deleted: 19
Deleted: 140
Deleted: 141
Deleted: <object>

the ILWU President, Willie Adams. HPEC was not invited to dinner with Seroka and the ILWU President and officers and is not aware of being informed about the Port's discussions with the ILWU.

Moved up [24]: 39¶

Deleted: ¶

Deleted: <object><object>¶
¶
¶

Deleted: 142

171. In her text, Tankersley also told Seroka that "Janna asked me to reach out to George & JR for call this week on HPEC." Two days later, on January 31, 2019, Janna Sidley (the Port's in-house General Counsel) and Executive Director Seroka participated in a call with the HPEC team regarding the status of the Project. Seroka began the call, "We need every acre of space. This could be of benefit to everyone, including ILWU, and Local 13 specifically, if they would take a meeting." Seroka advised HPEC to "keep chipping away. Keep using your channels going forward." He gave his "opinion" that Mendoza does not want to work with Rosenthal. Seroka told HPEC "this is a company town owned by the ILWU." During their discussion, Sidley stated, "We're now putting labor peace in the leases, which would be in your permit as well." This comment implicitly acknowledged that there was no labor peace requirement in any of HPEC's documents to date. The call closed with Seroka saying, "We love you guys and we love this project. We've just got to get stakeholder buy-in. We've got to keep chipping away." Seroka told HPEC, "Behind you 1000%."

Deleted: 143

172. HPEC is informed and believes that notwithstanding Ms. Sidley's claim, the Port has not required labor peace in its leases or permits. There is no rational basis for singling out HPEC from all other similarly situated Port tenants and imposing a requirement of labor peace that was not a part of any of the Project documents.

173. Following the call, Rosenthal thanked Ms. Sidley for her participation in the call. In response, Ms. Sidley continued to try to cover-up Seroka's illegal demand, texting back: "Happy to help. POLA has always been supportive of your project and your efforts so I'm baffled about how the message got garbled but glad we seem to be back on track."

Deleted: 144

Deleted: <object>

174. Throughout the first and second quarters of 2019, HPEC continued to jointly work with Port staff on processing the CEQA environmental review and expected completion of the draft report in May 2019 and continued to work toward a reasonable resolution with the ILWU's new leadership. HPEC sent letters to ILWU's new leadership and tried to re-engage them in discussions about the Project.

175. In a late February 2019 call between HPEC and P5 Infrastructure (one of the largest container terminals at the Port), the owners of Eagle Marine told HPEC that if it was up and running, it would have taken every space HPEC had.

176. Port documents show that Executive Director Seroka met again with the Mayor's Chief of Staff on March 14, 2019 to discuss HPEC. Again, HPEC was not present.

177. In April 2019, the Port met with HPEC's partner Macquarie in Washington D.C. and reassured Macquarie that it believed the Project could go forward.

178. The Port's reassurances to HPEC and Macquarie were false as HPEC later learned.

## U. Seroka Invalidly Terminated The Port's Agreements With HPEC As Part Of Defendants' Conspiracy To Restrain Trade And The Secondary Boycott

179. On May 8, 2019, HPEC, Macquarie and the Port had an update call. Seroka opened the call by saying, "It's been 30 days since I spoke to you with Janna Sidley asking for immediate progress. During that time, we have come to the painful conclusion that the project will not move forward. We have come this conclusion for three reasons. One, an unclear business plan. Two, complete disengagement of labor. Three, no clear pathway to success. It is painful to the City of Los Angeles that I must recommend that the project not go any further." A Macquarie representative expressed his huge disappointment, "It is hugely

Deleted:

Deleted: ¶

Deleted:

Deleted: ¶

Moved up [25]: ¶ 40¶

Deleted: <object><object>¶ ¶ ¶ 145

Deleted: 146

Deleted: 147

Deleted: 148

Deleted: .¶ Executive Director Seroka conspired with the Union Defendants and other parties¶ to plan alternative uses for the Project site that did not involve…

Deleted: , violating the

Deleted: <#>terms of the ENA and the implied covenant of good faith and fair dealing.¶ <#>T

Deleted: 149

Moved (insertion) [29]

Deleted: <object>

disappointing to hear that. Can I ask you what has changed since our meeting last Friday where you represented positively that we had been making progress?" Seroka responded, "Longshore labor doesn't want to meet. We have hit the 30 day date today, we have to go in a different direction now." When asked if the basis for determining the project cannot go further is that the project is infeasible, Seroka responded, "It is infeasible in the legal term, yes." When pressed for the specific reasons, Seroka said, "The reasons are a lack of a clear business plan, that we have no support from longshore labor, and from the disruption between two labor divisions on the project over jurisdiction. At this junction, we do not see a clear path forward for the project." A Macquarie representative stated, "I have to admit that I'm shocked that this is being made now. You originally told us in Washington that the 30 days was to get our attention and encourage movement, and we complied with every one of your requests. It is our firm belief that this project remains completely feasible." Seroka was asked whether this decision had been reviewed by the Board and publicly. He responded that the decision had been made by the Mayor and his Chief of Staff. He explained that he had a meeting with the ILWU on Friday (May 3) after receiving Macquarie's paperwork and "they unequivocally don't want to engage with you" and "categorically rejected" Macquarie's paperwork (which was a business plan). Macquarie's representative stated, "It does feel as though you've made ILWU approval a requirement of this project." Seroka responded that the Port takes into account all stakeholders. When asked when he came to this decision, Seroka responded, "Today. I provided 30 days, and I have come to this conclusion today." A Macquarie representative expressed surprise, "This is hugely disappointing, given that we've spent millions so far in good faith. This feels very surprising."

180. In a May 10, 2019 letter, Executive Director Seroka purported to terminate the ENA, the MOUs and the Indemnity Agreement, as well as HPEC's rights in the Project on the false pretense that the Port had purportedly "determined

Deleted:

Deleted: ¶
41¶
<object><object>¶
¶
¶

Deleted: 150

Moved (insertion) [30]

Deleted: <object>

the proposed project to be infeasible." If the Port knew that it was not bound by the ENA as amended or the MOU, there was no need for the Port to claim that the Project was infeasible. Seroka's letter was sent in furtherance of Defendants' conspiracy to restrain trade and the Union Defendants' secondary boycott. A true and correct copy of this May 10, 2019 letter is attached hereto as Exhibit I.

181. Notably absent from Seroka's May 10, 2019 letter is any suggestion that the ENA rights had expired in early 2018. Quite the contrary, Seroka's letter purports to invoke the ENA's own infeasibility clause and distinguishes the (other) agreements that had already expired on their own terms: "[T]he Port of Los Angeles (POLA) has determined the proposed project to be infeasible, and provides notice of termination of: any rights or obligations created by the 2016 exclusive negotiating agreement; further negotiations or discussions with HPEC concerning its proposed project; the 2017 memoranda of understanding concerning the Customs House and former LAXT sites; and the 2017 CEQA indemnity agreement. We note that the 2017 revocable permit and rail crossing agreement expired in accordance with their terms and conditions in January of 2019 and are of no effect."

182. Also absent from this letter is any indication that Janna Sidley, the Board, or the City Council were consulted with regard to this purported termination, or that they believed the Project to be "infeasible." To the contrary, the Port consistently and publicly supported and endorsed the efficiency, environmental and other benefits of the Project. And certainly, Seroka's belated notice of, and subsequent insistence upon accommodating the Union Defendants' illegal demands for exclusive intra-port drayage jurisdiction on the Project, do not constitute valid reasons to declare the Project infeasible.

183. Prior to May 2019, HPEC did not have any reason to believe that the Port would breach its contractual obligations and commit antitrust and federal labor law violations in the process and purport to terminate the ENA and HPEC's rights

**Deleted:** ¶
**Deleted:**
**Deleted:** ¶
**Deleted:**
**Deleted:** ¶
**Deleted:** ¶
42¶
*<object><object>*¶
¶
¶
151
**Deleted:** (as
**Deleted:** Port and the City now contend) the
**Deleted:** ¶
**Deleted:**
**Deleted:** ¶
**Deleted:**
**Deleted:** ¶
**Deleted:** .
**Deleted:** ¶
**Deleted:**
**Deleted:** 152
**Moved (insertion) [31]**
**Deleted:** *<object>*

in the Project. Until the City Defendants purported to terminate the parties' contracts and HPEC's rights in the Project in May 2019, HPEC was not on notice that further efforts to end the Defendants' unlawful conduct would be futile. The Project had faced a number of unforeseen hurdles since its beginning, obstacles which HPEC and the Port had managed to resolve. Indeed, right up until the May 2019 purported termination, the Port repeatedly reassured HPEC and its partner Macquarie that it supported the Project and the parties had continued to jointly work on the EIR for the Project. HPEC was induced by the Port not to take action but instead to wait until after the ILWU elections and new leadership was in place and the situation with the ILWU had stabilized. In light of the parties' ongoing contractual obligations and joint activities taken in furtherance of the Project, HPEC was entitled to not treat the Port's breaches and violations of its contractual obligations as breaches prior to the date the City Defendants' purported to terminate the parties' contracts and HPEC's rights in the Project.

184. Contrary to Executive Director Seroka's assertion in his May 10 termination letter, the Project was at all times highly feasible, remains so, and is well-capitalized. Indeed, prior to the May 10 termination letter, the Port and HPEC had jointly and consistently touted the Project at dozens of stakeholder meetings and conferences from coast to coast, including at the U.S. Commerce Department, the Southern California Association of Governments, the California Air Resources Board, the Air Quality Management District, the Harbor Trucking Association, the California Center for Environmental Research and Technology, and the Marine Transportation System National Advisory Board. Moreover, in the four years of HPEC's community outreach regarding the Project, HPEC is unaware of having received any critical comment from any constituent group other than the ILWU. The Project has been unanimously endorsed by Mayor Garcetti's own San Pedro Bay Port Sustainable Supply Chain Advisory Committee, the Los Angeles/Orange

Deleted:

Deleted: ¶

Deleted:

Deleted: ¶

Deleted:

Deleted: ¶

Deleted:

Deleted: .

Deleted: 153

Moved up [26]: ¶
43¶

Deleted: <object><object>¶
¶
¶

Moved (insertion) [32]

Deleted: <object>

Counties Building and Construction Trades Council, and the Los Angeles Chamber of Commerce.

185. If completed, the Project would provide significant benefits acknowledged publicly by the Port, including significantly improving the flow of cargo, reducing wait times for truckers and shippers, and providing environmental benefits by reducing trucker idling time and terminal gate congestion at the port complex. In fact, the Port has publicly stated that the Project will increase port throughput by 20%. The Project, if completed, would also provide significant benefits to HPEC and the Port, including tens of millions of dollars in fees from Project customers. The University of Southern California Center for Global Supply Chain Management has estimated that the decongestion could add 100,000 – 150,000 regional jobs.

**V. After Wrongfully Terminating HPEC's Rights, The Port Pursued A Deal With An ILWU Ally To Develop The Project Sites**

186. HPEC is informed and believes, and thereon alleges, that within days of this purported termination of the Project, Port executives were discussing alternative uses of the Project site with PCMC as earlier agreed to by Seroka and PCMC's President.

187. HPEC is informed and believes, and thereon alleges, that the Port negotiated a lease with PCMC for approximately twenty-five acres of the LAXT site for use as a chassis yard. HPEC understands that PCMC is the ILWU's largest employer in the Port, and therefore the ILWU has a greater interest in aligning with PCMC than with HPEC. One objective of the conspiracy between the Port and the Union Defendants was to develop a project that would benefit the union.

188. The Port, the City, and Executive Director Seroka deliberately and fraudulently withheld from HPEC that the Amendment purportedly needed further ratification and continued to improperly represent that it would be ratified, while simultaneously taking steps to ensure that the Project would not proceed unless

Deleted: 154

Deleted:

Deleted: U

Deleted: 155

Deleted: 156

Deleted: ¶
44¶
<object><object>¶
¶
¶
157

Deleted: <object>

HPEC agreed to provide illegal labor concessions to the Union Defendants. At all relevant times, the Port, the City, Executive Director Seroka, and other employees were acting with corrupt intent by, among other things, conspiring to impose an illegal labor agreement on HPEC, so as to avoid illegal widespread labor action at the Port and garner favor with the ILWU, an organization to which the Port is beholden due to the union's immense political power in the City and at the Port. At all relevant times, the City, the Port, Executive Director Seroka, and other employees were acting with corrupt intent despite the impact their conduct may have on the public good.

## W. HPEC Filed A Writ Proceeding In Los Angeles Superior Court

189. On May 31, 2019, HPEC sent a letter to Seroka and to the Port's counsel Janna Sidley, objecting to Seroka's purported termination of the project. In its letter, HPEC informed the Port that it would file a writ petition to contest the termination.

190. On June 17, 2019, HPEC filed a verified petition for a writ of mandate and complaint for declaratory and injunctive relief in Los Angeles Superior Court. In its petition, HPEC sought, among other things, an order (a) vacating Seroka's purported termination of HPEC's rights in the Project; (b) declaring that HPEC's rights and interests in the project, including the ENA and MOUs remain in full force and effect, (c) requiring that POLA follow applicable procedures set forth in the City Charter with respect to any future modification of HPEC's rights in the Project; (d) directing the Board to provide HPEC with detailed reasons to support any future termination decision; (e) staying any development work on the Project by anyone other than HPEC pending resolution of the dispute; and (f) prohibiting any use by anyone other than HPEC of HPEC work product or materials relating to the Project.

191. In its verified answer to HPEC's petition, the City Defendants took the position that the Amendment to the ENA was not valid or enforceable because it

**Deleted:** the Port

**Deleted:**

**Deleted:** ¶

**Deleted:**

**Deleted:** ¶

**Deleted:**

**Deleted:** ¶

**Deleted:**

**Deleted:** ¶

**Deleted:** <#>THE CITY DEFENDANTS AND SEROKA ARE NOT PROTECTED¶ <#>BY *PARKER* IMMUNITY¶

**Moved up [27]:** <#>158.

**Deleted:** <#>*Parker v. Brown* (1943) 317 U.S. 341, 350–51, the Supreme

**Deleted:** held that

**Deleted:** Sherman Act does not apply to

**Deleted:** actions of a state or

**Deleted:** actions of

**Deleted:** <#>its officers or agents as directed by its legislature. However, state agencies or¶ <#>subdivisions of a state are not exempt from the Sherman Act "simply by reason of¶ <#>their status as such." *City of Lafayette v. Louisiana Power & Light Co.* (1978) 435¶ <#>U.S. 389, 408. Rather, *Parker* immunity exempts anticompetitive conduct¶ <#>"engaged

**Deleted:** as

**Deleted:** act

**Deleted:** government

**Deleted:** *<object>*

would have extended the term of the ENA beyond three years and, as a result, required approval by the Board by an order or resolution. The City Defendants alleged that the Amendment was never approved or ratified by the Board.

192. HPEC filed this action and voluntarily dismissed the state action without prejudice the following day.

**X. The City Has Demanded That HPEC Pay Property Tax**

193. On October 8, 2020, the City sent HPEC a notice of supplemental assessment and a notice of escape assessment along with property tax bills for the Project Site. One of the bills was for a supplemental assessment for the period July 1, 2017 to June 30, 2018. Even though the City breached the Permit by not allowing HPEC to access the site and the Permit has expired, the City nonetheless has demanded that HPEC pay supplemental property tax. The other bills appear to relate to the period of July 1, 2020 to June 30, 2021, suggesting that HPEC retains a possessory interest in the Project site.

**THE UNION DEFENDANTS' CONDUCT IS NOT PROTECTED BY THE *NOERR-PENNINGTON* DOCTRINE**

194. The *Noerr-Pennington* doctrine extends First Amendment protections to immunize petitioning activity, direct communications to the government for redress of grievances, and conduct incidental to such petitioning activity. *Noerr-Pennington* is designed to protect "genuine efforts to influence" government bodies. *Clipper Express v. Rocky Mountain Motor Tariff Bureau, Inc.*, 690 F.2d 1240, 1252 (9th Cir. 1982).

195. The protections of *Noerr-Pennington* are not absolute. Noerr-Pennington does not protect "conduct which is otherwise unlawful." *Sony Electronics, Inc. v. Soundview Technologies, Inc.*, 157 F.Supp.2d 180, 189 (D. Conn. 2001) (citing *Federal Trade Comm'n v. Superior Court Trial Lawyers Assoc.*, 493 U.S. 411 (1990)); *see also* *United Nurses Ass'ns of Cal. v. N.L.R.B.*, 871 F.3d 767, 787 (9th Cir. 2017) (employer's "illegal objective" falls outside of

**Deleted:** State as sovereign, or,

**Deleted:** its¶
subdivisions, pursuant to state policy to displace competition with regulation or¶
monopoly public service." *Id.* at 413. With respect to local governmental entities,¶
their activities are protected by *Parker* immunity "if they are undertaken pursuant¶
to a 'clearly articulated and affirmatively expressed' state policy to displace¶
competition." *FTC v. Phoebe Putney Health System, Inc.* (2013) 568 U.S. 216, 226¶
(quoting *Cmty. Commc'ns Co. v. Boulder* (1982) 455 U.S. 40, 52).¶
¶
45¶
*<object><object>*¶
¶
¶
159. Here, the City Defendants are not entitled to the state-action immunity¶
from the antitrust laws because there is no clearly articulated state policy¶
authorizing their anti-competitive actions. First, the legislature has not authorized¶
the

**Deleted:** to engage in secondary boycotts or to co ... [1]

**Deleted:** <#>enter into illegal labor agreements. ... [2]

**Deleted:** Defendants and Seroka

**Deleted:** <#>are not immunized under *Parker* sin ... [3]

**Moved down [33]:** Cir.

**Deleted:** 1993) 998 F.2d 931, 948¶ ... [4]

**Deleted:** market participant exception to Parker ... [5]

**Deleted:** same exceptions as exist under *Parker*. S ... [6]

**Deleted:** LGAA is the same standard

**Deleted:** is applied for

**Deleted:** State Action Doctrine pursuant to the law ... [7]

**Deleted:** <#>*Sandcrest* case, with the only differe ... [8]

**Deleted:** 163

**Deleted:** . (9th Cir. 1982)

**Deleted:** 12 F.2d 1240, 1252.¶ ... [9]

**Deleted:** Although some¶ ... [10]

**Deleted:** <#>*Pennington* does not apply to the U ... [11]

**Moved down [34]:** <#> *v.*

**Deleted:** <#>*Int'l Ass'n of Bridge, Structural,*¶ ... [12]

**Deleted:** <#>conduct incidental to petitioning ac ... [13]

**Moved (insertion) [34]**

**Deleted:** ¶ ... [14]

**Moved up [28]:** 47¶

**Deleted:** *<object><object>*¶ ... [15]

**Deleted:** . (9th Cir. 2017)

**Deleted:** . The Union Defendants'

**Deleted:** <#>threats to HPEC were not made to ... [16]

**Deleted:** *<object>*

*Noerr-Pennington* protection); *Greenley v. Laborers' Int'l* Union *of North Am.*, 271 F.Supp.3d 1128, 1144 (D. Minn. 2017) ("*Noerr–Pennington* doctrine does not protect violence, illegal acts or defamation"); *Rodime PLC v. Seagate Technologies, Inc.*, 174 F.3d 1294, 1307 (Fed. Cir. 1999) (vacating summary judgment for defendant on tort claims where there was a genuine issue of fact as to whether defendant's conduct was otherwise unlawful and thus not protected by *Noerr-Pennington*). Defendants' threats (which were made directly to HPEC) and its demand for exclusive jurisdiction over the drayage jobs at the Project Site (which was also made directly to HPEC) are unlawful and not protected by *Noerr-Pennington*. Moreover, *Noerr-Pennington* does not protect secondary boycotts. "An appeal for a secondary boycott is not protected free speech, under the First Amendment to the Federal Constitution…" *Brown for and on Behalf of N. L. R. B. v. American Federation of Television and Radio Artists, San Francisco Local*, 191 F.Supp. 676, 679 (N.D. Cal. 1961).

196. The Union Defendants' conduct is not protected by *Noerr-Pennington* to the extent it involves communications with government officials in violation of the Brown Act. The Union Defendants engage in these unlawful actions because they cannot openly lobby the Board to illegally condition approval of a project on HPEC's agreement to assign the drayage jobs to the ILWU.

197. The Union Defendants' conduct also is not protected under *Noerr-Pennington* because their opposition constitutes sham petitioning. Sham petitioning occurs when a defendant's actions are not genuinely intended to influence favorable government action.

198. The Union Defendants' conduct towards HPEC violates the standard for single sham. This occurs when a party's claims are objectively baseless and for an improper or unlawful purpose. *Sosa v. DIRECTV, Inc.*, 437 F.3d 934, 938 (9th Cir. 2006).

**Moved (insertion) [33]**

**Deleted:** demands that HPEC agree to

**Deleted:** grant the ILWU

**Deleted:** . That is

**Deleted:** conduct

**Deleted:** incidental

**Deleted:** Union Defendants' activity

**Deleted:** petitioning the Port

**Deleted:** 167

**Deleted:** 168

**Deleted:** 169

**Deleted:** . (9th Cir. 2006)

**Deleted:** 18 934, 938.¶ 170

**Deleted:** <*object*>

199. The Union Defendants' claims about HPEC are objectively baseless. The RFP and HPEC's proposal do not require the ILWU's approval or that intra-port drayage jobs be assigned to the ILWU. Nonetheless, the Union Defendants held up their approval of the project and barred HPEC's access to the Board, illegally demanding that the intra-port drayage jobs be assigned to them. The Union Defendants' threats to HPEC were not made to influence the Port but were instead intended to interfere with its competitor, the Teamsters.

200. Immunity is also not afforded to the actions of the Union Defendants because their actions barred HPEC's access to adjudicative proceedings. *California Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 511 (1972). The Union Defendants unlawfully threatened HPEC and the Port with strikes, civil unrest and work stoppages if the Port brought the Amendment to the ENA and the Amendment to the Permit before the Board for its approval or disapproval. The Union Defendants sought more than to petition the Port about the Project but rather to exclude HPEC from the Board's decision-making process altogether and prevented HPEC and its supporters from being able to present the merits of the Project to the Board and City Council. Requiring the ILWU's consent to approve the Amendment to the ENA, the Amendment to the Permit and long-term leases denied HPEC access to the Board and the City Council. The Union Defendants controlled whether HPEC had access to the Board and the City Council and deprived the Board and City Council of their ability to function independently. *Basile v. City of Poway*, No. 07cv1793 DMS JMA, 2009 WL 10726770, *14 (S.D. Cal. July 8, 2009).

**FIRST CLAIM FOR**

**VIOLATION OF SECTION 1 OF THE SHERMAN ACT**

**(Against Defendants ILWU and Local 13)**

201. HPEC re-alleges and incorporates by this reference the allegations contained in Paragraphs 1 through 200, above as though set forth herein.

Deleted: 171

Deleted: (1972)

Deleted: .

Deleted: 27¶

Moved up [19]: 28¶
¶

Deleted: 48¶
<object><object>¶
¶
¶

Deleted: REFUSAL TO DEAL/DENIAL OF

Deleted: <#>ACCESS TO "ESSENTIAL" FACILITIES¶
<#>IN

Deleted: All

Deleted: <#>172

Moved down [35]: <#>. HPEC re-alleges and incorporates by this reference the allegations¶

Moved (insertion) [36]

Deleted: 171

Moved (insertion) [37]

Deleted: <object>

Deleted: 173

202. Defendants conspired to restrain trade between Defendants City and Port on the one hand and HPEC on the other. Specifically, Defendants agreed that Defendants City and Port will refuse to deal with HPEC unless HPEC agrees to provide unlawful labor concessions to the Union Defendants. When HPEC would not accede to the Union Defendants' unlawful demands, Defendants agreed to deny access to the Port and terminate HPEC's rights in the Project.

Deleted: 174

203. By engaging in the acts alleged herein, including terminating the Project in furtherance of the conspiracy, Defendants have also aided and abetted a secondary boycott engaged in by the Union Defendants against HPEC (to punish HPEC for its association with ILWU's rival, the Teamsters, and to force HPEC to grant exclusive jurisdiction over intra-port drayage and enter into an illegal prehire agreement).

Deleted: 175

204. In addition, Defendants City and Port control access to POLA business, and thus control an essential facility. By terminating the Project, Defendants have wrongfully denied HPEC access to this essential facility for the purpose of restraining trade and competition in the market.

Deleted: 176

205. Defendants City and Port have market power and monopsony power in the markets for the supply of container terminal support services and the development for container terminal support facilities in the Port of Los Angeles and the Port of Long Beach, where HPEC, Defendants, purchasers, suppliers and labor compete (hereinafter, the "Relevant Market"). Defendants have sought to maintain and further this monopsony power by the conduct alleged herein, designed to restrain trade and competition in the Relevant Market.

Moved up [21]: 28¶
¶

Deleted: 49¶
<object><object>¶
¶
¶

Deleted: 177

206. The geographic market described herein describes a contiguous geographic market that reasonably delineates the boundaries of competition for the products and services at issue. Container support services must naturally be in the vicinity of the Port where such services are needed and substitutions are not practical over larger geographic areas. For example, a container ship arriving at

Deleted:

Deleted: <object>

Port of Los Angeles cannot substitute container transport services, and associated labor services, from the Port of Seattle or some other geographic region. Other gateway ports do not have the requisite infrastructure or geographic proximity to end users.

207. No pro-competitive justifications exist for Defendants' conduct.

208. The Union Defendants' conduct is not entitled to protection under either the statutory or the non-statutory exemptions to the antitrust laws. The statutory exemption does not apply because (a) the Union Defendants entered into an illegal combination with a nonlabor group, POLA, in restraint of trade; (b) the provisions of the Norris-LaGuardia Act, 29 U.S.C. § 113(c), do not apply because there is no "labor dispute;" and (c) the Union Defendants' actions were not in pursuit of their legitimate labor interest because the refusal to deal was not designed to preserve work that they had historically performed but rather to monopolize intra-port drayage. *See, e.g.*, *Connell Constr. Co. v. Plumbers and Steamfitters Local Union No. 100*, 421 U.S. 616, 622 (1975) (statutory exemption does not apply to "concerted action or agreements between unions and nonlabor parties").

209. The nonstatutory exemption shields some restraints on competition imposed through the bargaining process, where the alleged anticompetitive conduct is anchored in the collective-bargaining process, concerns only the parties to the collective bargaining relationship, and relates to wages, hours, conditions of employment, or other mandatory subjects of collective bargaining.

210. The non-statutory exemption does not apply to the Defendants' conduct here because the conduct did not take place during a collective-bargaining negotiation. There is no collective bargaining relationship between the Union Defendants and HPEC. Nor were the parties negotiating in advance of a collective bargaining agreement because HPEC is not an employer and has no employees. As an agent for an employer, HPEC would not be a party to a collective bargaining agreement with the ILWU. The ILWU has a collective bargaining agreement with

Deleted: 178

Deleted: 179

Deleted:

Deleted: (1975)

Deleted:

Deleted: ¶

Deleted: 180

Deleted: ¶
50¶
<object><object>¶
¶
¶
181

Deleted: <object>

its employer, the Pacific Maritime Association. Moreover, the restraint of trade not only affects HPEC and the Union Defendants but also independent truckers, Teamsters, beneficial cargo owners and terminal operators and has substantial anticompetitive effects outside of those anticipated and protected by the non-statutory exemption.

211. Defendants' conduct is harmful to competition in the Relevant Market, because it will reduce the number of potential suppliers, increase prices, and decrease output or quality in these markets and is designed to further the anticompetitive goal of the Union Defendants, in concert with the other Defendants, of securing monopoly control over the jobs in the market.

212. The above-referenced conduct caused anticompetitive injury to HPEC's business or property by precluding HPEC from participating in the Relevant Market, and depriving HPEC of its rights under the ENA, the Amendment and the Permit and the profits it would have obtained from the pilot study and the Project. For the reasons alleged herein, Defendants' conduct harms competition in the Relevant Market.

**SECOND CLAIM FOR VIOLATION OF 29 U.S.C. § 187**

**(Against Defendants ILWU and Local 13)**

213. HPEC re-alleges and incorporates by this reference the allegations contained in Paragraphs 1 through 212, above as though set forth herein.

214. Each of the Union Defendants is a "labor organization" under Section 303(a) of the Labor Management Relations Act ("LMRA") and Section 8(b)(4) of the National Labor Relations Act ("NLRA").

215. Section 303(a) of the LMRA makes it unlawful for a labor organization, like the Union Defendants, to engage in conduct defined as an unfair labor practice under section 8(b)(4) of the NLRA.

Deleted:
Deleted: ¶
Deleted:
Deleted: ¶
Deleted:
Deleted: ¶
Deleted: 182
Deleted: 183
Deleted: Amendment, the MOUs
Deleted: ¶
Deleted:
Deleted: ¶
Deleted:
Moved (insertion) [35]
Deleted: <#>184
Moved down [38]: <#>. HPEC re-alleges and incorporates by this reference the allegations¶
Deleted: <#>183
Deleted: 185
Moved up [23]: 28¶
¶
Deleted: 51¶
*<object><object>*¶
¶
¶
186
Deleted: 187
Moved (insertion) [39]
Deleted: *<object>*

216. Under section 303(b) of the LMRA, "whoever shall be injured in his business or property by reason" of any violation of section 303(a) of the Act may sue for and recover damages and the cost of suit.

217. HPEC is a "person" under 29 U.S.C. § 152(1). HPEC is engaged in "commerce" and/or an industry that "affect commerce." 29 U.S.C. § 152(2) defines the term "employer" to include "any person acting as an agent of an employer, directly or indirectly." HPEC falls within the statutory definition of an "employer" because HPEC is a direct or indirect agent of an employer. It would have operated the Project through multiple third-party vendors of its choosing who would be the direct employer.

218. The Port is a "person" under 29 U.S.C. § 152(1). The Port is engaged in "commerce" and/or activities that "affect commerce."

**Unlawful Secondary Boycott By Threatening The Port To Cease Doing Business With HPEC**

219. Under section 8(b)(4)(ii)(B) of the NLRA, it is an unfair labor practice for a union to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce with the object of forcing or requiring any person to cease doing business with any other person.

220. By using the word "coerce," Congress "did not intend to proscribe only strikes or picketing but intended to reach any form of economic pressure of a compelling or restraining nature." *Associated Gen. Contractors v. N.L.R.B.*, 514 F.2d 433, 438 (9th Cir. 1975). Particular statements constitute prohibited "coercive threats" if, based on the specific language used and surrounding conduct and events, they reasonably can be expected to threaten parties with "ruin or substantial loss." *N.L.R.B. v. Retail Store Employees Union Local 1001*, 447 U.S. 607, 614 (1980).

221. By threatening the Port that the union would engage in labor disruption at the Port unless the Port stopped doing business with HPEC (because the HPEC

Deleted: 188

Deleted: 189

Deleted: 190

Deleted: 191

Deleted: . (9th

Deleted: Cir. 1975) 514

Deleted: .

Deleted: (1980)

Deleted: 24 614.
192

Deleted: <object>

project envisioned working with the ILWU's rival union the Teamsters and because HPEC would not grant ILWU exclusive jurisdiction over the drayage jobs), the Union Defendants engaged in unlawful secondary activity in violation of 29 U.S.C. § 158(b)(4)(ii)(B).

222. The Union Defendants successfully forced the Port to stop the HPEC Pilot Project from proceeding and ultimately were successful in forcing the Port to stop the entire HPEC Project from proceeding, in an effort to block the Teamsters from performing jobs at the Port and monopolize the drayage jobs.

**Unlawful Secondary And Tertiary Activity By Threatening, And Using Coercive Tactics To Pressure, HPEC To Force Third Party Employers To** Employ ILWU And **Enter Into Unlawful § 8(e) Agreements**

223. Under section 8(b)(4)(ii)(D) of the NLRA, it is an unfair labor practice for a union to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce in order to force or require any employer to assign particular work to employees in a particular labor organization or in a particular trade, craft, or class rather than to employees in another labor organization or in another trade, craft, or class.

224. Under section 8(b)(4)(ii)(A) of the NLRA, it is an unfair labor practice for a union to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce with the object of forcing or requiring any employer to enter into any agreement prohibited by section (e) of the NLRA, which includes forcing or requiring any employer to cease doing business with any other person.

225. Under Section 8(e) of the NLRA, labor organizations and employers are prohibited from entering into any agreement, express or implied, whereby such employer ceases or refrains or agrees to cease or refrain from doing business with any other person. The Supreme Court has interpreted § 8(e) to prohibit "secondary" union pressure to force an employer to enter such an agreement. *Nat'l*

**Moved up [29]:** ¶ 52¶

**Deleted:** <object><object>¶ ¶ ¶ 1

**Deleted:** 2

**Deleted:** 193

**Deleted:** Coercive Tactics To

**Deleted:** ,

**Deleted:** ¶

**Deleted:** 194

**Deleted:** an employer

**Deleted:** order to force

**Deleted:** require

**Deleted:** the

**Deleted:**

**Deleted:** ¶

**Deleted:**

**Deleted:** ¶

**Deleted:**

**Deleted:** 195

**Deleted:** an employer with the object of forcing the

**Deleted:** employer to

**Deleted:** or

**Deleted:** employer

**Deleted:** 196

**Deleted:** 24

**Deleted:** <object>

*Woodwork Mfrs. Ass'n v. NLRB*, 386 U.S. 612, 645 (1967). As the Ninth Circuit has explained:

> Union pressure is secondary when it is brought to bear upon a neutral or secondary employer for the purpose of forcing that neutral or secondary employer to apply pressure to the primary employer..... The tactical objective of secondary pressure is not to influence the labor policy of the neutral employer against whom it is directed, but to influence the labor policy of the primary employer.

*NLRB v. Hotel & Rest. Emps. & Bartenders' Union Local 531*, 623 F.2d 61, 65–66 (9th Cir. 1980).

226. By threatening HPEC with the object of forcing HPEC to require its third party vendors to hire the ILWU for the drayage jobs (jobs which were not within the ILWU's jurisdiction or expertise or jobs traditionally performed by the ILWU), the Union Defendants engaged in unlawful secondary and tertiary activity in violation of 29 U.S.C. § 158(b)(4)(ii)(A) and (D).

227. The labor agreement demanded by the Union Defendants is unlawful under section 8(e) of the NLRA because the Union Defendants do not have a collective bargaining relationship with HPEC, the work sought was not traditionally performed by the ILWU and HPEC had no power to grant the ILWU exclusive jurisdiction over intra-port drayage.

228. The conduct alleged herein constitutes unlawful secondary and tertiary activity in violation of 29 U.S.C. § 158(b)(4)(ii)(A), § 158(b)(4)(ii)(B), and § 158(b)(4)(ii)(D).

229. HPEC has standing to bring suit under section 303(b) because it was the specific target of the Union Defendants' illegal conduct in attempting to coerce HPEC into granting them exclusive jurisdiction over the drayage jobs at the HPEC project site and into agreeing to an up-front commitment that whoever HPEC hired

**Deleted:** (1967)

**Deleted:** , 87 S.Ct. 1250, 18¶ L.Ed.2d 357.

**Deleted:**

**Moved up [30]:** ¶ 53¶

**Deleted:** *<object><object>*¶ ¶ ¶

**Deleted:** (9th Cir. 1980)

**Deleted:** 6 F.2d 61, 65–66.¶ 197

**Deleted:** in violation

**Deleted:** 11

**Deleted:** 198

**Deleted:** 199

**Deleted:** ¶ 18

**Deleted:**

**Deleted:** 200

**Deleted:** .

**Deleted:** *<object>*

as a third party vendor would use longshore labor. As a direct and proximate result of the illegal conduct alleged herein, HPEC has suffered business injuries by precluding HPEC from participating in the relevant markets, and depriving HPEC of its property, its rights under the ENA, the Amendment, and the Permit, and the profits it would have obtained from the pilot study and the Project.

230. As a direct and proximate result of the wrongful acts alleged herein, HPEC has suffered substantial financial damages in an amount to be proven at trial.

**THIRD CLAIM FOR BREACH OF CONTRACT**

**(Against Defendants City and Port)**

231. HPEC re-alleges and incorporates by this reference the allegations contained in Paragraphs 1 through 230, above as though set forth herein.

232. The Port and HPEC entered into a series of agreements concerning the Project, including the ENA, the Amendment, two MOUs, an Indemnification Agreement, and the Permit. Until the Port's termination of HPEC's rights in the Project in May 2019, the parties undertook joint activities in furtherance of the Project.

233. The ENA expressly required that (a) the Port will negotiate exclusively with HPEC regarding the Project (Sections 1(A) & 1(B)), (b) the Port will negotiate in good faith with HPEC regarding the Project (Section 1(B)), and (c) the Port will terminate these agreements and HPEC's rights in the Project only if the Port reasonably and in good faith determines that the Project is infeasible (Section 2(A). Moreover, the Port agreed to extend the term of the ENA and prepared an amendment to that effect but failed to submit the Amendment to the Board and City Council for approval.

234. The Permit expressly granted HPEC's rights to, and required the Port to allow HPEC, exclusive use of the Project site for 12 months for a "temporary drayage truck, container, and container chassis handling, staging and storage, utilizing a maximum of four hundred (400) parking slots, alternative fueling facility

Deleted:
Deleted: ¶ HPEC has suffered business injuries by ... [17]
Deleted: ¶ relevant markets, and depriving HPEC ... [18]
Deleted: ¶ Amendment, the MOUs, …nd the Permit, and th ... [19]
Deleted: ¶
Deleted: 201
Moved up [31]: ¶ 54¶
Deleted: <object><object>¶ ¶ ¶
Deleted: VIOLATION…REACH OF HPEC'S FEDERALLY… ... [20]
Deleted: <#>PROTECTED NLRA RIGHTS UNDER 42 U.S.C. § 1983¶ ... [21]
Moved (insertion) [38]
Deleted: <#>202
Moved down [40]: <#>. HPEC re-alleges and incorporates by this reference the allegations¶
Deleted: <#>201
Deleted: <#>203. 42 U.S.C. § 1983 provides, in part, "[e]very person who, under color¶ <#>of any statute, ordinance, regulation, custom, or usage, of any State…subjects, or¶ <#>causes to be subjected, any citizen of the United States or other person within the¶ <#>jurisdiction thereof to the deprivation of any rights, privileges, or immunities¶ <#>secured by the Constitution and laws, shall be liable to the party injured in an action¶ <#>at law."¶ <#>204. The Supreme Court has held that the NLRA creates rights for labor¶ <#>and management that are "enforceable agai ... [22]
Moved up [39]: <#>27¶ ... [23]
Deleted: <#><object><object>¶ ... [24]
Moved down [41]: <#>(Against Defendants City
Deleted: <#>208
Moved down [42]: <#>. HPEC re-alleges and
Deleted: <#>contained in Paragraphs 1 throug ... [25]
Deleted: 210. These agreements
Deleted: require, or contemplate,…equired th ... [26]
Deleted: , …(Sections 1(A) & 1(B)), (b) the Por ... [27]
Deleted: , …(Section 1(B)), and (c) the Port will ... [28]
Deleted: ¶ ... [29]
Deleted: ¶ ... [30]
Deleted: will have… exclusive¶ ... [31]
Moved down [43]: e) HPEC will have exclusive use
Deleted: 211. The Port has
Deleted: <object>

(such as hydrogen)." (Section 2; see also Section 1). The Port agreed to abate rent until HPEC had operational access to the Project site and prepared an amendment to that effect but failed to submit the Amendment to the Board for approval.

235. The Port breached the ENA's contractual requirements by, among other things, secretly negotiating and conspiring with the Union Defendants, attempting to coerce HPEC into giving the Union Defendants exclusive jurisdiction over the intra-port drayage jobs at the Project, secretly negotiating with other parties to encumber the property and to develop alternative projects, failing to submit the Amendment to the ENA to the Board and City Council for approval, and wrongfully terminating the Project.

236. The Port breached the Permit's contractual requirements by prohibiting HPEC from accessing the site and running its pilot program for 12 months, extorting rent payments from HPEC while forbidding it to use the Project site for its operations, and failing to submit the amendment to the Permit to the Board for approval.

237. In addition to breaching the contractual requirements set forth above in paragraphs 235 and 236, the Port breached the ENA and the Permit by failing to disclose material facts. Although the Port accepted HPEC's proposal which expressly stated it was neutral on drayage and one of its joint venture partners employed Teamsters, the Port failed to disclose that it would require the ILWU's approval for the Project before HPEC would be allowed to run its pilot study and it would terminate the Project based on objections from the ILWU. The Port also failed to disclose prior to the expiration of the original ENA that it had failed to submit the Amendment to the Board to be acted upon. Although the Port represented to HPEC and Macquarie that it was supportive of the Project and knew that they believed that the Amendment to the ENA had been properly approved and was valid, the Port waited to disclose to them that it had failed to have the Board properly approve the Amendment to the ENA until after the closing of Macquarie's

Deleted: each of these
Deleted: ¶
Deleted:
Deleted: prohibiting
Deleted: <#>HPEC from running the pilot study, extorting rent payments from HPEC and¶
Deleted: 212
Deleted: paragraph 210
Deleted: , the Amendment, two MOUs
Deleted: Permit by failing to
Deleted: ¶
Deleted:
Deleted: ¶
Deleted:
Deleted: ¶
Deleted:
Deleted: ¶
Deleted:
Moved up [9]: ¶
¶
56
Deleted: ¶
<object><object>¶
¶
¶
Deleted:
Deleted: ,¶
Deleted: in its view,
Deleted: not
Deleted: <#>was not valid.¶
<#>213
Moved down [44]: <#>. At all times, HPEC has operated in full compliance with its rights and¶
Deleted: <object>

investment. Nor did the Port disclose that the ILWU would have to consent to HPEC's use of the Project site for its permitted pilot program.

238. At all times, HPEC has operated in full compliance with its rights and obligations under both the ENA and the Permit. HPEC relied on the Port and City's representations, investing substantial resources in developing the Project and improving the Project site for operation of its permitted Pilot program. Had the Port and City disclosed the material information they were concealing, HPEC reasonably would have behaved differently. HPEC paid rent due under the Permit through January 2019 and did not waive its right to access the Project Site for operational use by paying rent.

239. HPEC has suffered substantial financial damages as a result of the Port's breaches of the ENA and Permit and concealment of material facts in an amount to be proven at trial.

**FOURTH CLAIM FOR BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**

**(Against Defendants City and Port)**

240. HPEC re-alleges and incorporates by this reference the allegations contained in Paragraphs 1 through 239, above as though set forth herein.

241. The Port and HPEC have entered into a series of agreements concerning the Project, including the ENA, the Amendment, two MOUs, an Indemnification Agreement, and the Permit. Until the Port's termination of HPEC's rights in the Project in May 2019, the parties undertook joint activities in furtherance of the Project.

242. These agreements expressly require, or contemplate, that (a) the Port will negotiate exclusively with HPEC regarding the Project, (b) the Port will negotiate in good faith with HPEC regarding the Project, (c) the Port will terminate these agreements and HPEC's rights in the Project only if the Port reasonably and in good faith determines that the Project is infeasible, (d) HPEC will have exclusive

Moved (insertion) [45]
Deleted: each Agreement between
Deleted: Port
Deleted: HPEC
Deleted: the Port and
Deleted:
Deleted: ¶
Deleted:
Deleted: 214
Deleted: these Agreements
Deleted: FIFTH
Moved (insertion) [41]
Moved (insertion) [40]
Moved down [46]: <#>(Against Defendants City and Port)¶
Deleted: <#>215
Moved up [36]: <#>. HPEC re-alleges and incorporates by this reference the allegations¶
Deleted: <#>214
Deleted: 216
Deleted: 217
Deleted: <object>

use of the Project site, and (e) HPEC will have exclusive use of HPEC's own work product generated in connection with the Project.

243. These agreements also impose upon the parties the implied covenant of good faith and fair dealing, which precludes either party from doing anything that would unfairly interfere with the right of the other party to receive the benefits of the contract.

244. The Port has breached the implied covenant of good faith and fair dealing by, among other things, failing to negotiate in good faith, conspiring with the Union Defendants, failing to disclose that the Amendment to the ENA was supposedly invalid, failing to seek and obtain Board approval for the Amendment to the ENA, failing to disclose that it would require the ILWU's approval for the Project before HPEC would be allowed to run its pilot study, failing to disclose that it would terminate the Project because of objections from the ILWU, purporting to impose an illegal ILWU exclusivity requirement, purporting to terminate HPEC's rights in the Project based on a false pretext of infeasibility, negotiating with other developers regarding use of Project sites, allowing other developers to use HPEC work product, and refusing HPEC access to the pilot study site while insisting that HPEC pay rent. The Port conspired with the Union Defendants to restrict HPEC's access to the Port, deprive HPEC of its ability to participate in the market for the purchase of container terminal support services and the purchase of construction services for container terminal support facilities in the Port of Los Angeles, and to deprive HPEC of the benefits of the ENA, the Amendment, the MOUs and the Permit.

245. At all times, HPEC has operated in full compliance with its rights and obligations under each Agreement between the Port and HPEC.

246. HPEC has suffered substantial financial damages as a result of the City Defendants' breaches of the implied covenant of good faith and fair dealing in an amount to be proven at trial.

Moved (insertion) [43]

Deleted: <#>e) HPEC will have exclusive use of HPEC's own work¶
<#>product generated in connection with the Project.¶
<#>218

Deleted: ¶
57¶
<object><object>¶
¶
¶

Deleted: 219

Deleted: 220

Moved up [45]: . At all times, HPEC has operated in full compliance with its rights and¶

Moved (insertion) [44]

Deleted: 221

Deleted: SIXTH

Deleted: <object>

**FIFTH CLAIM FOR DECLARATORY RELIEF**

**(Against Defendants City and Port)**

247. HPEC re-alleges and incorporates by this reference the allegations contained in Paragraphs 1 through 246, above as though set forth herein.

248. There is an actual and present controversy between the parties. HPEC contends that (1) the Amendment is valid and enforceable; and (2) the Port's May 2019 termination of its rights in the Project is invalid. The City Defendants deny these contentions.

249. HPEC desires a judicial declaration that (1) the Amendment is valid and enforceable; and (2) the Port's May 2019 termination of its rights in the Project is invalid.

250. HPEC is presently and continuously injured by the City Defendants' termination of its rights in the Project. If not enjoined by this Court from transferring HPEC's rights in the Project to another entity and proceeding with an alternative project at the Project site, the City Defendants will proceed with an alternative project at the Project site.

251. HPEC has no plain, speedy, and adequate remedy at law. Damages would not fully redress any harm suffered by HPEC.

**PRAYER FOR RELIEF**

WHEREFORE, HPEC prays for judgment against the Defendants, and each of them, as follows:

a. For compensatory, consequential and incidental damages in an amount to be proven at trial;

b. For general damages in an amount to be proven at trial;

c. For special damages, according to proof;

d. For declaratory and injunctive relief;

e. For prejudgment interest;

f. For reasonable attorneys' fees;

Moved (insertion) [46]

Moved (insertion) [42]

Deleted: <#>(Against Defendants City and Port)¶
<#>222. HPEC re-alleges and incorporates by this reference the allegations¶

Deleted: <#>221

Deleted: ¶
58¶
<object><object>¶
¶
¶
223

Deleted: 224

Deleted: 225

Deleted: 226

Deleted: <object>

g. For the costs of suit herein incurred;

h. For restitution;

i. For treble damages; and

j. For such other and further relief as this Court may deem proper.

Dated: December 3, 2020 VALLE MAKOFF LLP

By: */s/ Jeffrey B. Valle*
Jeffrey B. Valle
Katherine Balatbat
Attorneys for Plaintiff Harbor Performance Enhancement Center, LLC

**DEMAND FOR JURY TRIAL**

HPEC hereby demands trial of its claims by jury to the extent authorized by law.

Dated: December 3, 2020 VALLE MAKOFF LLP

By: */s/ Jeffrey B. Valle*
Jeffrey B. Valle
Katherine Balatbat
Attorneys for Plaintiff Harbor Performance Enhancement Center, LLC

Deleted: ¶
59¶
<object><object>¶
¶
¶
1¶

Moved down [47]: By: /s/ Jeffrey B. Valle¶
Jeffrey B. Valle¶
Katherine Balatbat¶
Attorneys for Plaintiff Harbor¶
Performance Enhancement Center,¶
LLC¶

Deleted: July 20, 2020 VALLE MAKOFF LLP¶

Deleted: 8¶
9

Moved down [48]: DEMAND FOR JURY TRIAL¶

Moved down [49]: HPEC hereby demands trial of its claims by jury to the extent authorized by¶

Deleted: law.¶
Dated: July 20

Moved (insertion) [48]

Deleted: 17¶
18¶
19¶
20¶

Moved (insertion) [49]

Moved (insertion) [47]

Deleted: <object>

Moved up [37]: 60¶

Deleted: <object> <object>¶

**CERTIFICATE OF SERVICE**

Pursuant to Rule 5-3 of the Local Civil Rules of the United States District Court for the Central District of California, I hereby certify under penalty of perjury under the laws of the United States of America that on the below date, a true copy of the above document was filed through the Court's Case Management / Electronic Case Filing system and served by that system upon all counsel of record registered for the System and deemed to have consented to electronic service in the above-captioned case.

Deleted: <object>

Dated: December 3, 2020 **VALLE MAKOFF LLP**

Deleted: 12

*/s/ Jeffrey B. Valle*

Jeffrey B. Valle

Counsel for Plaintiff Harbor Performance Enhancement Center, LLC

Moved up [7]: ¶ 13¶

Deleted: 14¶

Deleted: 61

Deleted: <object>

| Page 59: [1] Deleted | Author | 12/4/2020 11:05:00 AM |
|---|---|---|

1

| Page 59: [2] Deleted | Author | 12/4/2020 11:05:00 AM |
|---|---|---|

2

| Page 59: [3] Deleted | Author | 12/4/2020 11:05:00 AM |
|---|---|---|

3

| Page 59: [4] Deleted | Author | 12/4/2020 11:05:00 AM |
|---|---|---|

4

| Page 59: [5] Deleted | Author | 12/4/2020 11:05:00 AM |
|---|---|---|

5

| Page 59: [6] Deleted | Author | 12/4/2020 11:05:00 AM |
|---|---|---|

6

| Page 59: [7] Deleted | Author | 12/4/2020 11:05:00 AM |
|---|---|---|

7

| Page 59: [8] Deleted | Author | 12/4/2020 11:05:00 AM |
|---|---|---|

| Page 59: [9] Deleted | Author | 12/4/2020 11:05:00 AM |
|---|---|---|

| Page 59: [10] Deleted | Author | 12/4/2020 11:05:00 AM |
|---|---|---|

23

| Page 59: [11] Deleted | Author | 12/4/2020 11:05:00 AM |
|---|---|---|

24

| Page 59: [12] Deleted | Author | 12/4/2020 11:05:00 AM |
|---|---|---|

25

| Page 59: [13] Deleted | Author | 12/4/2020 11:05:00 AM |
|---|---|---|

| | | |
|---|---|---|
| Page 59: [14] Deleted | Author | 12/4/2020 11:05:00 AM |
| Page 59: [15] Deleted | Author | 12/4/2020 11:05:00 AM |
| Page 59: [16] Deleted | Author | 12/4/2020 11:05:00 AM |
| Page 68: [17] Deleted | Author | 12/4/2020 11:05:00 AM |
| Page 68: [17] Deleted | Author | 12/4/2020 11:05:00 AM |
| Page 68: [18] Deleted | Author | 12/4/2020 11:05:00 AM |
| Page 68: [18] Deleted | Author | 12/4/2020 11:05:00 AM |
| Page 68: [19] Deleted | Author | 12/4/2020 11:05:00 AM |
| Page 68: [19] Deleted | Author | 12/4/2020 11:05:00 AM |
| Page 68: [19] Deleted | Author | 12/4/2020 11:05:00 AM |
| Page 68: [20] Deleted | Author | 12/4/2020 11:05:00 AM |
| Page 68: [20] Deleted | Author | 12/4/2020 11:05:00 AM |
| Page 68: [21] Deleted | Author | 12/4/2020 11:05:00 AM |
| Page 68: [21] Deleted | Author | 12/4/2020 11:05:00 AM |
| Page 68: [21] Deleted | Author | 12/4/2020 11:05:00 AM |
| Page 68: [22] Deleted | Author | 12/4/2020 11:05:00 AM |
| Page 68: [23] Moved to page 64 (Move #39) | Author | 12/4/2020 11:05:00 AM |
| Page 68: [23] Moved to page 64 (Move #39) | Author | 12/4/2020 11:05:00 AM |
| Page 68: [24] Deleted | Author | 12/4/2020 11:05:00 AM |
| Page 68: [25] Deleted | Author | 12/4/2020 11:05:00 AM |
| Page 68: [26] Deleted | Author | 12/4/2020 11:05:00 AM |

| Page 68: [26] Deleted | Author | 12/4/2020 11:05:00 AM |
|---|---|---|

| Page 68: [26] Deleted | Author | 12/4/2020 11:05:00 AM |
|---|---|---|

| Page 68: [27] Deleted | Author | 12/4/2020 11:05:00 AM |
|---|---|---|

| Page 68: [27] Deleted | Author | 12/4/2020 11:05:00 AM |
|---|---|---|

| Page 68: [27] Deleted | Author | 12/4/2020 11:05:00 AM |
|---|---|---|

| Page 68: [28] Deleted | Author | 12/4/2020 11:05:00 AM |
|---|---|---|

| Page 68: [28] Deleted | Author | 12/4/2020 11:05:00 AM |
|---|---|---|

| Page 68: [29] Deleted | Author | 12/4/2020 11:05:00 AM |
|---|---|---|

| Page 68: [29] Deleted | Author | 12/4/2020 11:05:00 AM |
|---|---|---|

| Page 68: [30] Deleted | Author | 12/4/2020 11:05:00 AM |
|---|---|---|

| Page 68: [30] Deleted | Author | 12/4/2020 11:05:00 AM |
|---|---|---|

| Page 68: [31] Deleted | Author | 12/4/2020 11:05:00 AM |
|---|---|---|

| Page 68: [31] Deleted | Author | 12/4/2020 11:05:00 AM |
|---|---|---|

| Page 68: [31] Deleted | Author | 12/4/2020 11:05:00 AM |
|---|---|---|