Name __Jeffrey B. Valle, VALLE MAKOFF LLP__

Address __11777 San Vicente Blvd., Ste. 890__

City, State, Zip __Los Angeles, CA 90049__

Phone __310-476-0300__

Fax __310-476-0333__

E-Mail __jvalle@vallemakoff.com; kbalatbat@vallemakoff.com__

☐ FPD    ☐ Appointed    ☐ CJA    ☐ Pro Per    ☒ Retained

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| HARBOR PERFORMANCE ENHANCEMENT CENTER, LLC<br><br>PLAINTIFF(S),<br><br>v.<br><br>CITY OF LOS ANGELES HARBOR DEPARTMENT; et al.<br><br>DEFENDANT(S). | CASE NUMBER:<br><br>CV20-3251 PSG (MMAx)<br><br>**NOTICE OF APPEAL** |

NOTICE IS HEREBY GIVEN that _____Harbor Performance Enhancement Center, LLC_____ hereby appeals to
*Name of Appellant*
the United States Court of Appeals for the Ninth Circuit from:

**Criminal Matter**

☐ Conviction only [F.R.Cr.P. 32(j)(1)(A)]
☐ Conviction and Sentence
☐ Sentence Only (18 U.S.C. 3742)
☐ Pursuant to F.R.Cr.P. 32(j)(2)
☐ Interlocutory Appeals
☐ Sentence imposed:

☐ Bail status:

**Civil Matter**

☒ Order (specify):
  Order Granting Motion to Dismiss, 11/2/20
  Order Granting Motion to Dismiss, 3/24/20
☐ Judgment (specify):


☐ Other (specify):

Imposed or Filed on __11/2/20 & 3/24/21__. Entered on the docket in this action on __11/2/20 & 3/24/21__.

A copy of said judgment or order is attached hereto.

__April 21, 2021__
Date

_____
Signature
☐ Appellant/ProSe    ☒ Counsel for Appellant    ☐ Deputy Clerk

**Note:**  The Notice of Appeal shall contain the names of all parties to the judgment or order and the names and addresses of the attorneys for each party.  Also, if not electronically filed in a criminal case, the Clerk shall be furnished a sufficient number of copies of the Notice of Appeal to permit prompt compliance with the service requirements of FRAP 3(d).

**NOTICE OF APPEAL**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

#38/40/41

| Case No. | CV 20-3251 PSG (MMAx) | Date | November 2, 2020 |
|---|---|---|---|
| Title | Harbor Performance Enhancement Center, LLC v. City of Los Angeles Harbor Department et al | | |

Present: The Honorable   Philip S. Gutierrez, United States District Judge

| Wendy Hernandez | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorneys Present for Plaintiff(s): | Attorneys Present for Defendant(s): |
|---|---|
| Not Present | Not Present |

**Proceedings (In Chambers):   The Court GRANTS IN PART and DENIES IN PART Defendants' motions to dismiss.**

Before the Court are three motions to dismiss filed by Defendants City of Los Angeles ("the City") and City of Los Angeles Harbor Department ("the Port") (collectively, "City Defendants"), *see City Defendants' Motion to Dismiss*, Dkt. # 38, ("*City Mot.*"), Defendant Eugene D. Seroka ("Defendant Seroka")[1], *see Eugene D Seroka's Motion to Dismiss*, Dkt. # 41, ("*Seroka Mot.*"), and Defendants International Longshore and Warehouse Union ("ILWU") and International Longshore and Warehouse Union Local 13 ("ILWU Local 13") (collectively, "Union Defendants"), *see Union Defendant's Motion to Dismiss*, Dkt. # 40, ("*Union Mot.*"). Plaintiff Harbor Performance Enhancement Center, LLC ("HPEC") opposed, *see* Dkts. # 45 ("*Opp. City*"), # 47 ("*Opp. Seroka*"), # 46 ("*Opp. Union*"), and replies were filed by the City Defendants, *see* Dkt. # 49 ("*City Reply*"), Defendant Seroka, *see* Dkt. # 50 ("*Seroka Reply*"), and the Union Defendants, *see* Dkt. # 48 ("*Union Reply*"). The Court finds the matter appropriate for decision without oral argument. *See* Fed. R. Civ. P. 78; L.R. 7-15. Having considered the moving, opposing, and reply papers, the Court **GRANTS IN PART and DENIES IN PART** the motions.

---

[1] The FAC does not clarify whether claims against Seroka are brought against him in his individual or official capacity. To the extent they are brought against him in his official capacity, the Court includes him as a "City Defendant." References to claims against Seroka throughout the order are analyzed as claims against him in his individual capacity.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 20-3251 PSG (MMAx) | Date | November 2, 2020 |
|----------|----------------------|------|------------------|
| Title | Harbor Performance Enhancement Center, LLC v. City of Los Angeles Harbor Department et al | | |

## I.    Background

This case stems from a failed attempt to reach a consensus between the developer, the City, and the union regarding the development of a Container Terminal Support Facility (the "Project") at the former Los Angeles Export Terminal ("LAXT") and the former U.S. Customs House ("Customs House") located at the Los Angeles Port (collectively, the "Site"). *First Amended Complaint*, Dkt. #36, ("*FAC*"), ¶ 32.  The City Defendants terminated the Project when HPEC and the Union Defendants could not reach an agreement granting ILWU workers exclusive jurisdiction over drayage (short-haul trucking) jobs at the Project site. *Id*. ¶ 149.

### A.    The Parties

HPEC is an infrastructure developer and the plaintiff in this action.  *FAC* ¶ 24.  HPEC has no employees other than lawyers and "developer types."  *Id*. ¶ 70.

The City Defendants, the City of Los Angeles and the Los Angeles Harbor Department, hold the LAXT site in trust.  *Id*. ¶ 25.  The Port operates as a landlord port with more than 200 leaseholders.  *Id*.  The Port generates its revenues from leasing and shipping fees.  *Id*.

Defendant Seroka is and was the Executive Director of the Port.  *Id*. ¶ 27.

The Union Defendants are ILWU and ILWU Local 13.  *Id*. ¶¶ 28  9.  ILWU is a labor union that represents workers in longshore and other occupations, employed by waterfront companies who are members of the Pacific Maritime Association, at all West Coast ports, including the Port of Los Angeles.  *Id*.  ILWU Local 13 is one of ILWU's longshore locals and is the representative for the longshore workers at the Port of Los Angeles.  *Id*.  According to the FAC, the ILWU collective bargaining agreement only applies to property that is "water adjacent."  *Id*. ¶ 104.  The ILWU has no jurisdiction over the Project sites, no members properly licensed to perform drayage work, no trucks and no collective bargaining agreement with any drayage company.  *Id*. ¶ 99.  Drayage jobs had historically been performed by the Teamsters and drayage companies hired by Beneficial Cargo Owners ("BCOs"),[2] not the ILWU.  *Id*.

Next, the Court summarizes the allegations in the sixty-two page First Amended Complaint ("FAC").

---

[2] A BCO is the party that ultimately owns the product being shipped.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 20-3251 PSG (MMAx) | Date | November 2, 2020 |
|----------|----------------------|------|------------------|

| Title | Harbor Performance Enhancement Center, LLC v. City of Los Angeles Harbor Department et al |
|-------|---|

B.    Factual Background

    i.    *The Proposal*

In 2015, the Port invited proposals from the development community to develop and operate a terminal support facility on a 110-acre site at Terminal Island that had been undeveloped for ten years. *Id*. ¶ 2. Following a publicly noticed Request for Proposals (the "RFP") and a competitive bidding process, the Port selected HPEC, and the parties entered a binding exclusive negotiating agreement (the "ENA"). *Id*. ¶ 2 3.

HPEC's proposal aimed to reduce traffic congestion, increase overall cargo handling, and provide access to everyone. *Id*. ¶ 35. The proposal expressly identifies Eco-Flo as the non-exclusive member of the HPEC consortium specializing in drayage, but does not suggest that any drayage company would have exclusive drayage rights. *Id*. The proposal also states that "[t]he higher throughput of marine terminals should ensure no loss of jobs to ILWU." *Id*

    ii.    *The ENA, the Memoranda of Understanding, and the Amendment*

The Los Angeles Board of Harbor Commissioners (the "Board") approved the ENA on July 21, 2016, and the Port executed the agreement on September 2, 2016. *Id*. ¶ 39. The ENA obligated the City not to negotiate for a permit or any other entitlement, or for the development of the Site or any portion thereof, with any party other than HPEC during the exclusivity period. *Id*. ¶ 40. The ENA specifically provided that "[n]egotiations under the [ENA] shall be undertaken by City and by Developer in good faith." *Id*.

As originally contemplated, the ENA had an initial term of 12 months with an option to extend for an additional six months. *Id*. ¶ 42. Thus, if HPEC exercised its option, the ENA would expire no later than March 2, 2018. *Id*. Three months following execution, on December 8, 2016, the Port decided that the Project required a full Environmental Impact Report ("EIR") rather than a more limited review, and therefore the entitlement process for the Project would exceed the original term of the ENA, requiring the parties to amend the agreement (the "Amendment"). *Id*.

The parties negotiated two Memoranda of Understanding ("MOUs") for both sites that provided the framework for finalizing a long-term lease agreement, as well as the Amendment that would extend the ENA. *Id*. ¶ 43.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 20-3251 PSG (MMAx) | Date | November 2, 2020 |
|---|---|---|---|
| Title | Harbor Performance Enhancement Center, LLC v. City of Los Angeles Harbor Department et al | | |

On February 2, 2017, HPEC CEO Jonathan Rosenthal ("Rosenthal") informed the Port's Executive Director Seroka and other Port staff that HPEC had determined to engage a real estate consultancy group, Jones Lang LaSalle ("JLL") to, among other things, prepare a feasibility study and market analysis. *Id*. ¶ 44. Rosenthal specifically informed the Port that HPEC's financial commitment was "material" and HPEC did not want to pull the trigger until getting the green light from Seroka and the Board in the form of an executed MOU and Amendment. *Id*. The Port's Director of its Real Estate Division, Jack Hedge ("Hedge"), responded that he personally approved of JLL and the Port would let HPEC know if there was a reason not to proceed with JLL. *Id*.

On February 9, 2017, the Port and HPEC agreed to modify the term of the ENA to the earlier of (i) the completion of "all approval processes" or (ii) the termination of the ENA under the terms defined in the agreement. *Id*. ¶ 45.

On March 2, the Port's staff presented a report to the Board outlining the scope of the Project along with a recommendation that the Board approve the Amendment and the MOUs and work toward finalization of the terms of lease agreements. *Id*. ¶ 46. In a closed session meeting, the Board approved the Amendment and the two MOUs. *Id*. ¶ 47. Seroka reported to HPEC by text message from the closed session: "100 % support from our Board on HPEC just now. Onward and upward we go!" *Id*. ¶ 48. That same day, Hedge emailed HPEC to offer his congratulations and to let HPEC know that "[w]e need to proceed with getting the MOU and ENA amendment signed and to proceeding with next steps." *Id*.

Seroka then executed the MOUs and the Amendment on behalf of the City Defendants, and Deputy City Attorney Steve Otera executed the Amendment as to "form and legality." *Id*. ¶ 50. Nevertheless, a few weeks later, on March 24, Hedge informed HPEC in an email that the City Attorney was "now of the opinion" that the Amendment needed to be further acted on by the Board, requiring scheduling for the next available board meeting. *Id*. ¶ 51.

The MOUs provided, "Until such time (if any) as this MOU is terminated, the Parties agree to work together cooperatively and in good faith to negotiate, prepare and execute the Lease, reflecting the terms summarized in this MOU." *Id*. ¶ 52. Likewise, the MOUs may be terminated only upon "written notice to HPEC that the Harbor Department has determined in its sole reasonable discretion that the project is infeasible." *Id*. Neither the ENA nor the MOUs placed any restriction on drayage or obligated HPEC to secure ILWU jurisdiction over drayage jobs. *Id*.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 20-3251 PSG (MMAx) | Date | November 2, 2020 |
|---|---|---|---|
| Title | Harbor Performance Enhancement Center, LLC v. City of Los Angeles Harbor Department et al | | |

> iii.    *The Pilot Study and the Permit*

Throughout the following months, Seroka made public statements supporting the Project and the relationship with HPEC. *Id*. ¶ 55. HPEC began marketing the Project internationally, and the Port continued to develop the project with HPEC. *Id*. ¶¶ 56 58. The parties coordinated to prepare the EIR, and the Board approved an Indemnity Agreement. *Id*. ¶ 58.

The Port and HPEC negotiated a 13-month permit   which operated as a lease   to facilitate a "Pilot Study" of the Project to test feasibility by assessing the Projects' environmental and market impact. Under the Pilot Study, HPEC would test 400 container spots for the Project site. *Id*. ¶ 60.

On November 16, 2017, the Board approved the Permit to operate a Pilot Study on 10 acres of the former LAXT site and a Private Railroad Crossing Agreement (the "Permit). *Id*. ¶ 62. At the public hearing regarding the Permit, President of ILWU Local 13 Mark Mendoza ("Mendoza") spoke in support of HPEC. *Id*. On December 12, the Port executed the Permit. *Id*. ¶ 63. The Permit required HPEC to pay a monthly rent of $24,119.86 for the 13-month term. *Id*.

HPEC began work to commence Pilot Study operations. *Id*. ¶ 64 67. By February 2018, HPEC was ready to begin operating the Pilot Study, but the Port repeatedly delayed the start date and prohibited HPEC from using the land. *Id*. ¶ 69. By this time, the ILWU had informed the Port and HPEC that it wanted exclusive jurisdiction over drayage jobs at the newly developed Port. *Id*. ¶ 70. HPEC informed the Port's Deputy Director Michael DiBernardo ("DiBernardo") that HPEC would contract with third parties for all services, including drayage, and that it had no power to contract with the ILWU. *Id*.

On February 9, 2018, Port staff met with Mendoza and other ILWU leaders to discuss HPEC. *Id*. ¶ 71. That same day, the Port told HPEC that the Permit would be modified to extend the start date and assured HPEC that it would not be charged rent until the Port allowed the Pilot Study to begin. *Id*. On February 26, the Port proposed to amend the Permit and defer the Pilot Study until it granted access to LAXT. *Id*.

During this time, HPEC and JLL continued to secure financing for the Project, including an investment from Macquarie Limited Group ("Macquarie"). *Id*. ¶ 74 76.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 20-3251 PSG (MMAx) | Date | November 2, 2020 |
|---|---|---|---|
| Title | Harbor Performance Enhancement Center, LLC v. City of Los Angeles Harbor Department et al | | |

*iv.     The Port's Meetings with the Union Defendants*

By the time HPEC and the Port were negotiating the Pilot Study and Permit, Seroka was meeting with the Union Defendants. *Id.* ¶ 79. Texts and emails between Port executives and Board members obtained in HPEC's Public Records Request show ILWU's involvement in the Project. *Id.* ¶¶ 77  78. For example, DiBernardo and Seroka met with ILWU leaders to discuss the Permit before its approval, Seroka met with Mendoza on September 29, 2017, to discuss HPEC, and a Port executive emailed the ILWU Vice President the draft board resolution regarding the Indemnity Agreement and Permit the day before their approval. *Id.* ¶¶ 81  83.

*v.     The Union Defendants' Demands*

On April 2, 2018, Deputy City Attorney Otera again advised HPEC that in the Port's view, the Amendment still required Board approval. *Id.* ¶ 88. Internal emails show that certain Port staff members expressed surprise at Otera's claim. *Id.* ¶ 89. The Board was scheduled to approve the Amendment on April 19. *Id.* ¶ 90. Seroka tabled this approval request. *Id.*

On April 11, Mendoza told a Port staff member that the ILWU would start a "war" with HPEC if HPEC did not accede to the union's demands for exclusive jurisdiction over intra-port drayage. *Id.* ¶ 94. Two days later, Seroka and other Port executives met with Mendoza and other ILWU Local 13 leaders to discuss HPEC. *Id.* ¶ 95. That same day, Seroka texted Rosenthal: "Any way it is sliced, [ILWU] run[s] the port and will put up a fight every step of the way. Your lack of engagement has not helped. The Board will be hard pressed without their support at any level." *Id.* ¶ 96. Seroka told HPEC it would be required to guarantee that ILWU workers would be granted jurisdiction and exclusive rights to provide all intra-port trucking services to and from the Project. *Id.* ¶ 97.

On May 3, the Port met with HPEC to discuss the ILWU conditions for approval of the Project. *Id.* ¶ 104. Seroka reiterated that HPEC needed "to give [the ILWU] the dray" and told Rosenthal that the ILWU would provide an operational plan. *Id.* Seroka also told HPEC that they would need to extend the terminal property to the yard, making the property "water adjacent," so that ILWU collective bargaining would apply. *Id.* Rosenthal told Seroka that HPEC "is not a trucking company and the dray is going to be handled by multiple vendors without exclusivity." *Id.* Furthermore, Rosenthal was worried about the economic impact of working with the ILWU since their hourly rates are five times the market rate. *Id.*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 20-3251 PSG (MMAx) | Date | November 2, 2020 |
|---|---|---|---|
| Title | Harbor Performance Enhancement Center, LLC v. City of Los Angeles Harbor Department et al | | |

In May and June, HPEC and the Union Defendants participated in multiple negotiation sessions. *Id*. ¶ 106. At these meetings, the Union Defendants made clear that they wanted exclusive jurisdiction over drayage jobs. *Id*. ¶ 109. At the May 18 meeting, Mendoza told HPEC that Seroka agreed that   so long as ILWU workers were driving   the daily fee for each truck would not start accruing until it left the HPEC facility, as opposed to accruing when it left the terminal. *Id*. ¶ 110.

On June 4, Seroka and other Port executives continued to communicate to HPEC that the Project would not go forward without ILWU approval. *Id*. ¶ 112 13. For example, DiBernardo told an HPEC executive that, "[i]f there is opposition from any entity, [the Amendment] will not get approved by our board. Therefore, all i's need to be dotted and t's crossed with ILWU before we go to the board." *Id*. ¶ 112. Seroka told HPEC that the Project needed unanimous support from ILWU, and that he learned that the ILWU Local 13 presidents had flown to their headquarters in San Francisco to meet with a "war council," which had not happened in 50 years. *Id*. ¶ 113. When HPEC asked what it needed to move past this, Seroka responded, "They've shared an easy path forward and were told it would not work." *Id*.

On June 19, HPEC and the Union Defendants again met to negotiate. *Id*. ¶ 120. At the meeting, the Union Defendants confirmed that they would only approve the Project if given exclusive jurisdiction over intra-port drayage. *Id*. Mendoza told HPEC, "Let's talk about the 800lb gorilla in the room. What's with the Teamsters." *Id*. He told HPEC, "The 2-3 miles of waterfront is ours, we're going to get it. We've told Seroka, we've talked with them. There will be some animosity, could be some civil unrest." *Id*. Mendoza also said, "If we're used, we're good. I'm not going to work double breasted with another union" and "[y]ou guys. If you work with us, there's no problem." *Id*.

> vi. *The City Defendants Charge Rent*

On June 25, Seroka met with three Local ILWU presidents and vice presidents at his office. *Id*. ¶ 122. The Union Defendants told Seroka they did not want to work with HPEC on the Project. *Id*. ¶ 124. At a meeting with HPEC that afternoon, Seroka told HPEC that the Union Defendants did not want to work with them, but that union elections were coming up and they may have more luck with new union leaders. *Id*.

Seroka also said that he expected HPEC to pay back rent and rent going forward, even though the Port told HPEC to hold off on operations until things were settled with the ILWU and

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 20-3251 PSG (MMAx) | Date | November 2, 2020 |
|---|---|---|---|
| Title | Harbor Performance Enhancement Center, LLC v. City of Los Angeles Harbor Department et al | | |

that rent would be suspended until HPEC started operations. *Id*. ¶ 125. Seroka told HPEC they could not start operations, even though they had to pay rent, because he was "not going to have 15,000 longshoremen marching on his property to save 10 Teamster jobs." *Id*. HPEC complied with the Port's rent request, ultimately paying rent back from December 12, 2017 through June 30, 2018. *Id*. ¶ 128. HPEC also committed to paying future rent payments. *Id*.

  vii. *The City Terminates the Agreement and Pursues the Deal with Another Developer*

  On June 29, Seroka gave his mid-year fiscal update to Mayor Eric Garcetti. *Id*. ¶ 129. He reported that the HPEC matter was "off track" due to issues with "union labor over drayage," but reported that the Port's goal was to continue to move forward with the Pilot Study. *Id*. Internally, Port staff shared their view that HPEC should stop working on the EIR given the labor impasse. *Id*. This information was not shared with HPEC. *Id*. Instead, the Port continued to work on the EIR with HPEC. *Id*.

  On July 17, the Port's general counsel, Janna Sidley ("Sidley), called Rosenthal to tell him that Commissioner Renwick had been recused by the Ethics Commission from participating at board meetings on matters relating to HPEC. *Id*. ¶ 131. The purported basis for Renwick's recusal was a meeting on December 18, 2017, with HPEC and Macquarie. *Id*. Although the Board's Vice President had met and communicated with the Union Defendants and HPEC, he was not recused from matters relating to HPEC. *Id*.

  HPEC made repeated efforts over the next few months to negotiate with the Union Defendants. *Id*. ¶ 132. Throughout the fall of 2018 and the first quarter of 2019, the Port provided reassurances to HPEC that it still supported the Project and told HPEC to keep "chipping away" at getting the ILWU to buy into the Project. *Id*. Seroka continued to tell HPEC that the ILWU would protest if he brought the ENA before the Board. *Id*.

  During late 2018, an internal Port email suggests that the Port was looking at developing a chassis yard project with Pacific Crane Maintenance Corporation ("PCMC"), an ILWU ally. *Id*. ¶ 138. Port documents suggest that PCMC toured the Project site at least twice. *Id*. Two January 2019 communications between Port executives also relate to the evaluation of a chassis yard. *Id*. Also in January 2019, Seroka and the ILWU officers met several times, including once at City Hall to discuss "HPEC and workforce opportunities." *Id*. ¶¶ 140‑41.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 20-3251 PSG (MMAx) | Date | November 2, 2020 |
|---|---|---|---|
| Title | Harbor Performance Enhancement Center, LLC v. City of Los Angeles Harbor Department et al | | |

On January 31, Sidley and Seroka called HPEC about the project. *Id*. ¶ 142. Seroka again advised HPEC to "keep chipping away" at negotiations with ILWU and said, "this is a company town owned by the ILWU." *Id*. During their discussion, Sidley stated, "We're now putting labor peace in the leases, which would be in your permit as well." *Id*. At the end of the call, Seroka reaffirmed his support for the Project. *Id*.

On May 8, 2019, HPEC, Macquarie and the Port had an update call. *Id*. ¶ 149. Seroka opened the call by saying, "It's been 30 days since I spoke to you with Janna Sidley asking for immediate progress. During that time, we have come to the painful conclusion that the project will not move forward. We have come this conclusion for three reasons. One, an unclear business plan. Two, complete disengagement of labor. Three, no clear pathway to success. It is painful to the City of Los Angeles that I must recommend that the project not go any further." *Id*. A Macquarie representative responded, "It is hugely disappointing to hear that. Can I ask you what has changed since our meeting last Friday where you represented positively that we had been making progress?" *Id*. Seroka responded, "Longshore labor doesn't want to meet. We have hit the 30 day date today, we have to go in a different direction now." *Id*.

Seroka was asked whether this decision had been reviewed by the Board. *Id*. He responded that the decision had been made by the Mayor and his Chief of Staff. *Id*. He explained that he had a meeting with the ILWU on Friday (May 3) after receiving Macquarie's paperwork and "they unequivocally don't want to engage with you" and they "categorically rejected" Macquarie's business plan. *Id*. Macquarie's representative stated, "It does feel as though you've made ILWU approval a requirement of this project." *Id*. Seroka responded that the Port takes into account all stakeholders. *Id*.

In a May 10, 2019 letter, Seroka purported to terminate the ENA, the MOUs and the Indemnity Agreement, as well as HPEC's rights in the Project because the Port had "determined the proposed project to be infeasible." *Id*. ¶ 150.

C.    Procedural Background

On June 17, 2019, HPEC filed a verified petition and complaint in the Los Angeles County Superior Court for ordinary mandamus and declaratory relief. *City Mot.* at 5. Following demurrer briefing, and discovery and motion practice, HPEC requested dismissal of its own

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 20-3251 PSG (MMAx) | Date | November 2, 2020 |
|---|---|---|---|
| Title | Harbor Performance Enhancement Center, LLC v. City of Los Angeles Harbor Department et al | | |

petition on April 8.  *Id*.  On April 7, HPEC filed suit in this Court.  *See Complaint*, Dkt. # 1 ("*Compl.*").  On June 15, the Defendants moved to dismiss the case.  *See* Dkts. # 22  24.  HPEC filed the operative FAC on July 20.

In the FAC, HPEC brings six causes of action:

> First Cause of Action: refusal to deal/denial of access to "essential" facilities in violation of Section 1 of the Sherman Act, against all Defendants.  *See FAC* ¶¶ 172  83.

> Second Cause of Action: violation of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 187, against the Union Defendants.  *See FAC* ¶¶ 184  89.

> Third Cause of Action: violation of HPEC's federally protected rights under 42 U.S.C. § 1983, against the City Defendants and Defendant Seroka.  *See FAC* ¶¶ 202  07.

> Fourth Cause of Action: breach of contract against the City Defendants.  *See id*. ¶¶ 208  14.

> Fifth Cause of Action: breach of the implied covenant of good faith and fair dealing against the City Defendants.  *See id*. ¶¶ 215  21.

> Sixth Cause of Action: declaratory relief against the City Defendants.  *See id*. ¶¶ 222  26.

The City Defendants, Defendant Seroka, and the Union Defendants again move to dismiss HPEC's claims.  Specifically, the City Defendants argue that the FAC should be dismissed with prejudice because (1) the City Defendants are immune from antitrust claims under the State Action Doctrine, *see City Mot.* at 6  10; (2) HPEC has failed to plead an antitrust claim, *see id.* at 10  17; (3) HPEC cannot state a § 1983 claim against the City Defendants, *see id*. at 17  18; and (4) HPEC's contract claims lack merit, *see id*. at 18  25.

The Court agrees that the City Defendants are immune under the state action doctrine, and therefore the Court does not reach whether the FAC states an antitrust violation.  The Court also finds that the FAC fails to state a claim under § 1983.  However, the Court finds that HPEC has

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 20-3251 PSG (MMAx) | Date | November 2, 2020 |
|---|---|---|---|
| Title | Harbor Performance Enhancement Center, LLC v. City of Los Angeles Harbor Department et al | | |

stated a claim for breach of contract, breach of the implied covenant of good faith and fair dealing, and declaratory relief.

Defendant Seroka argues the claims against him should be dismissed with prejudice. *See Seroka Mot.* 6:7 13. Specifically, Defendant Seroka contends that (1) the claims against him in his official capacity fail for the same reasons they fail against the City Defendants, *see id.*; (2) the claims against him in his individual capacity fail because (a) HPEC has failed to plead a plausible antitrust conspiracy claim or civil rights claim against him, *see id.* at 6 12, and (b) the Local Government Antitrust Act shields him from damages for antitrust violations, *see id.* at 12 13; and (c) he has qualified immunity from HPEC's lawsuit, *see id.* at 13 17.

The Court agrees that the Local Government Antitrust Act and the state action immunity doctrine protect Seroka from liability. Thus, the Court does not reach the question of qualified immunity.

The Union Defendants contends HPEC's claims against them should be dismissed with prejudice for the following reasons: (1) the Union Defendants are immune from liability under (a) the *Noerr-Pennington* doctrine, *see Union Mot.* at 4 8, and (b) the Statutory Labor Exemption of the Sherman Act, *see id.* at 7 8; (2) the FAC does not state a Sherman Act § 1 Claim, *see id.* 8 17; and (3) the NLRA claims also fail, *see id.* at 17 22.

The Court agrees that the Union Defendants are immune from liability under the *Noerr-Pennington* doctrine. Therefore, the Court does not reach whether the Union Defendants are immune under the statutory labor exemption or whether the FAC states an antitrust or an NLRA claim.

II.    Legal Standard

A.    Rule 12(b)(6)

To survive a motion to dismiss under Rule 12(b)(6), a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In assessing the adequacy of the complaint, the court must accept all pleaded facts as true and construe them in the light most favorable to the plaintiff. *See Turner v. City & Cty. of San Francisco*, 788 F.3d 1206, 1210 (9th Cir. 2015); *Cousins v. Lockyer*, 568 F.3d 1063, 1067

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 20-3251 PSG (MMAx) | Date | November 2, 2020 |
|---|---|---|---|
| Title | Harbor Performance Enhancement Center, LLC v. City of Los Angeles Harbor Department et al | | |

(9th Cir. 2009). The court then determines whether the complaint "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*. Accordingly, "for a complaint to survive a motion to dismiss, the non-conclusory factual content, and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009) (internal quotation marks omitted).

B.    Leave to Amend

Whether to grant leave to amend rests in the sound discretion of the trial court. *See Bonin v. Calderon*, 59 F.3d 815, 845 (9th Cir. 1995). Courts consider whether leave to amend would cause undue delay or prejudice to the opposing party, and whether granting leave to amend would be futile. *See Sisseton-Wahpeton Sioux Tribe v. United States*, 90 F.3d 351, 355 (9th Cir. 1996). Generally, dismissal without leave to amend is improper "unless it is clear that the complaint could not be saved by any amendment." *Jackson v. Carey*, 353 F.3d 750, 758 (9th Cir. 2003).

III.    Discussion

This order proceeds as follows. First, the Court addresses Defendants' various claims of immunity from the first and second causes of action for Sherman Act and NLRA violations. Next, the Court analyzes the third cause of action for civil rights violations under § 1983. Finally, the Court considers the fourth, fifth, and sixth causes of action related to breach of contract.

A.    Immunity Against the Sherman Act and NLRA Claims

HPEC brings its first cause of action for refusal to deal and denial of access to "essential" facilities in violation of § 1 of the Sherman Act against all Defendants, *see FAC* 49:4 and its second cause of action for NLRA violations against the Union Defendants, *see id*. 51:22. In their motions, Defendants claim various immunities from antitrust and NLRA claims. *City Mot.* 6:24 9:8 (claiming state action immunity from antitrust); *Seroka Mot.* 12:1 13:5 (claiming immunity from antitrust under (1) the state action doctrine and (2) the Local Government Antitrust Act); *Union Mot.* 4:1 8:22 (claiming immunity under (1) the *Noerr-Pennington* doctrine for (a) antitrust and (b) NLRA liability, and (2) the statutory labor exemption for

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 20-3251 PSG (MMAx) | Date | November 2, 2020 |
|---|---|---|---|
| Title | Harbor Performance Enhancement Center, LLC v. City of Los Angeles Harbor Department et al | | |

antitrust liability). The Court addresses (1) state action immunity, (2) Local Government Antitrust Act immunity, and (3) *Noerr-Pennington* immunity, in turn. Because the Union Defendants are immune under *Noerr-Pennington*, the Court does not reach the issue of whether they are immune under the statutory labor exemption.

*i.      Whether the City Defendants can claim state action immunity*

The City Defendants argue that they are immune from liability under the Sherman Act based on the state action exception established in *Parker v. Brown,* 317 U.S. 341 (1943). *City Mot.* 6:24  9:8. The Court agrees.

In *Parker*, the Court ruled that "the anticompetitive actions of a state are immune from the reach of antitrust laws." *Traweek v. City & Cty. of San Francisco*, 920 F.2d 589, 591 (9th Cir. 1990) (citing *Parker*, 317 U.S. at 313  14). State-immunity, under certain circumstances, is extended to "nonstate actors carrying out the State's regulatory program." *F.T.C. v. Phoebe Putney Health Sys., Inc.*, 568 U.S. 216, 224  25 (2013). Local governmental entities are immune from liability under the state action doctrine so long as "their anticompetitive activities were authorized by the State pursuant to state policy to displace competition with regulation or monopoly public service." *Town of Hallie v. City of Eau Claire*, 471 U.S. 34, 38 (1985).

A state legislature need not "expressly state in a statute or its legislative history that the legislature intends for the delegated action to have anticompetitive effects." *Phoebe Putney*, 568 U.S. at 226 (quoting *Hallie*, 471 U.S. at 42). Rather, a state policy is clearly articulated "if the anticompetitive effect was the 'foreseeable result' of what the State authorized." *Id*. (quoting *Hallie*, 471 U.S. at 42). "The indication must be more than mere neutrality but need not rise to the level of explicit authorization." *United Nat. Maint., Inc. v. San Diego Convention Ctr., Inc.*, 766 F.3d 1002, 1010 (9th Cir. 2014). An anticompetitive effect is foreseeable if it is "the inherent, logical, or ordinary result of the exercise of authority delegated by the state legislature." *Phoebe Putney*, 568 U.S. at 229.

Recent Ninth Circuit law outlines a two-step inquiry for the clear-articulation test. *See Chamber of Commerce of the United States of Am. v. City of Seattle*, 890 F.3d 769, 782 (9th Cir. 2018). The court must first determine "whether the regulatory structure which has been adopted by the state has *specifically authorized the conduct* alleged to violate the Sherman Act." *See id*. Then, the court turns to "the concept of foreseeability, which is to be used in deciding the *reach*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 20-3251 PSG (MMAx) | Date | November 2, 2020 |
|---|---|---|---|
| Title | Harbor Performance Enhancement Center, LLC v. City of Los Angeles Harbor Department et al | | |

of an antitrust immunity that stems from an *already authorized* monopoly, price regulation, or other disruption in economic competition." *See id.*

Here, California's delegation of authority satisfies both steps of the clear-articulation test. California granted the City broad power to regulate "all tidelands and submerged lands . . . within the present boundaries of the city." Cal. Stats. 2002, ch. 1130, § 1 (2002) (the "Tidelands Grant"). Specifically, the Tidelands Grant delegates the City the power to "grant franchises and permits thereon for limited periods . . . for purposes [of] . . . commerce, navigation, and fishery," and to "lease the lands." *See id.* The Tidelands Grant states that the Tidelands "shall be improved by the city . . . and any harbor constructed thereon shall always remain a public harbor for all purposes of commerce and navigation." *See id.* Furthermore, the Tidelands Grant contemplates that "[i]n the management, conduct or operation of any such harbor . . . no discrimination in rates, tolls, or charges, . . . shall ever be made . . . by the city." *See id.*

HPEC argues that this grant of authority fails the first step of the clear-articulation test because it does not demonstrate that the legislature intended that the City act anticompetitively. *See Opp. City* 10:4 11. Relying on the "new and improved" clear-articulation test "reformulated" in *Phoebe-Putney*, *see id.* 8:11 13 (quoting *Diverse Power, Inc. v. City of LaGrange, Georgia,* 934 F.3d 1270, 1277 (11th Cir. 2019)), HPEC contends that the City Defendants must cite a statute "showing a legislative intent to authorize them to engage in anticompetitive conduct." *See Opp. City* 10:4 5. But this is not the first step. Instead, under the Ninth Circuit's test, the City Defendants must first show that their conduct was authorized by the statute.

The City Defendants have met their burden under the first step. The Tidelands Grant gives the City ownership of the land and mandates that the land "shall be improved" by the City and affirmatively contemplates the construction and management of a harbor. Cal. Stats. 2002, ch. 1130, § 1 (2002). Thus, the City Defendants' conduct   negotiating with HPEC and the Union Defendants in the process of improving the Port   is authorized by the statute.

Furthermore, the City Defendants' allegedly anticompetitive conduct was foreseeable under the *Phoebe-Putney* "inherent, logical, or ordinary" test. The broad authority delegated under the Tidelands Grant indicates that the legislature anticipated the City would conduct a bidding process, negotiate with and select a developer, and coordinate various interested parties   including labor unions   when constructing the harbor. Thus, the "inherent, logical, or

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 20-3251 PSG (MMAx) | | Date | November 2, 2020 |
|---|---|---|---|---|
| Title | Harbor Performance Enhancement Center, LLC v. City of Los Angeles Harbor Department et al | | | |

ordinary result" of the City's authority includes the authority to ensure that any development proposals maintain labor peace at the Port.

HPEC argues that "[u]nspecific grants of power or delegations of generic contracting powers like the Tidelands Grant do not meet the clear-articulation test." *See Opp*. 8:21 22. But the Tidelands Grant is not a generic delegation of contacting power    it grants the City *managerial* powers by explicitly contemplating that the City will not only lease lands, but also construct and manage a harbor, set rates and prices, all for the purposes of commerce and navigation.

The Ninth Circuit's decision in *United Natural Maintenance, Inc. v. San Diego Convention Ctr., Inc.*, 766 F.3d 1002 (9th Cir. 2014), is illustrative. In *United Natural Maintenance*, a vendor of trade show cleaning services sued a city commission for its allegedly anticompetitive policy of only hiring internal cleaning services at the city's convention center. 766 F.3d at 1005 06. The commission relied on a California statute that authorized legislative bodies to "appoint a commission to select the site for the building, supervise its construction, and manage its use." *See id*. at 1010. The Ninth Circuit agreed with the commission that "this grant of authority . . . authorized [the city] to create a commission that would 'manage the use' of the convention center," and held that "managerial authorization is distinct from a general grant of corporate authority that simply allows a state subdivision to act."

The Tidelands Grant similarly delegates the City managerial, not solely general contracting, authority. Specifically, the Tidelands Grant delegates ownership rights in the land, the power to "grant franchises and permits," and specifically contemplates that the City will manage and operate a harbor ("In the management, conduct, or operation of any such harbor . . ."). Cal. Stats. 2002, ch. 1130, § 1 (2002). This is a broad grant of authority that extends beyond mere contracting power.[3]

Accordingly, state-action immunity applies. The Court **GRANTS** the City Defendants' motion to dismiss the first cause of action for antitrust violations. Because the Court finds that

---

[3] In the FAC and opposition, HPEC mentions that the Supreme Court has suggested a "possible market exception" to state action immunity where states act "not in a regulatory capacity but as a commercial participant in a given market." *Omni*, 499 U.S. at 374 75. The Ninth Circuit has not recognized such an exception, but other circuits have. *FAC* ¶ 60. Because the parties did not fully brief this argument, the Court declines to consider whether such an exception exists.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 20-3251 PSG (MMAx) | Date | November 2, 2020 |
|---|---|---|---|
| Title | Harbor Performance Enhancement Center, LLC v. City of Los Angeles Harbor Department et al | | |

HPEC cannot amend its complaint to overcome state-action immunity, the Court **DENIES** leave to amend the antitrust claim against the City Defendants. *See AmeriCare MedServices, Inc. v. City of Anaheim*, No. 816CV1596JLSAFMX, 2017 WL 1836354, at *11 (C.D. Cal. Mar. 28, 2017).

        ii.      *Whether Seroka can claim immunity under the Local Government Antitrust Act and the state action doctrine*

At the outset, Seroka claims he is shielded from liability in his official capacity from HPEC's antitrust claim by the state action immunity doctrine. *See Seroka Mot*. 6:7 9. The Court agrees. *See R. Ernest Cohn, D.C., D.A.B.C.O. v. Bond*, 953 F.2d 154, 159 (4th Cir. 1991) (finding that state-action immunity applies to medical staff members "acting as agents" of a municipally owned hospital).

Additionally, Seroka argues he is protected from any antitrust damages award by the Local Government Antitrust Act ("LGAA"), 15 U.S.C. § 34 36. *See Seroka Mot*. 11:1 12:5. HPEC agrees, *see Opp*. 2:28 29:1, and instead argues that the FAC seeks injunctive relief against Seroka, which is not barred by the LGAA, *see id*. 29:1 3. However, Seroka's immunity under the state action doctrine prevents HPEC's claim for injunctive relief. Thus, Seroka is immune under both the LGAA and the state action doctrine.

Accordingly, the Court **GRANTS** Seroka's motion to dismiss the first cause of action against him.[4] Because the Court finds that HPEC cannot amend its complaint to overcome state-action immunity and the LGAA, the Court **DENIES** leave to amend the antitrust claim against Seroka. *See Jackson*, 353 F.3d at 758 (denying leave to amend where amendment would be futile).

---

[4] Seroka also argues that the doctrine of qualified immunity protects him from antitrust liability in his individual capacity. *See Seroka Mot*. 13:6 17:18. Because the Court finds Seroka immune under the state action doctrine and the LGAA, the Court does not reach Seroka's qualified immunity argument.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 20-3251 PSG (MMAx) | Date | November 2, 2020 |
|---|---|---|---|
| Title | Harbor Performance Enhancement Center, LLC v. City of Los Angeles Harbor Department et al | | |

iii.   *Whether the Union Defendants can claim immunity under the Noerr-Pennington doctrine*

The Union Defendants argue that the *Noerr-Pennington* doctrine shields them from liability under (1) the Sherman Act, *see Union Mot*. 4:4  7:11, and (2) the NLRA, *see id*. 18:4  21:13.  The Court agrees on both grounds.

The *Noerr-Pennington* doctrine requires that, to the extent possible, courts "construe statutes so as to avoid burdens on activity arguably falling within the scope of the Petition Clause of the First Amendment." *Sosa v. DIRECTTV, Inc.*, 437 F.3d 923, 942 (9th Cir. 2006). Like state-action immunity, *Noerr-Pennington* stands for "the principle that antitrust laws regulate business, not politics." *See City of Columbia v. Omni Outdoor Advert., Inc.*, 499 U.S. 365, 383 (1991).  The doctrine states that federal antitrust laws "do not regulate the conduct of private individuals in seeking anticompetitive action from the government." *See id*. at 379  80. "That a private party's political motives are selfish is irrelevant." *See id*. at 380.  The doctrine "shields from the Sherman Act a concerted effort to influence public officials regardless of intent or purpose." *See id*. (quoting *Mine Workers v. Pennington*, 381 U.S. 657, 670 (1965)).

"While the *Noerr-Pennington* doctrine originally arose in the antitrust context, it is based on and implements the First Amendment right to petition and therefore . . . applies equally in all contexts." *White v. Lee*, 227 F.3d 1214, 1231 (9th Cir. 2000).  Thus, "those who petition any department of the government for redress are generally immune from statutory liability for their petitioning conduct." *Sosa*, 437 F.3d at 942.

However, "[t]he protection afforded by the *Noerr-Pennington* doctrine is not absolute." *Evans Hotels, LLC v. Unite Here Local 30*, 433 F. Supp. 3d 1130, 1143 (S.D. Cal. 2020).  For example, "[w]here petitioning activity is 'a mere sham to cover what actually is nothing more than an attempt to interfere directly with the business relationships of a competitor,' immunity does not apply." *Id*. (citing *Noerr*, 365 U.S. at 144).

First, the Court will determine whether the Union Defendants' activities "are of the type that the *Noerr-Pennington* doctrine seeks to protect." *See Boone v. Redev. Agency of City of San Jose*, 841 F.2d 886, 894 (9th Cir. 1988).  Then, the Court will discuss whether any exceptions apply. *See id*.  This review "is guided in part by the fundamental first amendment values that the *Noerr-Pennington* doctrine is designed to protect." *See id*.  Thus, "[i]n order not to chill

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 20-3251 PSG (MMAx) | Date | November 2, 2020 |
|---|---|---|---|
| Title | Harbor Performance Enhancement Center, LLC v. City of Los Angeles Harbor Department et al | | |

legitimate lobbying activities, it is important that a plaintiff's complaint contain specific allegations demonstrating that the *Noerr Pennington* protections do not apply." *Id*.

a. *The Union Defendants' activities*

The allegations describing the Union Defendants' activities in the FAC can be grouped as follows: (1) they met and communicated secretly with the Port and Seroka even though they had no jurisdiction over the Project, *FAC* ¶¶ 77 86, 93 99, 102; (2) they conspired with Seroka to either force HPEC to give ILWU workers exclusivity over drayage jobs or to kill the project, *id*. ¶¶ 6, 13, 77 78, 85, 87, 93 97, 110, 156; (3) they threatened the Port and HPEC on numerous occasions with actions such as "war" and "civil unrest," *id*. ¶¶ 6, 9, 109, 120; and (4) they "prevented HPEC from access to the Board's processes for approval of the amendment to the ENA and the amendment to the pilot study permit," *id*. ¶ 12, 91, 133.

These are precisely the sorts of allegations that are protected by *Noerr-Pennington*. Courts have found that activities such as "developing close relationships with city officials," *Boone*, 841 F.2d at 894, "conspiring" with city officials, *Omni.*, 499 U.S. at 383, and "persuading" government officials to deny permits using threats, *Franchise Realty Interstate Corp. v. San Francisco Local Joint Exec. Bd. of Culinary Workers*, 542 F.2d 1076, 1080 (9th Cir. 1976), are immune under *Noerr-Pennington*.

HPEC contends that *Noerr-Pennington* immunity should not apply because the Union Defendants' conduct (1) falls under the sham exception and (2) was independently unlawful. The Court now addresses whether these exceptions apply.

b. *The sham exception*

The sham exception applies to conduct that, while "ostensibly directed toward influencing government action, is a mere sham to cover what is actually nothing more than an attempt to interfere with the business relationships of a competitor." *See Noerr*, 365 U.S. at 144. In *Omni*, the Supreme Court explained:

> The "sham" exception to *Noerr* encompasses situations in which persons use the governmental process as opposed to the outcome of that process as an anticompetitive weapon. A classic example is the filing of frivolous objections to the license application of a competitor, with no expectation of achieving denial of

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 20-3251 PSG (MMAx) | Date | November 2, 2020 |
|----------|------------------------|------|------------------|
| Title | Harbor Performance Enhancement Center, LLC v. City of Los Angeles Harbor Department et al | | |

the license but simply in order to impose expense and delay.  A "sham" situation involves a defendant whose activities are not genuinely aimed at procuring favorable government action at all, not one who genuinely seeks to achieve his governmental result, but does so through improper means.

499 U.S. at 380.

HPEC argues the Union Defendants' conduct falls under the sham exception because (1) it was objectively baseless, and (2) it prevented HPEC from obtaining meaningful access to an adjudicative body.  *See Opp. Union* at 22.

HPEC's objectively baseless argument lacks merit.  The Ninth Circuit recognizes that a single sham, rather than serial actions, can fall within the sham exception so long as the act was objectively baseless and brought for an improper subjective motive, such as to delay or cause expense.  *See Sosa*, 437 F.3d at 938.  However, "[w]hen the branch of government is the legislature, 'the sham exception is extraordinarily narrow.'"  *See Evans Hotel*, 433 F. Supp. at 1149 (citing *Kottle v. N.W. Kidney Ctrs.*, 146 F.3d 1056, 1061 (9th Cir. 1998)).  "It is 'pointless' to ask whether a lobbying effort was objectively baseless, because there are few, if any, objective standards in the political realm of legislation against which to measure the defendant's conduct."  *Id*.

Here, HPEC fails to allege that the Union Defendants' conduct was objectively baseless.  It is clear from the FAC that the Union Defendants' efforts were to further their goal of assuring ILWU drayage jobs, not to meaninglessly delay or create expense.  *See, e.g.*, *FAC* ¶ 120 (alleging Mendoza told HPEC "If we're used, we're good," and "[y]ou guys.  If you work with us, there's no problem.").

HPEC's second argument — that the Union Defendants prevented HPEC from accessing an adjudicative body — is a closer call.  Courts have held that "[a]ctions taken to discourage and ultimately prevent competitors from meaningful access to the processes of administrative agencies fall within the sham exception to *Noerr-Pennington* immunity."  *Hosp. Bldg. Co. v. Trs. of Rex Hosp.*, 691 F.2d 678, 687 (4th Cir. 1982) (citing *Cal. Motor Transp. Co. v. Trucking Unltd.*, 404 U.S. 508, 512–13 (1972)).  HPEC contends that preventing access to an adjudicative body is paramount to weaponizing the governmental process itself, rather than the outcome of the process.  *See Omni*, 499 U.S. at 380.  The Ninth Circuit agrees that this type of conduct falls outside *Noerr-Pennington* protection.  For example, when rejecting the plaintiff's sham

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 20-3251 PSG (MMAx) | Date | November 2, 2020 |
|---|---|---|---|
| Title | Harbor Performance Enhancement Center, LLC v. City of Los Angeles Harbor Department et al | | |

exception allegations in *Franchise Realty*, the Ninth Circuit implied the outcome would have been different if the plaintiff had been prevented "from having a hearing before the Board." 542 F.2d at 1082.

Here, HPEC has not met its burden of alleging that the Union Defendants blocked access to an adjudicative body. First, the FAC alleges that various city officials, including Seroka, said that ILWU approval was necessary before going to the Board. *FAC* ¶¶ 112, 115, 117, 133. For example, a city official told Rosenthal that the Board would not approve the ENA or Permit without ILWU's approval "[a]ll i's need to be dotted and t's crossed with ILWU." *Id.* ¶ 112. These allegations show that going to the Board would have been futile without ILWU support because the Union Defendants were successful in their lobbying efforts to ensure their interests were prioritized. They do not show that the Union Defendants themselves prevented HPEC's access to the Board.

Second, the FAC lacks specificity regarding the Board's approval processes and power. For example, the FAC does not state that Board approval was necessary for the Project to continue. Instead, HPEC alleges that *Rosenthal informed the Port* that "HPEC did not want to pull the trigger until getting the green light from Seroka and the Board in the form of an executed MOU and amendment to the ENA." *Id.* ¶ 44. Thus, even if HPEC was prevented from accessing the Board, the FAC does not explain how that denial amounts to a denial of access to an adjudicative body.

Accordingly, the Court concludes that, as alleged, the sham exception to *Noerr-Pennington* immunity does not apply.

   *c. Independently unlawful conduct*

HPEC also argues that *Noerr-Pennington* does not protect "conduct which is otherwise unlawful." *See Opp. Union* 18:13 24. "Courts treat illegal acts, such as fraud and bribery," as "sham petitioning activity." *Evans Hotels*, 433 F. Supp. 3d at 1152 (quoting *Clipper Exxpress v. Rocky Mtn. Motor Tariff Bureau*, 690 F.2d 1240, 1256 n.23 (9th Cir. 1982)).

Here, the FAC alleges two illegal acts: (1) the Union Defendants' demand for exclusive jurisdiction over intra-port drayage, which violates § 8(e) of the NLRA; and (2) the Union Defendants' threats of "war," "civil unrest," labor disruption, a work stoppage, and marching

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 20-3251 PSG (MMAx) | Date | November 2, 2020 |
|---|---|---|---|
| Title | Harbor Performance Enhancement Center, LLC v. City of Los Angeles Harbor Department et al | | |

and protesting to coerce HPEC and the Port to agree to its illegal demands, which violated §§ 8(b)(4)(ii)(A), (B), and (D).  *See Opp. Union* 20:3 10.[5]

HPEC misconstrues the independent illegal conduct exception.  The exception applies when a plaintiff's claim is based on conduct *independent* of the defendant's petitioning activity.  For example, in *McKay, Inc. v. City of Huntington Park*, No. 17-01467 SJO, 2017 WL 10059252 (C.D. Cal. Dec. 21, 2017), the Court held that *Noerr-Pennington* did not apply because the plaintiff's claims were based on the defendants' agreements with city officials to engage in illegal conduct, not the defendants' petitioning activity.  *Id.* at *5.  Similarly, in *Sony Electronics*, the court held that, although the defendant's agreement to challenge the plaintiff's patent on its own may be protected activity, the plaintiff's allegations of price fixing and group boycotts were not petitioning activity, and thus could not be disregarded on a motion to dismiss under *Noerr-Pennington*.  157 F. Supp. 2d 180, 181 82 (D. Conn. 2001).

In both of these cases, the plaintiffs alleged additional conduct independent from the defendant's petitioning activity.  Here, HPEC's claims are entirely based on the Union Defendants' petitioning activity.  HPEC's demand for exclusive jurisdiction over intra-port drayage and its threats of work stoppage are part and parcel of its attempts to lobby government to protect its interests.  *See Evans Hotels*, 433 F. Supp. 3d at 1150 51 (holding that *Noerr-Pennington* immunity applied when the union defendants made demands and threats to city councilmembers, including delaying the vote on a proposed amendment to a lease); *see also Plumbers v. Pipefitters Local 32 v. NLRB*, 912 F.2d 1108, 1110 (9th Cir. 1990) ("[T]he court may not presume from a threat to picket a jobsite that the picketing would be done in an unlawful manner.").  This type of lobbying activity is at the heart of *Noerr-Pennington* immunity.

HPEC alludes to the argument that a threat to strike is different from other types of threats.  *See Opp. Union* 20:12 21:5.  However, HPEC does not cite any authority to support this argument, and the FAC does not allege that the Union Defendants in fact used violence or caused unlawful work stoppages.  While some of the cases HPEC cites indicate that NLRA cases are treated differently than others under *Noerr-Pennington*, *see White*, 227 F.3d at 1236, these cases concern weighing two first amendment rights  an employer's right to petition by filing a

---

[5] To the extent the FAC's allegations regarding a conspiracy with the government preclude application of *Noerr-Pennington*, that argument lacks merit.  The Supreme Court has expressly rejected a conspiracy exception to the doctrine.  *See Omni*, 499 U.S. at 383.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 20-3251 PSG (MMAx) | Date | November 2, 2020 |
|---|---|---|---|
| Title | Harbor Performance Enhancement Center, LLC v. City of Los Angeles Harbor Department et al | | |

law suit against employees' right to associate, *see United Nurses Ass'n of Cal. v. Nat'l Labor Relations Bd.*, 871 F.3d 767, 787 (9th Cir. 2017) (employer lawsuit exempted from *Noerr-Pennington* protection where the lawsuit had an illegal objective). Here, the only first amendment rights at stake are the petitioning rights of the Union Defendants.

Accordingly, the Union Defendants' conduct is immune under *Noerr-Pennington*. The Court **GRANTS** the Union Defendants' motion to dismiss the first and second causes of action against them.

The Court finds that HPEC could save its complaint through amendment. For example, HPEC could allege additional facts to support its argument that (1) the Union Defendants prevented HPEC from accessing the Board and (2) the Union Defendants engaged in *independent* illegal conduct. Accordingly, the Court **GRANTS** leave to amend to overcome *Noerr-Pennington* immunity.

Next, the Court addresses the third cause of action against the City Defendants for violation of § 1983.

B.   Third Cause of Action: Violation of HPEC's Federally Protected NLRA Rights Under § 1983

HPEC also alleges violations of 42 U.S.C. § 1983 based on its rights under the NLRA against the City Defendants and Seroka. *FAC* at 55. Seroka and the City Defendants argue that HPEC's § 1983 claim fails because (1) it is based on an agreement that has not been plausibly pled, (2) the FAC does not assert a specific right under the NLRA, and (3) the FAC does not allege an injury caused by an NLRA violation. *City Mot.* at 17 8. The Court agrees that the FAC fails to state a § 1983 claim.

"Section 1983 provides a federal remedy for 'the deprivation of any rights, privileges, or immunities secured by the Constitution and laws.'" *Golden State Transit Corp. v. City of Los Angeles*, 493 U.S. 103, 105 (1989) (quoting 42 U.S.C. § 1983). "As the language of the statute plainly indicates, the remedy encompasses violations of federal statutory as well as constitutional rights." *Id*.

The elements of a § 1983 claim are: (1) that the conduct complained of was committed by a person acting under color of state law; and (2) that the conduct deprived a person of rights,

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 20-3251 PSG (MMAx) | Date | November 2, 2020 |
|----------|----------------------|------|------------------|
| Title | Harbor Performance Enhancement Center, LLC v. City of Los Angeles Harbor Department et al | | |

privileges, or immunities secured by the Constitution or laws of the United States.  *Johnson v. Hawe,* 388 F.3d 676, 681 (9th Cir. 2004).  The parties do not dispute that the City Defendants and Seroka acted under color of law.  The issue is whether they deprived HPEC of its statutory rights.

"A determination that § 1983 is available to remedy a statutory or constitutional violation involves a two-step inquiry."  *Golden State Transit*, 493 U.S. at 106.  "First, the plaintiff must assert the violation of a federal *right*," not only a violation of federal law.  *Id.*  To determine whether the right has been violated, courts "consider[] whether the provision in question creates obligations binding on the governmental unit or rather 'does no more than express a congressional preference for certain kinds of treatment.'"  *Id*. (citing *Pennhurst State School and Hosp. v. Halderman,* 451 U.S. 1, 19 (1981)).  Furthermore, "[t]he interest the plaintiff asserts must not be 'too vague and amorphous' to be 'beyond the competence of the judiciary to enforce.'"  *Id*. (citing *Wright v. Roanoke Redev. and Housing Auth.,* 479 U.S. 418, 431  32 (1987)).  Courts also ask "whether the provision in question was intended to benefit" the plaintiff.  *Id*.

"Second, even when the plaintiff has asserted a federal right, the defendant may show that Congress specifically foreclosed a remedy under § 1983 by providing a comprehensive enforcement mechanism for protection of a federal right."  *Id*. (citations omitted).  That there are "administrative mechanisms to protect the plaintiff's interests" may not be enough "to demonstrate that Congress intended to foreclose a § 1983 remedy."  *Id*.  "Rather, the statutory framework must be such that '[a]llowing a plaintiff' to bring a § 1983 action 'would be inconsistent with Congress' carefully tailored scheme.'"  *Id*. (citing *Smith v. Robinson*, 468 U.S. 992, 1005 (1984)).

Here, HPEC alleges that "[t]he City Defendants' and Seroka's conduct violated HPEC's federally protected NLRA rights to negotiate with labor free of outside interference or coercion."  *FAC* ¶ 207.  HPEC is correct that the NLRA "creates rights in labor and management both against one another and against the State."  *Golden State Transit*, 493 U.S. 103 at 109.  But HPEC is neither labor nor management.  The FAC states that "HPEC is not an employer and has no employees," *see FAC* ¶ 181, and "HPEC has no employees, no collective bargaining agreement with any union. . . . HPEC is not a terminal operator but rather an infrastructure developer.  It will develop the project and ultimately operate it through multiple third-party vendors."  *See FAC* ¶ 98.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 20-3251 PSG (MMAx) | Date | November 2, 2020 |
|---|---|---|---|
| Title | Harbor Performance Enhancement Center, LLC v. City of Los Angeles Harbor Department et al | | |

In a footnote, HPEC asserts it has rights under §8(b)(4) of the NLRA as a "person engaged in commerce or in an industry affecting commerce," and as an indirect agent of an employer. *See Opp. Seroka* at 6 n.3. But § 8(b)(4) applies when a union threatens or coerces a person in order to force *an employer* to enter into a "hot cargo" agreement or hire a particular labor organization. 29 U.S.C. § 158(b)(4). HPEC has made clear that it is not an employer.

None of the cases that HPEC cites establish that the NLRA protects the rights of others besides labor and management. For example, in *Flying Eagle Expresso Inc. v. Host Int'l. Inc*, the plaintiff was an *employer* who claimed interference with her rights to hire non-labor employees. No. C04-1551P, 2005 WL 2318827, at *1 2 (W.D. Wash. Sept. 22, 2005). In *Livadas v. Bradshaw*, the plaintiff was an *employee* who claimed state interference with her rights under a collective bargaining agreement. 512 U.S. 107, 110 (1994).

HPEC fails to successfully allege that the NLRA "was intended to benefit" non-employer or employee parties such as HPEC. Accordingly, the Court **GRANTS** the City Defendants' and Seroka's motions on this ground. Because HPEC is not an employer, amendment would be futile. The Court **DENIES** leave to amend. *Jackson*, 353 F.3d at 758.

Next, the Court addresses whether the FAC states a breach of contract claim.

C.     Fourth Cause of Action: Breach of Contract

HPEC alleges the Port violated its various agreements with HPEC, including the ENA and the Amendment, the MOUs, and the Permit. *FAC* ¶ 210. The Court finds that the FAC alleges a breach of the Permit, but that it fails to allege a breach of any other contract. The Court addresses (1) the ENA and the Amendment, (2) the MOUs, and (3) the Permit.

*i.     Whether the FAC alleges a breach of the ENA and the Amendment*

Under California law,[6] a plaintiff alleging breach of contract must prove "[1] the existence of the contract, [2] performance by the plaintiff or excuse for nonperformance, [3] breach by the defendant, and [4] damages." *First Commercial Mortg. Co. v. Reece*, 89 Cal. App. 4th 731, 745 (2001). "Contract formation requires that the parties [] reach mutual assent or consent on definite or complete terms. . . . Mutual assent is accomplished when a specific offer

---

[6] There is no dispute that California law applies.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 20-3251 PSG (MMAx) | Date | November 2, 2020 |
|---|---|---|---|
| Title | Harbor Performance Enhancement Center, LLC v. City of Los Angeles Harbor Department et al | | |

is communicated to the offeree, and an acceptance is subsequently communicated to the offeror." *Sanchez v. Aurora Loan Servs., LLC*, No. CV 13-8846 MMM (RZx), 2014 WL 12589659, at *17 (C.D. Cal. Mar. 11, 2014) (quoting *Netbula, LLC v. Bindview Dev. Corp.*, 516 F. Supp. 2d 1137, 1155 (N.D. Cal. 2007)).

The City Defendants argue that the there was no breach of the ENA because its terms expired on January 5, 2018, and the Amendment was never expressly approved. *See City Mot*. 18:20  19:6.  Although the FAC alleges the ENA expired, at the latest, on March 2, 2018, *FAC* ¶ 42, in its opposition HPEC does not contest that the ENA expired on January 5, 2018.  Instead, HPEC responds by raising doubts as to (1) whether the Amendment needed further approval, and (2) whether the Port failed to disclose that the Amendment had not been approved.  *See Opp. City* 21:13  25.

First, the plain language of the Amendment reveals that the express approval requirements were never met.  The Amendment states: "The effective date of this First Amendment shall be upon execution by the Executive director and Secretary of City's Board of Harbor Commissioners *after approval of the City Council* of the Resolution approving this First Amendment."  *See First Amendment of Exclusive Negotiating Agreement*, Dkt. # 36-4, Ex. D ("*Amend.*"), ¶ 5 (emphasis added).  The FAC fails to allege that the City Council approved the Amendment.  Thus, the Amendment was never approved.

Further, HPEC's reliance arguments lack merit because the plain language of the contract expressly requires the City Council's approval.  *See Knutson v. Sirius XM Radio Inc.*, 771 F.3d 559, 567 (9th Cir. 2014) ("As a general rule, a party cannot avoid the terms of a contract by failing to read them before signing.").  HPEC argues that the City Defendants acted as if the Amendment was effective.  *See Opp. City* 22:15  18.  But the FAC alleges that the Port informed HPEC that the Amendment still needed further action less than three weeks after the Board voted on it.  *Id*. ¶ 51.

Furthermore, HPEC could not have reasonably concluded that the City Defendants' actions indicated the Amendment had been approved.  The FAC alleges the City Defendants continued working with HPEC through the expiration of the ENA, and that they reminded HPEC the Amendment needed further approval once the ENA had expired.  *See FAC* ¶ 88.  That the City Defendants continued negotiating with HPEC during the ENA period indicates the ENA was in effect, not that the Amendment was in effect.  Additionally, while the allegations in the

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 20-3251 PSG (MMAx) | Date | November 2, 2020 |
|---|---|---|---|
| Title | Harbor Performance Enhancement Center, LLC v. City of Los Angeles Harbor Department et al | | |

FAC express the importance of the Amendment to HPEC and its investors, *see, e.g. FAC* ¶ 75, they do not indicate that the City Defendants shared this opinion.

The FAC separately lists several agreements between the parties, the obligations from those agreements, and then several ways the agreements were breached. *FAC* ¶¶ 209 12. The FAC fails to explain exactly *how* each individual agreement was allegedly breached. Thus, while the Court finds that the Amendment was ineffective, it is possible that the City Defendants breached the ENA, which was in effect until January or March 2018. However, because the FAC fails to indicate which specific conduct breached the ENA, the Court **GRANTS** the City Defendant's motion to dismiss on this ground. Because HPEC could allege additional facts to explain how each agreement was breached, the Court **GRANTS** leave to amend.

> ii. *Whether the FAC alleges a breach of the MOUs*

HPEC also alleges the City Defendants breached the MOUs. *See FAC* ¶ 209. However, explicit language in the MOUs indicates that these documents were unenforceable. *See Memorandum of Understanding (LAXT)*, Dkt. # 36-5, Ex. E, ("*MOU LAXT*"), ¶ B; *Memorandum of Understanding (Customs House Site)*, Dkt. # 36-6, Ex. F, ("*MOU CHS*"), ¶ B. HPEC has not shown language in the MOUs indicating otherwise.

Accordingly, the Court **GRANTS** the City Defendants' motion to dismiss on this ground. Amendment here would be futile because the MOUs are not enforceable. Thus, the Court **DENIES** leave to amend.

> iii. *Whether the FAC alleges a breach of the Permit*

HPEC argues that the City Defendants breached their contractual duty under the Permit. *See Opp. City* 24:17 24. The Permit allowed HPEC to use the premises "for temporary drayage truck, container, and container chassis handling, staging and storage." *FAC* ¶ 63. According to HPEC, the City Defendants breached this provision by denying HPEC access to the Project site to run the Pilot Study. The Court agrees.

The City Defendants respond that "[i]f HPEC was unable to access the land as alleged, HPEC could have exercised" its contract rights to revoke the Permit. *City Reply* 12:3 5. However, the City Defendants fail to explain how HPEC's right to revoke permitted the City Defendants to breach the terms of the Permit by excluding HPEC from the Project site.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 20-3251 PSG (MMAx) | Date | November 2, 2020 |
|---|---|---|---|
| Title | Harbor Performance Enhancement Center, LLC v. City of Los Angeles Harbor Department et al | | |

Accordingly, the Court **DENIES** the City Defendants' motion to dismiss on this ground.

The Court now turns to the fifth cause of action for breach of the implied covenant of good faith and fair dealing.

D.  Fifth Cause of Action: Breach of the Implied Covenant of Good Faith and Fair Dealing

The City Defendants argue that the cause of action for breach of the implied covenant of good faith and fair dealing should also be dismissed. *See City Mot*. 23:13  24:4. The Court disagrees.

The implied covenant of good faith and fair dealing, which is implied by law in every contract, "functions 'as a supplement to the express contractual covenants[] to prevent a contracting party from engaging in conduct which (while not technically transgressing the express covenants) frustrates the other party's rights to the benefits of the contract.'" *Thrifty Payless, Inc. v. The Americana at Brand, LLC*, 218 Cal. App. 4th 1230, 1244 (2013) (internal citations omitted). "A breach of the implied covenant of good faith is a breach of the contract." *Id*. Thus, the "implied covenant of good faith and fair dealing rests upon the existence of some specific contractual obligation." *Racine & Laramie, Ltd. v. Dep't of Parks & Recreation*, 11 Cal. App. 4th 1026, 1031 (1992).

The City Defendants do not contest the existence of a contract between the parties. Instead, they argue that "HPEC received the rights and benefits promised by its agreements with the City, and is owed nothing more." *City Mot*. 23:17  18. The FAC alleges that HPEC did not receive all the benefits promised by the agreement. For example, the FAC alleges the City Defendants prevented HPEC from beginning the Pilot Study until the Project received ILWU approval. *FAC* ¶ 219. While conditioning the Pilot Study on ILWU approval was not an express term of the agreement, it certainly frustrated HPEC's "rights to the benefits of the contract.'" *Thrifty Payless*, 218 Cal. App. 4th at 1244.

Furthermore, the City Defendants themselves admit that they did not seek City Council or further Board approval of the Amendment. *See City Mot*. 20:8  10. This frustrates the spirit of the ENA, which contemplates that the parties would exclusively negotiate in good faith for the length of its terms. *See generally Exclusive Negotiating Agreement*, Dkt. # 36-3, ("*ENA*"). The FAC alleges that the City Defendants started the process of approving an Amendment to the

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 20-3251 PSG (MMAx) | Date | November 2, 2020 |
|---|---|---|---|
| Title | Harbor Performance Enhancement Center, LLC v. City of Los Angeles Harbor Department et al | | |

ENA that would extend its terms, and then, without informing HPEC, neglected to continue the process. *FAC* ¶ 211. Certain actions by Port officials indicate that the Port was in fact working on finalizing the Amendment. *Id.* ¶ 51. These actions deprived HPEC of the benefit of the ENA. *Ocean Servs. Corp. v. Ventura Port Dist.*, 15 Cal. App. 4th 1762, 1781 (1993), *as modified on denial of reh'g* (June 23, 1993).

Accordingly, the Court **DENIES** the City Defendants' motion to dismiss the fifth cause of action for breach of the implied covenant of good faith and fair dealing.

Finally, the Court addresses HPEC's claim for declaratory relief.

E.     Sixth Cause of Action: Declaratory Relief

The City Defendants argue that the Court should dismiss HPEC's declaratory relief claim because the FAC has not alleged a "substantial controversy." *See City Mot.* 24:6 10. Because the Court finds that the FAC alleges (1) a breach of the Permit and (2) breaches of the implied covenant of good faith and fair dealing, the FAC alleges a "substantial controversy."

Accordingly, the Court **DENIES** the City Defendants' motion to dismiss the declaratory relief claim.

F.     Summary

In sum, the Court rules as follows:

- The Court **GRANTS** the motion to dismiss the first cause of action for violations of the Sherman Act as to all Defendants because (1) the City Defendants are immune under the state action doctrine, (2) Seroka is immune under the state action doctrine and the LGAA, and (3) the Union Defendants are immune under *Noerr-Pennington*.

- The Court **GRANTS** the motion to dismiss the second cause of action for NLRA violations against the Union Defendants because the Union Defendants are immune under *Noerr-Pennington*.

- The Court **GRANTS** the motion to dismiss the third cause of action for civil rights violations against the City Defendants and Seroka because the FAC fails to state a claim.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 20-3251 PSG (MMAx) | Date | November 2, 2020 |
|---|---|---|---|
| Title | Harbor Performance Enhancement Center, LLC v. City of Los Angeles Harbor Department et al | | |

- The Court **GRANTS** the motion to dismiss the fourth cause of action for breach of contract against the City Defendants on the grounds that the City Defendants breached the ENA, the Amendment, and the MOUs.

- The Court **DENIES** the motion to dismiss the fourth cause of action for breach of contract against the City Defendants on the ground that the City Defendants breached the Permit.

- The Court **DENIES** the motion to dismiss the fifth cause of action for breach of the implied covenant of good faith and fair dealing.

- The Court **DENIES** the motion to dismiss the sixth cause of action for declaratory relief.

- HPEC has leave to amend the following: (1) facts regarding *Noerr-Pennington* immunity against the Union Defendants and (2) breach of the ENA against the City Defendants.

V.    Conclusion

    For the foregoing reasons, the Court **GRANTS IN PART and DENIES IN PART** the motions to dismiss and **GRANTS** leave to amend as explained above.  Any amended complaint must be filed by **December 3, 2020**.

    **IT IS SO ORDERED.**

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 20-3251 PSG (MMAx) | Date | March 24, 2021 |
|---|---|---|---|
| Title | Harbor Performance Enhancement Center, LLC v. City of Los Angeles Harbor Department et al | | |

| Present: The Honorable | Philip S. Gutierrez, United States District Judge |
|---|---|

| Wendy Hernandez | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorneys Present for Plaintiff(s): | Attorneys Present for Defendant(s): |
|---|---|
| Not Present | Not Present |

**Proceedings (In Chambers):**     **The Court GRANTS the Union Defendants' motion, DECLINES to exercise supplemental jurisdiction over the remaining claims, and DISMISSES the case**

Before the Court are two motions to dismiss filed by Defendants City of Los Angeles ("the City") and City of Los Angeles Harbor Department ("the Port") (collectively, "City Defendants"), *see City Defendants' Motion to Dismiss*, Dkt. # 58, ("*City Mot.*"), and Defendants International Longshore and Warehouse Union ("ILWU") and International Longshore and Warehouse Union Local 13 ("ILWU Local 13") (collectively, "Union Defendants"), *see Union Defendant's Motion to Dismiss*, Dkt. # 57, ("*Union Mot.*"). Plaintiff Harbor Performance Enhancement Center, LLC ("HPEC") opposed, *see* Dkts. # 60 ("*Opp. City*"), # 61 ("*Opp. Union*"), and replies were filed by City Defendants, *see* Dkt. # 63 ("*City Reply*") and Union Defendants, *see* Dkt. # 62 ("*Union Reply*"). The Court held a hearing on the matter on March 23, 2021. Having considered the moving, opposing, and reply papers, as well as the arguments made at the hearing, the Court **GRANTS** the Union Defendants' motion with prejudice, **DECLINES** to exercise supplemental jurisdiction over the remaining claims, and **DISMISSES** the case without prejudice.

I.    <u>Background</u>

This case stems from a failed attempt to reach a consensus between the developer, the City, and the union regarding the development of a Container Terminal Support Facility (the "Project") at the former Los Angeles Export Terminal ("LAXT") and the former U.S. Customs House ("Customs House") located at the Los Angeles Port (collectively, the "Site"). *Second Amended Complaint*, Dkt. #53 ("*SAC*"), ¶ 31. The City Defendants terminated the Project when HPEC and the Union Defendants could not reach an agreement granting ILWU workers exclusive jurisdiction over drayage (short-haul trucking) jobs at the Project site. *Id.* ¶¶ 180–81.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 20-3251 PSG (MMAx) | Date | March 24, 2021 |
|---|---|---|---|
| Title | Harbor Performance Enhancement Center, LLC v. City of Los Angeles Harbor Department et al | | |

A.    <u>The Parties</u>

HPEC is an infrastructure developer and the plaintiff in this action. *SAC* ¶¶ 24, 124. HPEC has no employees other than lawyers and "developer types." *Id*. ¶ 92.

The City Defendants, the City of Los Angeles and the Los Angeles Harbor Department, hold the LAXT site in trust. *Id*. ¶ 25. The Port operates as a landlord port with more than 200 leaseholders, and it generates its revenues from leasing and shipping fees. *Id*.

The Union Defendants are ILWU and ILWU Local 13. *Id*. ¶¶ 27–28. ILWU is a labor union that represents workers in longshore and other occupations who are employed by waterfront companies that are members of the Pacific Maritime Association, at all West Coast ports, including the Port of Los Angeles. *Id*. ILWU Local 13 is one of ILWU's longshore locals and is the representative for the longshore workers at the Port. *Id*. According to the SAC, the ILWU collective bargaining agreement only applies to property that is "water adjacent." *Id*. ¶ 130. The ILWU has no jurisdiction over the Project sites, no members properly licensed to perform drayage work, no trucks and no collective bargaining agreement with any drayage company. *Id*. ¶ 125. Drayage jobs had historically been performed by the Teamsters and drayage companies hired by Beneficial Cargo Owners ("BCOs"),[1] not the ILWU. *Id*.

Next, the Court summarizes the allegations in the seventy-four page Second Amended Complaint ("SAC").

B.    <u>Factual Background</u>

i.    *The Proposal*

In 2015, the Port invited proposals from the development community to develop and operate a terminal support facility on a 110-acre site at Terminal Island that had been undeveloped for ten years. *Id*. ¶ 2. Following a publicly noticed Request for Proposals (the "RFP") and a competitive bidding process, the Port selected HPEC, and the parties entered a binding exclusive negotiating agreement (the "ENA"). *Id*. ¶¶ 2–3.

HPEC's proposal aimed to reduce traffic congestion, increase overall cargo handling, and provide access to everyone. *Id*. ¶ 34. The proposal expressly identifies Eco-Flo as the

---

[1] A BCO is the party that ultimately owns the product being shipped.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 20-3251 PSG (MMAx) | Date | March 24, 2021 |
|---|---|---|---|

| Title | Harbor Performance Enhancement Center, LLC v. City of Los Angeles Harbor Department et al |
|---|---|

nonexclusive member of the HPEC consortium specializing in drayage, but does not suggest that any drayage company would have exclusive drayage rights. *Id*. The proposal also states that "[t]he higher throughput of marine terminals should ensure no loss of jobs to ILWU." *Id*.

ii.     *The ENA, the Memoranda of Understanding, and the Amendment*

The Los Angeles Board of Harbor Commissioners (the "Board") approved the ENA on July 21, 2016, and the Port executed the agreement on September 2, 2016. *Id*. ¶ 48. The ENA obligated the City not to negotiate for a permit or any other entitlement, or for the development of the Site or any portion thereof, with any party other than HPEC during the exclusivity period. *Id*. ¶ 49. The ENA specifically provided that "[n]egotiations under the [ENA] shall be undertaken by City and by Developer in good faith." *Id*.

As originally contemplated, the ENA had an initial term of 12 months with an option to extend for an additional six months. *Id*. ¶ 53. On December 8, 2016, the Port decided that the Project required a full Environmental Impact Report ("EIR") rather than a more limited review, and therefore the entitlement process for the Project would exceed the original term of the ENA, requiring the parties to amend the agreement (the "Amendment"). *Id*.

The parties negotiated two Memoranda of Understanding ("MOUs") for both sites that provided the framework for finalizing a long-term lease agreement, as well as the Amendment that would extend the ENA. *Id*. ¶ 54. The Amendment modified the term of the ENA to the earlier of (i) the completion of "all approval processes" or (ii) the termination of the ENA under the terms defined in the agreement. *Id*. ¶ 67. Similar to the ENA, neither the Amendment nor the MOUs placed any restriction on drayage or obligated HPEC to secure ILWU jurisdiction over drayage jobs. *Id*. ¶ 71.

On February 2, 2017, HPEC CEO Jonathan Rosenthal ("Rosenthal") informed the Port's Executive Director Eugene Seroka ("Seroka") and other Port staff that HPEC had engaged a real estate consultancy group, Jones Lang LaSalle ("JLL") to, among other things, prepare a feasibility study and market analysis. *Id*. ¶ 55. Rosenthal specifically informed the Port that HPEC's financial commitment was "material" and HPEC did not want to pull the trigger until getting the green light from Seroka and the Board in the form of an executed MOU and Amendment. *Id*. The Port's Director of its Real Estate Division, Jack Hedge ("Hedge"), responded that he personally approved of JLL and the Port would let HPEC know if there was a reason not to proceed with JLL. *Id*.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 20-3251 PSG (MMAx) | Date | March 24, 2021 |
|----------|----------------------|------|----------------|
| Title | Harbor Performance Enhancement Center, LLC v. City of Los Angeles Harbor Department et al | | |

On March 2, the Port's staff presented a report to the Board outlining the scope of the Project along with a recommendation that the Board approve the Amendment and the MOUs and work toward finalization of the terms of lease agreements. *Id*. ¶ 62. In a closed session meeting, the Board approved the Amendment and the two MOUs. *Id*. ¶ 63. Seroka reported to HPEC by text message from the closed session: "100 % support from our Board on HPEC just now. Onward and upward we go!" *Id*. ¶ 64. That same day, Hedge emailed HPEC to offer his congratulations and to let HPEC know that "[w]e need to proceed with getting the MOU and ENA amendment signed and to proceeding with next steps." *Id*.

Seroka then executed the MOUs and the Amendment on behalf of the City Defendants, and Deputy City Attorney Steve Otera ("Otera") executed the Amendment as to "form and legality." *Id*. ¶ 66. Nevertheless, a few weeks later, on March 24, Hedge informed HPEC in an email that Otera was "now of the opinion" that the Amendment needed to be further acted on by the Board. *Id*. ¶ 68.

### iii. The Pilot Study and the Permit

Throughout the following months, Seroka made public statements supporting the Project and the relationship with HPEC. *Id*. ¶ 74. HPEC began marketing the Project internationally, and the Port continued to develop the project with HPEC. *Id*. ¶¶ 75–76. The parties coordinated to prepare the EIR, and the Board approved an Indemnity Agreement. *Id*. ¶ 77.

The Port and HPEC negotiated a 13-month permit which operated as a lease to facilitate a "Pilot Study" of the Project to test feasibility by assessing the Projects' environmental and market impact. *Id*. ¶ 79. Under the Pilot Study, HPEC would test 400 container spots for the Project site. *Id*.

On November 16, 2017, the Board approved the Permit to operate a Pilot Study on 10 acres of the former LAXT site and a Private Railroad Crossing Agreement (the "Permit"). *Id*. ¶ 83. At the public hearing regarding the Permit, President of ILWU Local 13 Mark Mendoza ("Mendoza") spoke in support of HPEC. *Id*. On December 12, the Port executed the Permit. *Id*. ¶ 84. The Permit required HPEC to pay a monthly rent of $24,119.86 for the 13-month term. *Id*.

HPEC began work to commence Pilot Study operations. *Id*. ¶¶ 86–88. By February 2018, HPEC was ready to begin operating the Pilot Study, but the Port repeatedly delayed the start date and prohibited HPEC from using the land. *Id*. ¶ 90.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 20-3251 PSG (MMAx) | Date | March 24, 2021 |
|---|---|---|---|
| Title | Harbor Performance Enhancement Center, LLC v. City of Los Angeles Harbor Department et al | | |

By this time, the ILWU had informed the Port and HPEC that it wanted exclusive jurisdiction over drayage jobs at the newly developed Port. *Id*. ¶ 91. In January 2018, the Board's Vice President David Arian ("Arian") asked the Port's Deputy Director Michael DiBernardo ("DiBernardo") how the Pilot Project would work and "where are the containers coming from and who is draying them." *Id*. DiBernardo forwarded the questions to Rosenthal, who told DiBernardo that HPEC would contract with third parties for all services, including drayage, and that it had no power to contract with the ILWU. *Id*. ¶ 92.

On February 9, 2018, Port staff met with Mendoza and other ILWU leaders to discuss HPEC. *Id*. ¶ 94. That same day, the Port told HPEC that the Permit would be modified to extend the start date and assured HPEC that it would not be charged rent until the Port allowed the Pilot Study to begin. *Id*. On February 26, the Port proposed to amend the Permit and defer the Pilot Study until it granted access to LAXT. *Id*. ¶ 95.

During this time, HPEC and JLL continued to secure financing for the Project, including an investment from Macquarie Limited Group ("Macquarie"). *Id*. ¶¶ 98–102.

    iv.    *The Port's Meetings with the Union Defendants*

By the time HPEC and the Port were negotiating the Pilot Study and Permit, Seroka was meeting with the Union Defendants. *Id*. ¶ 105. Texts and emails between Port executives and Board members obtained in HPEC's Public Records Request show the ILWU's involvement in the Project. *Id*. ¶¶ 103–12. For example, DiBernardo and Seroka met with ILWU leaders to discuss the Permit before its approval, Seroka met with Mendoza on September 29, 2017, to discuss HPEC, and a Port executive emailed the ILWU Vice President the draft board resolution regarding the Indemnity Agreement and Permit the day before their approval. *Id*. ¶¶ 81–83. Many of these communications involved Vice President Arian, who had previously served as President of both Local 13 and the ILWU. *Id*. ¶ 103.

    v.    *The Union Defendants' Demands*

On April 2, 2018, Deputy City Attorney Otera again advised HPEC that in the Port's view, the Amendment still required Board approval. *Id*. ¶ 114. Internal emails show that certain Port staff members expressed surprise at Otera's claim. *Id*. ¶ 115. The Board was scheduled to approve the Amendment on April 19. *Id*. ¶ 116. Seroka tabled this approval request and instead advocated for a "closed meeting" regarding the Project. *Id*. ¶ 117.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 20-3251 PSG (MMAx) | Date | March 24, 2021 |
|---|---|---|---|
| Title | Harbor Performance Enhancement Center, LLC v. City of Los Angeles Harbor Department et al | | |

On April 11, Mendoza told a Port staff member that the ILWU would start a "war" with HPEC if HPEC did not accede to the union's demands for exclusive jurisdiction over intra-port drayage. *Id*. ¶ 120. Two days later, Seroka and other Port executives met with Mendoza and other ILWU Local 13 leaders to discuss HPEC. *Id*. ¶ 121. That same day, Seroka texted Rosenthal: "Any way it is sliced, [ILWU] run[s] the port and will put up a fight every step of the way. Your lack of engagement has not helped. The Board will be hard pressed without their support at any level." *Id*. ¶ 122. Seroka told HPEC it would be required to guarantee that the ILWU would be granted exclusive jurisdiction over all intra-port trucking services to and from the Project. *Id*. ¶ 123.

On May 3, the Port met with HPEC to discuss the ILWU conditions for approval of the Project. *Id*. ¶ 130. Seroka reiterated that HPEC needed "to give [the ILWU] the dray" and told Rosenthal that the ILWU would provide an operational plan. *Id*. Seroka also told HPEC that they would need to extend the terminal property to the yard, making the property "water adjacent," so that the ILWU collective bargaining would apply. *Id*. Rosenthal told Seroka that HPEC "is not a trucking company and the dray is going to be handled by multiple vendors without exclusivity." *Id*. Furthermore, Rosenthal was worried about the economic impact of working with the ILWU since their hourly rates are five times the market rate. *Id*.

In May and June, HPEC and the Union Defendants participated in multiple negotiation sessions. *Id*. ¶ 132. At these meetings, the Union Defendants made clear that they wanted exclusive jurisdiction over drayage jobs. *Id*. ¶¶ 132–37.

On June 4, Seroka and other Port executives continued to communicate to HPEC that the Project would not go forward without ILWU approval. *Id*. ¶¶ 139–40. For example, DiBernardo told an HPEC executive that, "[i]f there is opposition from any entity, [the Amendment] will not get approved by our board. Therefore, all i's need to be dotted and t's crossed with ILWU before we go to the board." *Id*. ¶ 139. Seroka told HPEC that the Project needed unanimous support from ILWU, and that he learned that the ILWU Local 13 presidents had flown to their headquarters in San Francisco to meet with a "war council," which had not happened in 50 years. *Id*. ¶ 140. When HPEC asked what it needed to move past this, Seroka responded, "They've shared an easy path forward and were told it would not work." *Id*.

On June 11, DiBernardo told HPEC the Port would put the formalized agreement to stay the rent before the Board on June 21, but would pull it from the agenda if there was any opposition. *Id*. ¶ 142. DiBernardo suggested that it "might be to our advantage that the ILWU elections are underway so hopefully it will keep the ILWU at bay for a while." *Id*. The Port

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 20-3251 PSG (MMAx) | Date | March 24, 2021 |
|---|---|---|---|
| Title | Harbor Performance Enhancement Center, LLC v. City of Los Angeles Harbor Department et al | | |

circulated a draft board resolution regarding the rent stay on June 13. *Id*. ¶ 143. Later that evening, DiBernardo texted Seroka and Hedge "I hear Arian does not want HPEC on June 21 agenda." *Id*. ¶ 145. Seroka responded, "Does Arian understand this is compliance only and no concessions." *Id*. The next day, DiBernardo texted Hedge: "what the f with Otera and Hpec?" *Id*. ¶ 146. Hedge responded, "Man! He HATES this thing!" *Id*.

On June 19, HPEC and the Union Defendants again met to negotiate. *Id*. ¶ 147. At the meeting, the Union Defendants confirmed that they would only approve the Project if given exclusive jurisdiction over intra-port drayage. *Id*. Mendoza told HPEC, "Let's talk about the 800lb gorilla in the room. What's with the Teamsters." *Id*. He told HPEC, "The 2-3 miles of waterfront is ours, we're going to get it. We've told Seroka, we've talked with them. There will be some animosity, could be some civil unrest." *Id*. Mendoza also said, "If we're used, we're good. I'm not going to work double breasted with another union" and "[y]ou guys. If you work with us, there's no problem." *Id*.

During this time, Avin Sharma ("Sharma"), a Port staff member, had "a challenged lunch with Eric Tate," an Executive Board member of a local Teamsters union. *Id*. ¶ 138. Sharma reported that the Teamsters were contemplating moving forward with a National Labor Relations Board ("NLRB") petition against the ILWU. *Id*. Sharma told Seroka and DiBernardo that "Their lawyers think there's enough for a claim now even with no active HPEC [because] . . . HPEC would be operational today if not for hold up but [the Port] which is really holdings this up [because] of lack of ILWU support." *Id*.

> vi.     *The City Defendants Charge Rent*

On June 25, Seroka met with three Local ILWU presidents and vice presidents at his office. *Id*. ¶ 149. The Union Defendants told Seroka they did not want to work with HPEC on the Project. *Id*. ¶ 151. At a meeting with HPEC that afternoon, Seroka told HPEC that the Union Defendants did not want to work with them, but that union elections were coming up and they may have more luck with new union leaders. *Id*.

Seroka also said that he expected HPEC to pay back rent and rent going forward, even though the Port told HPEC to hold off on operations until things were settled with the ILWU and that rent would be suspended until HPEC started operations. *Id*. ¶ 152. Seroka told HPEC they could not start operations, even though they had to pay rent, because he was "not going to have 15,000 longshoremen marching on this property to save 10 Teamster jobs." *Id*. Later that day,

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 20-3251 PSG (MMAx) | Date | March 24, 2021 |
|---|---|---|---|

| Title | Harbor Performance Enhancement Center, LLC v. City of Los Angeles Harbor Department et al |
|---|---|

some Port staff members met without HPEC to discuss "project alternatives for HPEC." *Id.* ¶ 154.

HPEC complied with the Port's rent request, ultimately paying rent back from December 12, 2017 through June 30, 2018. *Id.* ¶ 155. HPEC also committed to paying future rent payments. *Id.*

> vii. *The City Terminates the Agreement and Pursues the Deal with Another Developer*

On June 29, Seroka gave his mid-year fiscal update to Mayor Eric Garcetti. *Id.* ¶ 156. He reported that the HPEC matter was "off track" due to issues with "union labor over drayage," but reported that the Port's goal was to continue to move forward with the Pilot Study. *Id.* Internally, Port staff shared their view that HPEC should stop working on the EIR given the labor impasse. *Id.* ¶ 157. This information was not shared with HPEC. *Id.* Instead, the Port continued to work on the EIR with HPEC. *Id.*

On July 17, the Port's general counsel, Janna Sidley ("Sidley), called Rosenthal to tell him that Commissioner Renwick had been recused by the Ethics Commission from participating at board meetings on matters relating to HPEC. *Id.* ¶ 159. The purported basis for Renwick's recusal was a meeting on December 18, 2017, with HPEC and Macquarie. *Id.* Although the Board's Vice President David Arian had met and communicated with the Union Defendants and HPEC, he was not recused from matters relating to HPEC. *Id.*

HPEC made repeated efforts over the next few months to negotiate with the Union Defendants. *Id.* ¶ 160. Throughout the fall of 2018 and the first quarter of 2019, the Port provided reassurances to HPEC that it still supported the Project and told HPEC to keep "chipping away" at getting the ILWU to buy into the Project. *Id.* Seroka continued to tell HPEC that the ILWU would protest if he brought the ENA before the Board. *Id.* ¶ 161. For example, Seroka told HPEC and Macquarie, "I have been instructed by the ILWU not to bring anything forward, or they will protest. I spend an incredible amount of time with cargo owners and if there is any disruption . . . We've seen this move before and we do not want to do it again, so that is my recommendation. . . . 2002 lockout. 97 ships off coast [the Port] share went from 80% to 60%. The BCO's will stay away. It's not a threat, but it's how decisions are made." *Id.*

During late 2018, an internal Port email suggests that the Port was looking at developing a chassis yard project with Pacific Crane Maintenance Corporation ("PCMC"), an ILWU ally.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 20-3251 PSG (MMAx) | Date | March 24, 2021 |
|----------|----------------------|------|----------------|

| Title | Harbor Performance Enhancement Center, LLC v. City of Los Angeles Harbor Department et al |
|-------|---------------------------------------------------------------------------------------------|

*Id*. ¶ 167.  Port documents suggest that PCMC toured the Project site at least twice, including once during the initial 12-month exclusivity period.  *Id*.  Seroka told PCMC's president to tell him when PCMC is ready and the Port will provide HPEC with the 30-day notice required to terminate the project so "PCMC can step into the permit."  *Id*.  Also in January 2019, Seroka and the ILWU officers met several times, including once at City Hall to discuss "HPEC and workforce opportunities."  *Id*. ¶¶ 168–69.

On January 31, Sidley and Seroka called HPEC about the project.  *Id*. ¶ 171. Seroka again advised HPEC to "keep chipping away" at negotiations with ILWU and said, "this is a company town owned by the ILWU."  *Id*.  During their discussion, Sidley stated, "We're now putting labor peace in the leases, which would be in your permit as well."  *Id*.  At the end of the call, Seroka reaffirmed his support for the Project.  *Id*.

On May 8, 2019, HPEC, Macquarie and the Port had an update call.  *Id*. ¶ 179. Seroka opened the call by saying, "It's been 30 days since I spoke to you with Janna Sidley asking for immediate progress.  During that time, we have come to the painful conclusion that the project will not move forward.  We have come [to] this conclusion for three reasons.  One, an unclear business plan.  Two, complete disengagement of labor. Three, no clear pathway to success.  It is painful to the City of Los Angeles that I must recommend that the project not go any further."  *Id*.  A Macquarie representative responded, "It is hugely disappointing to hear that.  Can I ask you what has changed since our meeting last Friday where you represented positively that we had been making progress?"  *Id*.  Seroka responded, "Longshore labor doesn't want to meet.  We have hit the 30 day date today, we have to go in a different direction now."  *Id*.

Seroka was asked whether this decision had been reviewed by the Board.  *Id*.  He responded that the decision had been made by the Mayor and his Chief of Staff.  *Id*.  He explained that he had a meeting with the ILWU on Friday (May 3) after receiving Macquarie's paperwork and "they unequivocally don't want to engage with you" and they "categorically rejected" Macquarie's business plan.  *Id*.  Macquarie's representative stated, "It does feel as though you've made ILWU approval a requirement of this project."  *Id*.  Seroka responded that the Port takes into account all stakeholders.  *Id*.

In a May 10, 2019 letter, Seroka purported to terminate the ENA, the MOUs and the Indemnity Agreement, as well as HPEC's rights in the Project because the Port had "determined the proposed project to be infeasible."  *Id*. ¶ 180.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 20-3251 PSG (MMAx) | Date | March 24, 2021 |
|---|---|---|---|
| Title | Harbor Performance Enhancement Center, LLC v. City of Los Angeles Harbor Department et al | | |

C.    <u>Procedural Background</u>

On June 17, 2019, HPEC filed a verified petition and complaint in the Los Angeles County Superior Court for ordinary mandamus and declaratory relief. *Id.* ¶ 190. Following demurrer briefing, and discovery and motion practice, HPEC requested dismissal of its own petition on April 8. *Id*. ¶¶ 191–92.

On April 7, HPEC filed suit in this Court against the City Defendants, the Union Defendants, and Seroka, alleging violations of the Sherman Act, the National Labor Relations Act ("NLRA"), and breach of contract and related claims. *See generally* Dkt. # 1. Defendants moved to dismiss, *see generally* Dkts. # 22–24, and HPEC filed a First Amended Complaint ("FAC"), *see generally First Amended Complaint*, Dkt. # 36 ("*FAC*"). In addition to adding more factual allegations against Defendants, HPEC added a claim under 42 U.S.C. § 1983 against Seroka. *See generally id*.

Defendants again moved to dismiss. *See generally* Dkts. # 40–42. On November 2, 2020, the Court granted in part and denied in part Defendants' motions. *See generally Order Granting in Part and Denying in Part Defendants' Motions to Dismiss*, Dkt. # 52 ("*November 2020 Order*"). Specifically, the Court denied the motion to dismiss the breach of contract and related claims against the City Defendants based on alleged breaches of the Permit. The Court dismissed without leave to amend the Sherman Act claims against the City Defendants and Seroka, the civil rights claim under § 1983 against Seroka, and the breach of contract claim against the City Defendants based on alleged breaches of the Amendment and the MOUs. Finally, the Court dismissed with leave to amend the Sherman Act and NLRA claims against the Union Defendants under *Noerr-Pennington* and the breach of contract claim against the City Defendants based on alleged breaches of the ENA. *See generally id*.

HPEC then filed the operative Second Amended Complaint ("SAC"), *see generally* Dkt. # 53 ("*SAC*"), alleging the following causes of action:

<u>First Cause of Action</u>: violation of Section 1 of the Sherman Act, against the Union Defendants. *Id*. ¶¶ 201–12.

<u>Second Cause of Action</u>: violation of the NLRA, 29 U.S.C. § 187, against the Union Defendants. *SAC* ¶¶ 213–30.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 20-3251 PSG (MMAx) | Date | March 24, 2021 |
|---|---|---|---|
| Title | Harbor Performance Enhancement Center, LLC v. City of Los Angeles Harbor Department et al | | |

Third Cause of Action: breach of contract, against the City Defendants. *Id.* ¶¶ 231–39.

Fourth Cause of Action: breach of the implied covenant of good faith and fair dealing, against the City Defendants. *Id.* ¶¶ 240–46.

Fifth Cause of Action: declaratory relief, against the City Defendants. *Id.* ¶¶ 247–51.

Defendants again moves to dismiss. For the reasons discussed below, the Court **GRANTS** the Union Defendants' motion with prejudice, **DECLINES** to exercise supplemental jurisdiction over the remaining claims, and **DISMISSES** the case without prejudice.

II.   Legal Standard

A.   Rule 12(b)(6)

To survive a motion to dismiss under Rule 12(b)(6), a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In assessing the adequacy of the complaint, the court must accept all pleaded facts as true and construe them in the light most favorable to the plaintiff. *See Turner v. City & Cty. of San Francisco*, 788 F.3d 1206, 1210 (9th Cir. 2015); *Cousins v. Lockyer*, 568 F.3d 1063, 1067 (9th Cir. 2009). The court then determines whether the complaint "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* Accordingly, "for a complaint to survive a motion to dismiss, the non-conclusory factual content, and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009) (internal quotation marks omitted).

B.   Leave to Amend

Whether to grant leave to amend rests in the sound discretion of the trial court. *See Bonin v. Calderon*, 59 F.3d 815, 845 (9th Cir. 1995). Courts consider whether leave to amend would cause undue delay or prejudice to the opposing party, and whether granting leave to amend would be futile. *See Sisseton-Wahpeton Sioux Tribe v. United States*, 90 F.3d 351, 355 (9th Cir.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 20-3251 PSG (MMAx) | Date | March 24, 2021 |
|---|---|---|---|
| Title | Harbor Performance Enhancement Center, LLC v. City of Los Angeles Harbor Department et al | | |

1996). Generally, dismissal without leave to amend is improper "unless it is clear that the complaint could not be saved by any amendment." *Jackson v. Carey*, 353 F.3d 750, 758 (9th Cir. 2003).

III. <u>Discussion</u>

A. <u>The Union Defendants' Motion to Dismiss</u>

In the November 2020 Order, the Court found that the Union Defendants were immune from liability under the *Noerr-Pennington* doctrine and granted the motion to dismiss the Sherman Act and NLRA claims with leave to amend. *See November 2020 Order* at 17–22. Now the Union Defendants again move to dismiss, arguing (1) the Sherman Act and NLRA claims are still barred by *Noerr-Pennington*, (2) the Sherman Act claim is barred by the *Parker* immunity doctrine and the statutory labor exemption, and (3) both the Sherman Act and NLRA claims are substantively deficient. *See generally Mot.* Because *Noerr-Pennington* still immunizes the Union Defendants from liability, the Court does not address the remaining arguments.

The *Noerr-Pennington* doctrine requires that, to the extent possible, courts "construe statutes so as to avoid burdens on activity arguably falling within the scope of the Petition Clause of the First Amendment." *Sosa v. DIRECTTV, Inc.*, 437 F.3d 923, 942 (9th Cir. 2006). The doctrine states that federal antitrust laws "do not regulate the conduct of private individuals in seeking anticompetitive action from the government." *City of Columbia v. Omni Outdoor Advert., Inc.*, 499 U.S. 365, 379–80 (1991). "That a private party's political motives are selfish is irrelevant." *Id*. at 380. The doctrine "shields from the Sherman Act a concerted effort to influence public officials regardless of intent or purpose." *Id*. (quoting *Mine Workers v. Pennington*, 381 U.S. 657, 670 (1965)).

"While the *Noerr-Pennington* doctrine originally arose in the antitrust context, it is based on and implements the First Amendment right to petition and therefore . . . applies equally in all contexts." *White v. Lee*, 227 F.3d 1214, 1231 (9th Cir. 2000). Thus, "those who petition any department of the government for redress are generally immune from statutory liability for their petitioning conduct." *Sosa*, 437 F.3d at 942.

However, "[t]he protection afforded by the *Noerr-Pennington* doctrine is not absolute." *Evans Hotels, LLC v. Unite Here Local 30*, 433 F. Supp. 3d 1130, 1143 (S.D. Cal. 2020). For example, "[w]here petitioning activity is 'a mere sham to cover what actually is nothing more

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 20-3251 PSG (MMAx) | Date | March 24, 2021 |
|---|---|---|---|
| Title | Harbor Performance Enhancement Center, LLC v. City of Los Angeles Harbor Department et al | | |

than an attempt to interfere directly with the business relationships of a competitor,' immunity does not apply." *Id*. (citing *Noerr*, 365 U.S. at 144).

First, the Court determines whether the Union Defendants' activities "are of the type that the *Noerr-Pennington* doctrine seeks to protect." *See Boone v. Redev. Agency of City of San Jose*, 841 F.2d 886, 894 (9th Cir. 1988). Then, the Court discusses whether any exceptions apply. *See id*. This review "is guided in part by the fundamental first amendment values that the *Noerr-Pennington* doctrine is designed to protect." *See id*. Thus, "[i]n order not to chill legitimate lobbying activities, it is important that a plaintiff's complaint contain specific allegations demonstrating that the *Noerr-Pennington* protections do not apply." *Id*.

          i.     *The Union Defendants' activities*

In its November 2020 Order, the Court grouped the Union Defendants' alleged activities as follows: "(1) they met and communicated secretly with the Port and Seroka even though they had no jurisdiction over the Project; (2) they conspired with Seroka to either force HPEC to give ILWU workers exclusivity over drayage jobs or to kill the project; (3) they threatened the Port and HPEC on numerous occasions with actions such as 'war' and 'civil unrest;' and (4) they 'prevented HPEC from access to the Board's processes for approval of the amendment to the ENA and the amendment to the pilot study permit.'" *November 2020 Order* at 18 (citations omitted). The Court found that "[t]hese are precisely the sorts of allegations that are protected by *Noerr-Pennington*." *Id*.; *Boone*, 841 F.2d at 894–95 (finding that allegations of "shadowy secret meetings," "covert agreements," and "'payments to' and 'the hiring of' key city officials" fell within *Noerr-Pennington* protection where "the developers did not allege that these activities were perpetrated for reasons other than legitimate petitioning of government").

The Union Defendants assert that these same allegations, and nothing more, are found in the SAC. *Union Mot*. 6:7–11. HPEC does not contest this point, and instead insists that exceptions to *Noerr-Pennington* apply. *Opp. Union* 6:10–14; *Tapia*, 2015 WL 4650066, at *2 (arguments to which no response is supplied are deemed conceded). Accordingly, the Court turns to the exceptions.

          ii.     *The sham exception*

The sham exception applies to conduct that, while "ostensibly directed toward influencing government action, is a mere sham to cover what is actually nothing more than an attempt to

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 20-3251 PSG (MMAx) | Date | March 24, 2021 |
|---|---|---|---|
| Title | Harbor Performance Enhancement Center, LLC v. City of Los Angeles Harbor Department et al | | |

interfere with the business relationships of a competitor." *See Noerr*, 365 U.S. at 144.  In *Omni*, the Supreme Court explained:

> The "sham" exception to *Noerr* encompasses situations in which persons use the governmental process—as opposed to the outcome of that process—as an anticompetitive weapon.  A classic example is the filing of frivolous objections to the license application of a competitor, with no expectation of achieving denial of the license but simply in order to impose expense and delay.  A "sham" situation involves a defendant whose activities are not genuinely aimed at procuring favorable government action at all, not one who genuinely seeks to achieve his governmental result, but does so through improper means.

499 U.S. at 380.

In the November 2020 Order, the Court found that HPEC failed to allege the sham exception applied because (1) the Union Defendants' conduct was not objectively baseless and (2) HPEC did not allege that the Union Defendants had prevented HPEC from meaningful access to an adjudicatory body.  *November 2020 Order* at 18–20.  The Union Defendants argue the SAC fails to cure these defects.  *Union Mot*, 9:3–12:12.  The Court agrees on both grounds.

First, the SAC fails to allege that HPEC was denied access to an *adjudicatory* agency.  "Although the *Noerr–Pennington* doctrine applies to activities directed at any branch of government, the scope of the sham exception depends on the type of governmental entity involved."  *Kottle v. Nw. Kidney Centers*, 146 F.3d 1056, 1060 (9th Cir. 1998).  "If it is the legislature, the sham exception is extraordinarily narrow."  *Id*. at 1061.  "But if it is the judicial branch, this circuit recognizes three categories of anticompetitive behavior that can amount to a sham and, therefore, outside the protection of the *Noerr–Pennington* doctrine."  *Id*.

Here, HPEC alleges that the Union Defendants prevented HPEC from accessing the Board, an administrative agency.  *SAC* ¶ 200.  Courts have held that "[a]ctions taken to discourage and ultimately prevent competitors from meaningful access to the processes of administrative agencies fall within the sham exception to *Noerr-Pennington* immunity," *Hosp. Bldg. Co. v. Trs. of Rex Hosp.*, 691 F.2d 678, 687 (4th Cir. 1982) (citing *Cal. Motor Transp. Co. v. Trucking Unltd.*, 404 U.S. 508, 512 13 (1972)), so long as those agencies are acting in adjudicative rather than legislative capacities, *Kottle*, 146 F.3d at 1061–62 ("If we thought that the Department was an essentially political entity, . . .  Kottle's suit would have absolutely no merit at all.").

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 20-3251 PSG (MMAx) | Date | March 24, 2021 |
|----------|------------------------|------|----------------|
| Title | Harbor Performance Enhancement Center, LLC v. City of Los Angeles Harbor Department et al | | |

To make this determination, "[t]he critical inquiry is whether the agency has discretion and independence, characteristic of a political process, or whether it must instead follow rules and other enforceable standards subject to review, as is the case with an adjudicatory process." *Comm. to Protect Our Agric. Water v. Occidental Oil & Gas Corp.*, 235 F. Supp. 3d 1132, 1156 (E.D. Cal. 2017). Ultimately, courts look at the totality of the circumstances to determine whether an agency "operates in a sufficiently non-political way to warrant application of the judicial sham exception." *Kottle*, 146 F.3d at 1062.

The Ninth Circuit's decision in *Kottle* is illustrative. There, the court held that an administrative department was acting in an adjudicatory capacity because the proceeding at issue "bears many indicia of a true adjudicatory proceeding." *Kottle*, 146 F.3d at 1062. Specifically, the court noted that the department "conducts public hearings, accepts written and oral arguments, permits representation by counsel, and allows affected persons to question witnesses," that it "must issue written findings after its hearings," that "its decision is appealable," and the "appeal is governed by APA procedures and statutory standards." *Id*.

In contrast, the SAC explains that the Board has broad, discretionary power to make decisions. For example, "the Board oversees the management and operation of the Port" and "has the power" to "regulate and control the construction, maintenance, operation and use of any railroad, wharf, warehouse or other facility." *SAC* ¶¶ 40, 42. Although the Port can "authorize its general manager to contract on behalf of the department," *id*. ¶ 43, there is no indication that the Board follows specific standards when deciding which parties should have the opportunity to contract with the Port. A lack of applicable standards demonstrates that the Board acts as a legislative, not adjudicative, body. *See Boone*, 841 F.2d at 896 (finding that an agency with "broad discretion to amend the plan and approve or disapprove of new projects" was "carrying out essentially legislative tasks in amending the plan").

Because the SAC alleges that the Board acted as a legislative agency, the sham exception to *Noerr-Pennington* is extremely narrow. *See Franchise Realty Interstate Corp. v. San Francisco Loc. Joint Exec. Bd. of Culinary Workers*, 542 F.2d 1076, 1079 (9th Cir. 1976) ("The relatively precise legal standards in light of which certain arguments may be characterized as 'frivolous' are simply absent from the rough and tumble of the political arena; almost any position, including the self-interested plea of one competitor that another should be denied a permit, may be urged before such a political body."); *see also Omni*, 499 U.S. at 381 (the sham exception applies to lobbying only when "the conspirators' participation in the governmental process was itself claimed to be a 'sham,' employed as a means of imposing cost and delay").

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 20-3251 PSG (MMAx) | Date | March 24, 2021 |
|---|---|---|---|
| Title | Harbor Performance Enhancement Center, LLC v. City of Los Angeles Harbor Department et al | | |

In this context, the SAC still fails to allege that the Union Defendants' conduct amounts to something other than successful lobbying. HPEC attempts to overcome this defect by arguing that the Union Defendants "were successful in forcing the Port to stop the entire HPEC Project from proceeding, in an effort to block the Teamsters from performing jobs at the Port and monopolize the drayage jobs." *SAC* ¶ 222. However, this is not a situation where the Union Defendants aimed to prevent HPEC and the BCOs from hiring the Teamsters regardless of whether ILWU workers were hired. The Union Defendants' purpose was clearly to secure ILWU jobs, *see, e.g.*, *SAC* ¶ 147, not solely "to interfere with the business relationships of a competitor," *see Franchise Realty*, 542 F.2d at 1081; *Omni*, 499 U.S. at 381 ("[T]he purpose of delaying a competitor's entry into the market does not render lobbying activity a 'sham,' unless . . . the delay is sought to be achieved only by the lobbying process itself, and not by the governmental action that the lobbying seeks.").

HPEC also contends "[t]his case is akin to *Basile v. Poway,* No. 07CV1793 DMS JMA, 2009 WL 107226770 (S.D. Cal. July 8, 2009)." *Opp. Union* 8:3–4. In *Basile*, the defendants caused the City planning department to add conditions on approval of the plaintiffs' residential construction that were not otherwise required, including granting the defendants "an informal veto-power" over the plans. *Id*. at *5. Although the court found that the defendants had engaged in petitioning activity, the court denied summary judgment because it concluded there were triable issues as to whether the defendants had prevented plaintiffs' access to the City planning department under the sham exception. *Id*. at *14.

However, *Basile* differs from instant case. First, although the *Basile* court did not directly address the legislative-adjudicatory agency issue, it is clear the planning department was acting in an adjudicatory capacity because it had standards to determine whether to approve residential permits. *Id*. at *5 (the "conditions are not required for similarly situated residents" and "the City does not normally impose such requirements for detached structures"). These standards made it possible for the *Basile* court to decide whether the efforts were "sham." Here, as explained above, the Board was acting under its broad discretionary authority as a political body, and thus the sham exception exempts a much smaller range of conduct.

Second, the *Basile* defendants' success did not come from lobbying the government. Instead, the complaints in *Basile* were made by the city's Deputy Mayor and Director of Development, whom the court stated "abused their positions and authority." *Id*. at *5, *14. HPEC insists this situation is similar because "[t]he Union Defendants controlled HPEC's access to the Board with the aid of the Board's Vice President David Arian who was a former ILWU International and Local 13 President." *Opp. City* 9:14–25. But unlike the city officials in *Basile*,

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 20-3251 PSG (MMAx) | Date | March 24, 2021 |
|---|---|---|---|
| Title | Harbor Performance Enhancement Center, LLC v. City of Los Angeles Harbor Department et al | | |

Arian is not a Union Defendant, and the SAC does not allege Sherman Act and NLRA claims against Arian.[2]  As such, HPEC essentially alleges a conspiracy between the Board and the Union through Arian.  As stated in the November 2020 Order, "[t]he Supreme Court has expressly rejected a conspiracy exception to the [*Noerr-Pennington*] doctrine."  *November 2020 Order* at 21 n. 5 (citing *Omni*, 499 U.S. at 383).

Finally, HPEC argues that although the Court previously ruled that "the allegations in the [FAC] showed that the Union Defendants were successful in their lobbying efforts . . ., the allegations also lead to the reasonable inference that the Union Defendants, through its former President Arian, the Port's Executive Director and its own threats of war, civil unrest and an illegal work stoppage, prevented HPEC from having a hearing before the Board."  *Opp. Union* 10:10–19.  According to HPEC, "the court must construe inferences in the light most favorable to HPEC" on a motion to dismiss.  *Id*.  But HPEC fails to cite a single case demonstrating that conduct that qualifies as lobbying can be construed as anything else for purposes of *Noerr-Pennington*.  Furthermore, "[a]lthough we may be more generous in reviewing complaints in other contexts, our responsibilities under the first amendment in a case like this one require us to demand that a plaintiff's allegations be made with specificity."  *See Boone*, 841 F.2d at 894.

As such, HPEC fails to allege that the Union Defendants' conduct falls within the sham exception.

    *iii.*    *Independently unlawful conduct*

"Courts treat illegal acts, such as fraud and bribery, as 'analogous to the sham petitioning activity.'"  *Evans Hotels*, 433 F. Supp. At 1152 (quoting *Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau*, 674 F.2d 1252, 1266 n. 23 (9th Cir. 1982)).  In its November 2020 Order, the Court found the FAC failed to allege that the Union Defendants' behavior fell within the independently unlawful conduct exception.  *November 2020 Order* at 20–22.  Specifically, the Court concluded that HPEC had failed to allege any conduct *independent* of the Union Defendants' protected petitioning activity.  *Id*. at 21.

The Court also explicitly rejected HPEC's argument that NLRA claims are treated differently than others in the *Noerr-Pennington* context.  *See id*. at 21–22 (the cases cited by

---

[2]  The Court dismissed the Sherman Act claim against the City Defendants because the City Defendants are immune under the *Parker* immunity doctrine.  *See November 2020 Order* at 13–16.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 20-3251 PSG (MMAx) | Date | March 24, 2021 |
|---|---|---|---|
| Title | Harbor Performance Enhancement Center, LLC v. City of Los Angeles Harbor Department et al | | |

HPEC "concern weighing two first amendment rights—an employer's right to petition by filing a law suit against employees' right to associate. . . . Here, the only first amendment rights at stake are the petitioning rights of the Union Defendants."); *see also Sosa*, 437 F.3d at 930 ("Labor laws must be interpreted, where possible, to avoid burdening the petitioning behavior.").

HPEC now argues that "the Court erred when it concluded that *Noerr-Pennington* immunity applied broadly to HPEC's unfair labor claims."[3] *Opp. Union* 11:6–7. HPEC alleges that the Union Defendants' conduct constituted a secondary boycott and a demand for an illegal prehire agreement, both of which are prohibited under § 8(b)(4) of the NLRA. According to HPEC, "[t]he First Amendment does not protect coercive conduct that violates [§ 8(b)(4)]." *Id.* 11:26–27.

To support its argument, HPEC cites language from various cases stating that the First Amendment does not protect unlawful picketing and related conduct. *Opp. Union* 11:26–13:13. However, none of the cited cases specifically implicate *Noerr-Pennington* and the First Amendment right to petition. For example, *NLRB v. Int'l Ass'n of Bridge, Structural, Ornamental & Reinforcing Ironworkers Union, Loc. 433*, 891 F.3d 1182, 1187 (9th Cir. 2018), held that §8(b)(4) "regulates conduct rather than content," but did not opine on how the NLRA interacts with petitioning rights. And *Int'l Bhd. of Elec. Workers, Loc. 501, A.F. of L. v. N.L.R.B.*, 341 U.S. 694, 705 (1951), held that the NLRA's prohibition on secondary boycotts "carries no unconstitutional abridgment of free speech," but, again, did not specifically address the right to petition.

HPEC also points to language in *White*, which states "[w]hile the Noerr-Pennington doctrine originally arose in the antitrust context, it is based on and implements the First Amendment right to petition and therefore, with one exception we discuss *infra* (see Section 1.B.3..b), applies equally in all contexts." 227 F.3d at 1231. HPEC is correct that the exception discussed in *White* applies in the NLRA context. *Id.* at 1234–37. But as explained in the November 2020 Order, the exception does not cover all NLRA violations, or even all § 8(b)(4) claims. Instead, NLRA cases are "treat[ed] differently from all others" because "[t]he First Amendment rights of employers in the context of the labor relations setting are limited to an extent that would rarely, if ever, be tolerated in other contexts." *Id.* at 1236 (citation omitted). Specifically, "[t]he employer's right of expression has to be balanced against the equal rights of

---

[3] HPEC fails to address the Union Defendants' argument that the exception does not apply to the antitrust claim, and therefore concedes the point. *See Tapia*, 2015 WL 4650066, at *2 (arguments to which no response is supplied are deemed conceded).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 20-3251 PSG (MMAx) | Date | March 24, 2021 |
|---|---|---|---|
| Title | Harbor Performance Enhancement Center, LLC v. City of Los Angeles Harbor Department et al | | |

the employees to associate freely, giving special consideration to the economic dependence of the employees on their employers." *Id*. at 1237 (citation omitted). Here, as explained in the November 2020 Order, "the only first amendment rights at stake are the petitioning rights of the Union Defendants." *November 2020 Order* at 22.

HPEC asks the Court to first determine whether the Union Defendants' actions are coercive and unlawful, and then determine whether *Noerr-Pennington* applies. *See Opp. City* 14:1–5. This is backwards. Courts apply *Noerr-Pennington* to "construe statutes so as to avoid burdens on activity arguably falling within the scope of the Petition Clause of the First Amendment." *See Sosa*, 437 F.3d at 942. Thus, first deciding whether the Union Defendants' actions violate the NLRA would put the cart before the horse and risk interpreting the statute so broadly that it interferes with the Union Defendants' petitioning rights. *See White*, 227 F.3d at 1231 ("The Noerr–Pennington doctrine ensures that those who petition the government for redress of grievances remain immune from liability for statutory violations, *notwithstanding the fact that their activity might otherwise be proscribed by the statute involved*." (emphasis added)); *see also Brown & Root, Inc. v. Louisiana State AFL-CIO*, 10 F.3d 316, 326–27 (5th Cir. 1994) (holding that threats were "not coercive" after applying *Noerr-Pennington* to narrowly interpret §8(b)(4)).

Further, contrary to HPEC's arguments, courts have dismissed NLRA claims under *Noerr-Pennington*. *See, e.g.*, *Evans Hotels*, 433 F.Supp.3d at 1150–52 (holding the union was immune to a secondary boycott claim where the union threatened city council and delayed a vote on a proposed lease amendment); *Brown & Root*, 10 F.3d at 327 (dismissing § 8(b)(4)(ii) claim under *Noerr-Pennington* and finding no "clear indication in [the NLRA's] legislative history that Congress intended to proscribe [] lobbying"); *see also BE & K Const. Co. v. N.L.R.B.*, 536 U.S. 516, 536 (2002) (holding that *Noerr-Pennington* may limit the NLRA's reach).

Accordingly, because HPEC still fails to allege any *independent* conduct apart from the Union's lobbying efforts, the Union Defendants' conduct does not fall within the independently unlawful conduct exception.

The SAC still fails to include specific allegations that the Union Defendants' conduct falls outside of *Noerr-Pennington* protection. As such, the Court **GRANTS** the Union Defendants' motion to dismiss the NLRA and Sherman Act claims against them. HPEC has now had three opportunities to amend its claims. Given these shortcomings, the Court believes that further attempts to amend would be futile. *See Sisseton-Wahpteon Sioux Tribe*, 90 F.3d at 355. As such, the Court **DENIES** leave to amend.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 20-3251 PSG (MMAx) | Date | March 24, 2021 |
|---|---|---|---|
| Title | Harbor Performance Enhancement Center, LLC v. City of Los Angeles Harbor Department et al | | |

B.    The City Defendants' Motion to Dismiss

Generally, subject matter jurisdiction is based on the presence of a federal question, *see* 28 U.S.C. § 1331, or on complete diversity of citizenship between the parties, *see* 28 U.S.C. §1332. The Court's original jurisdiction over the action was based on federal question jurisdiction over the antitrust and labor law claims. *See SAC* ¶ 20. The state law claims were before the Court based on supplemental jurisdiction.

With the dismissal of the NLRA and Sherman Act claims, the Court no longer has federal question jurisdiction over the case. The only claims pending before the Court are state law claims and a claim for declaratory relief against the City Defendants. The Declaratory Judgment Act, 28 U.S.C. § 2201, confers authority upon federal courts to award declaratory relief. It does not extend or modify the Court's jurisdiction, and therefore cannot serve as a basis for federal question jurisdiction. *See Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671–72 (1950); *see also Borden v. Katzman*, 881 F.2d 1035, 1037 (11th Cir. 1989) ("[T]he Declaratory Judgment Act . . . does not, of itself, confer jurisdiction upon the federal courts").

The Court also lacks diversity jurisdiction. For a federal court to exercise diversity jurisdiction, there must be "complete" diversity between the parties and the $75,000 amount in controversy requirement must be met. *See Strawbridge v. Curtis*, 7 U.S. 267, 267 (3 Cranch) (1806); 28 U.S.C. § 1332(a). Here, the parties are not diverse because the City Defendants and HPEC are citizens of California. *See SAC* ¶¶ 24–26.

For the Court to retain jurisdiction over the case, it must continue to exercise supplemental jurisdiction over the remaining claims. 28 U.S.C. § 1367(c). The Court **DECLINES** to do so. *See San Pedro Hotel Co. v. City of Los Angeles*, 159 F.3d 470, 478 (9th Cir. 1998) (holding that no explanation is required when a district court declines to exercise supplemental jurisdiction because it has dismissed all claims over which it has original jurisdiction under 28 U.S.C. § 1367(c)). Because the Court lacks jurisdiction, the Court **DISMISSES** the case without prejudice.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 20-3251 PSG (MMAx) | Date | March 24, 2021 |
|----------|------------------------|------|----------------|
| Title | Harbor Performance Enhancement Center, LLC v. City of Los Angeles Harbor Department et al | | |

IV.   <u>Conclusion</u>

For the foregoing reasons, the Court **GRANTS** the Union Defendants' motion to dismiss in its entirety with prejudice, **DECLINES** to exercise supplemental jurisdiction over the remaining claims, and **DISMISSES** those claims without prejudice.  This order closes the case.

**IT IS SO ORDERED.**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT
## Form 6. Representation Statement

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form06instructions.pdf*

**Appellant(s)** *(List each party filing the appeal, do not use "et al." or other abbreviations.)*

Name(s) of party/parties:

Harbor Performance Enhancement Center, LLC

Name(s) of counsel (if any):

Jeffrey B. Valle
Katherine Balatbat
VALLE MAKOFF LLP

Address: 11777 San Vicente Blvd., Ste. 890

Telephone number(s): 310-476-0300

Email(s): jvalle@vallemakoff.com; kbalatbat@vallemakoff.com

Is counsel registered for Electronic Filing in the 9th Circuit?   ⦿ Yes   ○ No

**Appellee(s)** *(List only the names of parties and counsel who will oppose you on appeal. List separately represented parties separately.)*

Name(s) of party/parties:

City of Los Angeles Harbor Department; City of Los Angeles

Name(s) of counsel (if any):

Crowell & Moring LLP; Jason C. Murray
Nossaman LLP; David Graeler
Office of the City Attorney; Janna Sidley

Address: 515 S. Flower Street, 40th Floor, Los Angeles, CA 90071

Telephone number(s): 213-443-5590

Email(s): jmurray@crowell.com; dgraeler@nossaman.com; jsidley@portla.org

*To list additional parties and/or counsel, use next page.*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

Continued list of parties and counsel: *(attach additional pages as necessary)*

**Appellants**

Name(s) of party/parties:

Name(s) of counsel (if any):

Address:

Telephone number(s):

Email(s):

Is counsel registered for Electronic Filing in the 9th Circuit?   ○ Yes   ○ No

**Appellees**

Name(s) of party/parties:

International Longshore and Warehouse Union; International Longshore and Warehouse Union Local 13

Name(s) of counsel (if any):

SR Holguin, PC; Steven R. Holguin
Kesselman Brantly Stockinger LLP; David W. Kesselman

Address: 800 West 6th Street, Suite 788, Los Angeles, CA 90016

Telephone number(s): 213-395-0956

Email(s): steven@srholguin.com; dkesselman@kbslaw.com

Name(s) of party/parties:

Name(s) of counsel (if any):

Address:

Telephone number(s):

Email(s):

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 6**                                        2                              *New 12/01/2018*

## <u>CERTIFICATE OF SERVICE</u>

Pursuant to Rule 5-3 of the Local Civil Rules of the United States District Court for the Central District of California, I hereby certify under penalty of perjury under the laws of the United States of America that on the below date, a true copy of the above document was filed through the Court's Case Management / Electronic Case Filing system and served by that system upon all counsel of record registered for the System and deemed to have consented to electronic service in the above-captioned case.


Dated:    April 21, 2021            **VALLE MAKOFF LLP**


                                    */s/ Katherine Balatbat*
                                    _____

                                    Katherine Balatbat

                                    Counsel for Plaintiff/Appellant Harbor
                                    Performance Enhancement Center, LLC